

FILED

1/5/2022

SH

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# DRAFT

**22CV83**

JUDGE DURKIN
MAGISTRATE JUDGE FINNEGAN

# ONLY

## ATTACHED TO MOTION FOR LEAVE
## TO FILE OVERSIZED BRIEF
### 1/5/22
### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA ARONG O'BRIEN, | ) | |
| | ) | |
| | ) | |
| *Petitioner* | ) | Case No. 22-CV-_____ |
| | ) | |
| | ) | (No. 17-CR-239) |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | HONORABLE THOMAS M. DURKIN, |
| | ) | |
| *Respondent* | ) | *Judge* |
| | ) | |

### PETITIONER'S 28 U.S.C. § 2255 MOTION TO VACATE A CONVICTION UNCONSTITUTIONALLY PROCURED THROUGH PROSECUTORIAL MISCONDUCT & INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner, Jessica Arong O'Brien ("Petitioner"), *pro se,* respectfully submits her motion under 28 U.S.C. § 2255 ("Petition") to overturn her conviction and dismiss this case with prejudice based on the lead prosecutor's calculated and pervasive prosecutorial misconducts and Petitioner's attorneys' failure to fully understand the nuances of the financial transactions in this case.

1

Specifically, the government's corrupt deeds alone, combined with the ineffective assistance of counsel Petitioner received at vital phases of her criminal proceedings, deprived Petitioner of her Due Process rights under the Fifth and the Fourteenth Amendments of the Constitution that guarantees all defendants a fair trial, Six Amendment right to effective assistance of counsel, right to be confronted by her accusers (Confrontational Clause), and right not to be prosecuted for laws that violate the *Ex Post Facto* Clause.[1] More so, in prosecuting this case, the government circumvented its burden of proof to establish subject-matter jurisdiction. But for all these constitutional errors, Petitioner would have been and should have been acquitted of all charges of bank and mail fraud brought against her, consistent with her innocence.

At the conclusion of this Petition, O'Brien respectfully requests that this Honorable Court vacate her conviction that was unconstitutionally procured and dismiss this case with prejudice to remedy a complete miscarriage of justice. At a minimum, Petitioner request a hearing on this Petition in accordance with 28 U.S.C. § 2255 (b). In support hereof, O'Brien states the following:

## I.     **INTRODUCTION**

For the purpose of comparison to better visualize this case and to demonstrate that cases involving prosecutorial misconduct are not a novelty, Petitioner briefly refers this Court to the press release that the attorneys for the late Senator Stevens issued before the release of the Schuelke Report. Petitioner is confident that more discrepancies would be uncovered should an extensive special investigation be ordered in this case.

> "Once in a generation, a case comes along which impacts more than the parties involved and their families. **This is that case.** To preserve justice in America, we must carefully analyze injustice wherever we find it. This [Petition] does that. If we don't learn from injustice, we are doomed to repeat it. We can't pretend it did not happen. Mere reverence for the Constitution does not assure that it actually protects individual liberties. This [Petition] is a powerful tool to prevent future violations of the rights of all citizens.

---

[1] U.S. Constitution, Article I, Section 9, Clause 3. The U.S. Supreme Court has referred repeatedly to its ruling in *Calder v. Bull*, 3 U.S. 386 (1798) when addressing unconstitutional enlargement of statutes or federally criminalizing certain actions.

every citizen is at risk of wrongful conviction unless honest, skilled professionals perform their respective roles in the criminal justice system with diligence, zeal and **respect for the rule of law**. Needless to say, if this can happen to a [sitting Circuit Court Judge in Cook County, Illinois], it can happen to any citizen anywhere in America."[2]

## II.  <u>OVERVIEW OF PETITIONER'S 28 U.S.C. § 2255 MOTION</u>

Pursuant to 28 U.S.C. § 2255 (a): "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack," Petitioner respectfully moves this Honorable Court to vacate or set aside her conviction. The constitutional errors which Petitioner presents herein amounted to "fundamental defect[s] which inherently resulted in a complete miscarriage of justice"[3] that warrant relief.

This Petition details how the government unconstitutionally and illegally obtained its conviction. Petitioner will support her arguments with the trial record and extrinsic records, including public information, documents obtained during discovery, evidentiary and trial transcripts, certified public records, the government's investigatory reports (redacted as necessary), information gathered from court filings and Petitioner's affidavit. The errors

---

[2] *See* Ex. 1 (emphasis added and adapted to Petitioner's facts and circumstances, *e.g.*, replacing "Report" to "Petition," etc.). Quoting and adapting Brendan V. Sullivan, Jr. and Robert M. Cary's Preliminary Statement dated March 15, 2012 which describes the prosecutorial misconduct that occurred in the late Senator Ted Stevens' case, whom they represented. Petitioner believes that Attorneys Sullivan and Cary's description of the prosecutors' misconduct in that case also happened in this case, albeit different facts and circumstances. That preliminary statement included, "Judge Emmett Sullivan was so stunned by the government's misconduct that he ordered an investigation by an independent attorney to run parallel to the Department of Justice's own investigation." Judge Sullivan's Order dismissing the case stated, "Notwithstanding the mounting evidence to the contrary, the Court accepted the prosecutors' representations and declined to dismiss the case … Had the Court known of the misconduct and the information concealed by the government … those decisions would have been different." Judge Sullivan's courage to admit to this in an Order and his wisdom to order a special investigation have inspired the enactment of the Due Process Protections Act P.L: No: 116-182 (116th Congress 10/21/2020).

Petitioner believes and hopes that after this Court reviews and verifies the list of government misconducts in this case, your Honor will also conclude just as Judge Emmett Sullivan and Senator Stevens' attorneys did that in this case, the "evidence of [the] government's corruption is shocking in its boldness and its breath" *Id.* at p.1 and therefore, Petitioner's conviction too must be vacated.

[3] *Davis v. United States*, 417 U.S. 333, 346 (1974).

enumerated herein escalated to the level of outrageous constitutional violations that inevitably resulted in a proceedings that were "inconsistent with the rudimentary demands of fair procedure."[4]

Furthermore, the mounting evidence of the government's misconduct, including: suppressing exculpatory evidence in violation of *Brady*, misstating the law and facts to the jury, presenting perjured testimony, etc., led to jurisdictional and constitutional blunders that foreseeably prejudiced Petitioner. Had the lead prosecutor abided by his prosecutorial responsibilities and complied with the law, the justice miscarried at the expense of Petitioner would have been averted and Petitioner would have been acquitted of all charges brought against her.

## III.   **PETITIONER'S TIMELY FILING & THE COURT'S JURISDICTION**

The United States Supreme Court denied Petitioner's Petition for *Writ* of *Certiorari* on January 11, 2021.[5] Pursuant to 28 U.S.C. § 2255 (f)(1), Petitioner has one year from the date on which her judgment of conviction became final. Petitioner is still under probation or supervised release until June of 2022 and therefore is still considered "in custody" for purposes of 28 U.S.C. § 2255.[6] *See Maleng v. Cook,* 490 U.S. 488, 491 (1989). This Petition is therefore timely.

---

[4] *United States v. Addonizio*, 442 U.S. 178, 185-86 (1979); *Reed v. Farley,* 512 U.S. 339, 354 (1994); *United States v. Essig*, 10 F.3d 968, 977 n. 25 (3d Cir. 1993).
[5] *See also*
https://www.supremecourt.gov/search.aspx?filename=/docket/DocketFiles/html/Public/20-767.html
[6] In *United States v. Hayman*, 342, U.S. 205, 211 (1952), the Supreme Court analyzed the 28 U.S.C. § 2255: "..In 1867, Congress changed the common-law rule by extending the *writ of habeas corpus* to 'all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States,' and providing for inquiry into the facts of detention. 14 Stat. 385. In commenting on the 1867 Act this Court has said in relevant parts: '. . . a prisoner in custody pursuant to the final judgment of a . . . court of criminal jurisdiction may have a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention, although it may become necessary to look behind and beyond the record of his conviction to a sufficient extent to test the jurisdiction of the . . . court to proceed to judgment against him. . . ." (citation omitted). Under the 1867 Act, United States District Courts have jurisdiction to determine whether a [petitioner] has been deprived of liberty in violation of constitutional rights …[and] a variety of allegations [that] have been held to permit challenge of convictions on facts *dehors* the record." *Id.* at 212. *See also Monahan v*

4

Congress also granted this Court the authority in 28 U.S.C. § 2255 (a) and (b) to provide relief upon Petitioner's claims that her conviction was imposed in violation of the Constitution or laws of the United States. This includes scheduling a hearing on her Petition and vacating her conviction on the grounds that: "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the [Petitioner] as to render the judgment vulnerable to collateral attack…"

## IV.    PETITIONER'S SUMMARY OF BASES FOR RELIEF

To summarize, Petitioner's § 2255 primary bases for relief are the following:

i.      Petitioner's conviction was predicated on the prosecutor's presentation of perjured testimony of the government's key witness (*e.g.,* testimony on the subject of corporate structure of CitiMortgage, Inc. and Citibank, N.A., funding, losses, HELOC offerings, etc.), which violated Petitioner's due process right to a fair trial. The perjured testimony of this government's key witness, Judy Taylor, related to material issues in this case that predictably affected the outcome of this case. Specifically, the perjured testimony related to subject-matter jurisdiction, and the elements of the bank and mail fraud statutes.

ii.     Petitioner's conviction was predicated on the prosecutor's suppression of exculpatory evidence (*e.g.,* funding, Quit Claim Deeds from Maria Bartko (co-defendant – "Bartko") to Christopher Kwan ("Kwan" – the borrower and one of the buyers in the 2007 real estate transactions, etc.) that also related to the elements of bank and mail fraud statutes (*e.g.,* financial institution, intent, and scheme to defraud) and subject-matter jurisdiction.

iii.    Petitioner's conviction was predicated upon the prosecutor's misstatement of law, distortion of facts, presentation of arguments that were not supported by the record (some inconsistent with the government's investigation) and using charged and prejudicial language (calling Petitioner a "robber" and comparing the mortgage transactions set forth in its indictment to the commission of robberies, crimes that generally are associated with violence and a "robber" being armed and dangerous), and submitting a deceptive exhibit to the jury. (*See* Doc. # 364-5; labeled as Government Exhibit 46th St Sale 2, attached herein as Ex. ___) This trial exhibit was a critical evidence that Petitioner had nothing to

---

*Holohan*, 294 U.S. 103, 115 (1935), where the Supreme Court opined that judgments predicated upon perjured testimony or because material evidence was concealed or suppressed, "extrinsic to the record" or "in cases of extrinsic fraud that the relief sought could be had." *Ibid.*

violence and a "robber" being armed and dangerous), and submitting a deceptive exhibit to the jury. (*See* Doc. # 364-5; labeled as Government Exhibit 46th St Sale 2, attached herein as Ex. __) This trial exhibit was a critical evidence that Petitioner had nothing to do with Kwan's HELOC transaction and never seen it. Here, the government deceptively also attached the first page of the HUD-1 (with Kwan's first and second loans included) that Petitioner signed with CitiMortgage, Inc as the lender) to appear as if they were the same transaction. This document listed as Attachment # 5 is also what the Seventh Circuit Court of Appeals accessed. This misconduct relates to subject-matter jurisdiction, elements of bank and mail fraud statutes –financial institution and intent. This particular misconduct was tantamount to forgery and jury tampering.

iv.  Petitioner's attorneys, trial and appellate, provided constitutionally defective representation[7] that violated her Sixth Amendment rights.

Petitioner will endeavor to provide this Court with a detailed analysis of these four § 2255

primary grounds as to the materiality of these errors, how they affected the outcome of this

prosecution,  how these errors violated Petitioner's constitutional rights,[8] and how and why these

errors, taken individually and cumulatively, resulted in a complete miscarriage of justice.

---

[7] Specifically, Petitioner's attorney failed to: (a) fully or effectively investigate Citigroup, Inc.'s corporate structure, its asset securitization activities and process, (b) defend against the lead prosecutor's lies, distortion of facts and law and making arguments unsupported by the record, (c) review the exhibit binders that were sent back to the jury, (d) make timely objections to improper examination of witnesses ("Citi" to mean Citibank, N.A. that was egregiously prejudicial to Petitioner), (e) make an offer of proof for the Citigroup, Inc.'s certified SEC 10-K report after this Court sustained the government's objection to its admission, (f) present an effective opening and closing arguments to emphasize material and exculpatory documents in evidence (e.g., the Acknowledgments and their significance having been notarized by a closer who was also an attorney, underwriting documents that explained income, etc.), (g) present an effective case of Petitioner having taken the mortgages in good faith and explain to the jury the significance of certain documents, the government's failure to present any witness with personal knowledge and therefore, unreliable testimony and the actual process of a real estate closing, (h) effectively examine witnesses regarding sellers' attorneys limited role in preparing the HUD-1 statements, and (i) explain to the jury that Petitioner had no input whatsoever of Kwan's HELOC by comparing the closing statement entrees she submitted had zero effect on that HUD-1. Petitioner's appellate attorney failed to fully understand the facts on the record as demonstrated by his ineffective performance during oral arguments. The substance of the brief filed likewise was lacking in substantive arguments that could have and should have been raised, rather than just referring the Seventh Circuit of Appeal judges to Petitioner's post-trial filing in this Court.
[8] The Fifth Amendment of the United States Constitution guarantees all criminal defendants to have a fair trial, which the U.S. Supreme Court partially incorporated this Due Process Clause into the Fourteenth Amendment worth repeating: "All persons born or naturalized in the United

## V.    PETITIONER'S CONVICTION

Petitioner was convicted of mail fraud under 18 U.S.C. § 1341 (Count I) and bank fraud under 18 U.S.C. § 1344 (2) (Count II). The government's April 11, 2017 indictment[9] ("Indictment") recites a scheme to defraud "lenders" from 2004 through 2007. 18 U.S.C. §§ 1344 and 1341 require a "financial institution" to be knowingly defrauded and affected, respectively. The definition of "financial institution" for this purpose is set forth in 18 U.S.C. § 20.  During the years at issue from 2004 to 2007, 18 U.S.C. § 20 defined "financial institution" as an FDIC-insured entity.[10] The definition was not changed to include non-FDIC insured entities until May 20, 2009,[11] over two years after the transactions itemized in the government's Indictment occurred.

Pursuant to 18 U.S.C. § 3282, the statute of limitations for mail fraud prosecutions is five years, except for mail fraud schemes that affect a financial

---

States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, *without due process of law*; nor deny to any person within its jurisdiction *the equal protection of the laws*." (Emphasis added).

[9] *See* attached and marked as Ex. ___.  The Government's indictment dated April 11, 2017.
[10] Section 3(c)(2) of the Federal Deposit Insurance Act.
[11] Congress passed the "Fraud Enforcement and Recovery Act of 2009" or "FERA" to include non-FDIC insured lenders (e.g., mortgage corporations) and also extended the statute of limitation for bank fraud from five years to ten years. P.L. 111-21, 111th Congress (May 20, 2009).

institution, in which case the statute is ten years.  18 U.S.C. § 3293.  Below is the text for each of these statutes.

### 18 U.S.C. §3282. Offenses not capital

In General.—Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

### 18 U.S.C. § 3293. Financial institution offenses

No person shall be prosecuted, tried, or punished for a violation of, or a conspiracy to violate—
(1) section 215, 656, 657, 1005, 1006, 1007, 1014, 1033, or 1344;
(2) section 1341 or 1343, if the offense affects a financial institution; ... unless the indictment is returned or the information is filed within 10 years after the commission of the offense.

## VI.    RELEVANTS FACTS

Based on Petitioner's review of the (1) trial record; (2) discovery received from the government and Citibank/CitiMortgage representative; (3) October 11, 2017 evidentiary hearing, pre-trial, trial and post-trial transcripts, (4) public records, case law, business and financial articles, etc., the following is a list of factual assertions relevant to the Analysis and Arguments Sections of this Petition:

1.  Paragraph 23 of Count I of the Indictment recites the executing transaction of the government's alleged scheme to defraud is the sale of the 46th Street property that occurred on April 16, 2007.

2.  Applying this expanded FERA definition of "financial institution" to include mortgage corporations in this case would violate the *Ex Post Facto Clause* of the Constitution.

3.  The extended ten-year statute of limitation for bank and mail fraud, however, is applicable in this case only if the government can prove beyond a reasonable doubt the "financial institution" element of bank and mail fraud.  This means that the old definition of "financial institution" or the definition in effect in 2007, for purposes of bank and mail fraud, is applicable.  This also means that when applying and interpreting 18 U.S.C. §§ 1344 and 1341, "financial institution" only becomes a 'financial institution' if it is insured by the FDIC.

8

6. The government argued that it did not have to prove that Petitioner's alleged scheme to defraud created a risk of financial loss to a bank or a financial institution insured by the FDIC (specifically, the depositor of the account at issue) because the jury convicted Petitioner under 18 U.S.C. § 1344(2).

7. The government argued that in *Loughrin v. United States,* 710 F.18 U.S.C. § 1344 (2) does not require the government to prove that a defendant intended to defraud a financial institution.

8. In the *Loughrin* case, petitioner Kevin Loughrin was charged with bank fraud after he was caught forging stolen checks, using them to buy goods at a Target store, and then returning the goods for cash. The district court declined to give Loughrin's proposed jury instruction that a conviction under §1344(2) required proof of "intent to defraud a financial institution." The jury's conviction of Loughrin was affirmed by the tenth circuit and the United States Supreme Court. However, in *Loughrin*, there was no statute of limitation issue and in its Opinion, the Supreme Court noted that the checks that Loughrin was stealing in people's mail boxes had the name of the banks on the checks and therefore, in that fact scenario, the government was not required to prove that Loughrin was scheming to defraud a bank. Also worth noting is Justice Kagan's response to the dissent that this issue needs to be reviewed on a case by case basis.

9. Notwithstanding, the fact that Petitioner was convicted on 18 U.S.C. § 1344 (2) made Taylor's perjured testimony, the government's suppression of the funding of Kwan's loans and the government's manipulation of an exhibit that was submitted to the jury, all the more material to the issues in this case.

10. None of the mortgages in the government's Indictment were succeeded by any FDIC-insured institutions, which was known by the government as they had documents before they indicted Petitioner.

11. Specifically, Petitioner's purchase loan originated by Argent Mortgage, Inc. was purchased by CitiFinancial Mortgage, a non-FDIC insured mortgage company. Petitioner's refinance loans' servicing rights (accepting payments from Petitioner) [12] were succeeded by Chase Home Finance, LLC, another non-FDIC mortgage corporation. The government knew this as well before Petitioner was indicted.

---

[12] Bret Hellstrom, a government witness from Chase Bank testified that Chase Home, LLC, a non-FDIC mortgage corporation, only succeeded the rights to service (collect payments and taxes) Petitioner's loans, also known as MSRs. These loans were originated and funded by New Century Corporation. R. Doc. # 257, Tr. Vol. 3-A, pp. 331, 348-49. The 2004 purchase loan was succeeded by CitiFinancial Mortgage, another non-FDIC entity. As discussed later, Taylor gave perjured testimony that Citibank, N.A. succeeded this loan at AUSA Madden's promptings by improperly and prejudicially defining "Citi" to mean Citibank, N.A., when in reality, Citigroup, Inc. rebranded itself and called itself "Citi" as its global brand. *See* Ex. __.

Finance, LLC, another non-FDIC mortgage corporation. The government knew this as well before Petitioner was indicted.

12. On May 16, 2017, Petitioner's trial attorney requested any favorable and exculpatory evidence from the government. Ex.__ (Doc. # __). And then again on _____, Petitioner's attorney submitted a second request. Ex. __ (Doc. # __).

13. Both CitiMortgage, Inc. and Citibank, N.A. were actively assisting the government in prosecuting this case, meeting and corresponding with the government throughout the process. *See* Grp. Ex. __.

14. Petitioner's attorneys issued subpoenas multiple times and filed motions to compel multiple times. Yet, on January __, 2018, just days before the trial in this case, Citibank/CitiMortgage representative, Kate Lessaris, informed this Court that AUSA Madden requested for her to retried funding documents for __ and that mysteriously, they were able to find them. Tr. [quote]

15. Prior to finally producing these funding documents, Lessaris filed a motion for protective order, essentially requesting this Court to quash Petitioner's subpoenas. Ex. __ (Doc. __).

16. Congress is the only branch of our government that can give the federal government authority over the actions and transactions of its citizens. From 2004-2007, Congress did not grant jurisdiction to the federal government over financial transactions involving non-FDIC insured entities (*e.g.,* mortgage corporations) for purposes of bank and mail fraud. Ergo, indictments that allege schemes to defraud non-FDIC lenders violate the Constitution and the laws of the United States and are prosecuted without subject-matter jurisdiction.

## VII.   ANALYSIS & ARGUMENTS

*A. **The government in this case systematically engaged in prosecutorial misconduct by misstating the law during closing & rebuttal arguments, suppressing exculpatory evidence, misrepresenting and distorting the facts by making arguments devoid of any support from the trial record and in other times, inconsistent with its investigation, individually and altogether violating Petitioner's constitutional due process right to a fair trial, among others, and inevitably resulted in a complete miscarriage of justice.***

### (a) Misstating the Law, Making Improper & Prejudicial Comments During Closing Arguments:

*1. Government's Misstatement of the Law to the Jury:*

---

succeeded this loan at AUSA Madden's promptings by improperly and prejudicially defining "Citi" to mean Citibank, N.A., when in reality, Citigroup, Inc. rebranded itself and called itself "Citi" as its global brand. *See* Ex. __.

and mail frauds with the jury, AUSA Matthew Francis Madden, improperly and unconstitutionally argued: "In considering whether the government has proven that scheme to defraud, the government must prove that one or more of the false or fraudulent pretenses, representations, or promises charged in the portion of the indictment describing the scheme be proved beyond a reasonable doubt. And I underlined the last line here: The government, however, is not required to prove all of them. This is a case where we have charged—and you've heard about numerous lies, numerous—numerous lies and numerous times when the defendant concealed material information from lenders. We only need to prove one of those as part of the scheme." (Tr. Vol. 7-A, page 1201, lines 12-19). For the remainder of his closing argument, AUSA Madden goes over every transaction and never clarifies that the government needed to prove beyond a reasonable doubt the "straw buyer" sale transaction. (Tr. p. 1201-1246). This is not only against this Court's instructions, the prosecutor essentially instructed the jury that they can convict Petitioner on the non-FDIC insured or non-"financial institution" transactions which were not only outside of its federal jurisdiction, but also outside of the statute of limitations, which holds true for the majority of the government's scheme to defraud (*e.g.*, 2004, 2005, 2006, 2007 transactions). Although Petitioner's trial attorney failed to object, this is a material issue in this case and was addressed in Petitioner's various motions to dismiss on the subject of duplicity, statute of limitation, pre-indictment delay, failure to state a federal crime, etc. This Court ruled in favor of the government on all those motions, but instructed the government that it needed to specifically prove, beyond a reasonable doubt, the "straw buyer" transaction or the case does not go to the jury. Tr. __, Vol. __, lines __. AUSA Madden undoubtedly knew the importance and significance of following this Court's unambiguous instruction, yet he willfully defied it violating Petitioner's constitutional due process right to a

fair trial and the *Ex Post Facto* Clause of the Constitution. Most importantly, this error circumvented the government's duty to establish subject-matter jurisdiction.

At this crucial point, Petitioner's ineffective trial lawyer failed to object. After he failed in his pre-trial motions on duplicity and statute of limitation matters, this issue remained critical and sensitive. However, since Petitioner's review of all the documents, transcripts, and emails in order to prepare this Petition, she finally comprehended the prejudicial effects of this prosecutor's maneuverings that were so methodical, yet the resistance employed against them by her attorneys seem to have diminished as trial date approached. *See also Section on Ineffective Assistance of Counsel.*

As an experienced prosecutor who led many mortgage fraud cases, AUSA Madden's errors in this case were not accidental. This Court's dictum right before trial in this case began that the government had to prove the "straw buyer" transaction could not have been clearer. Therefore, the jury's verdict could not be based on the 2004, 2005, 2006 and 2007 sale transaction of 823 W. 54th St. As if that was not bad enough, in his rebuttal argument—which was the last thing the jury heard before deliberating—experienced prosecutor Madden argued again with the following:

> "If you're a bank robber and you go and rob a bank tomorrow and then you think better – and you get $5,000 – the next week, you return the money to the bank – you feel bad about it; you return the $5,000 – you are still a bank robber. Fraud is no different. It's what you do on the front end. If you meet the elements, if you tell those material lies and engage in a scheme to get money, the fact that you repaid the money or that you intended to repay the money, that is not a defense to criminal fraud charges. Mr. Meza also talked about – he was waving the indictment around and suggesting there was some reason that I didn't show it to you. And then he cherry-picked a couple of sentences in the indictment to say, "The government didn't prove these." And the argument at least seemed to imply that the government needs to prove every single sentence of this indictment. But `that's not the law. I'm going to show you what the law is because that's going to come from Judge Durkin. And the law is what you get in these jury instructions. These are the elements instructions. I'm not going to read the whole thing, but I

you. And then he cherry-picked a couple of sentences in the indictment to say, "The government didn't prove these." And the argument at least seemed to imply that the government needs to prove every single sentence of this indictment. But `that's not the law. I'm going to show you what the law is because that's going to come from Judge Durkin. And the law is what you get in these jury instructions. These are the elements instructions. I'm not going to read the whole thing, but I just want to read the first paragraph ... And there are a couple of things towards the end here that we did not offer proof on. That is accurate. But that does not mean that we did not prove these elements beyond a reasonable doubt. We absolutely proved them. You may recall what I said in the -- when I did the closing a little bit earlier today. We do not need to prove every false representation that's charged in the indictment. And I'm going to show you that because I think that's the important one to focus on. ...(he goes on to discuss each of the transactions where he further misrepresented the facts or made arguments with no evidence in the trial record, which will be addressed below and tabulated in Exhibit __) ... But make no mistake about it. These were lies, and these were done with intent to defraud." (quoted lines from Tr. Vol. 7-B, pp. 1296, lines 19-25, pp. 1297, p. 1301, lines 21-22; *See* pp. 1296 -1301; *see also* Ex. __).

The repetitive and "sandwiched" closing argument , especially for a seasoned prosecutor demonstrates the calculated and intentional manner in which this error was purveyed to the jury. This induced jury confusion manifested in ways none of us can fully comprehend. However, the jury's question put to the Court during deliberation proves it.

Petitioner believes that this Court gave the government the benefit of the doubt in its rulings with respect to the law on duplicity, definition of "financial institution" pursuant to 18 U.S.C. § 20 in effect from 2004 to 2007, the law on statute of limitations (especially given the United States Supreme Court Opinion in *Kokesh* [citation]), the law on continuing offenses and the United States Supreme Court's Opinion in *Toussie v. United States* (citation), which expressly held that the crimes of bank and mail fraud are not continuing, and *stare decisis* in a this district's in *United States v. Anderson*, and the *Ex Post Facto* Clause of the United States Constitution. In return, the lead prosecutor engaged in a series of misconducts, including lying and deceiving this Court on material issues of this case. This prosecutor made a mockery of our criminal justice system with impunity even though he absolutely knew better. "It is well settled that courts will not rely on "prosecutorial discretion" to ensure that a statute does not ensnare those beyond its proper confines."[14] Prosecutors necessarily enjoy much discretion and

---

[14] *See Baggett v. Bullitt*, 377 U.S. 360, 373-374, 12 L. Ed. 2d 377, 84 S. Ct. 1316 (1964).

generally, ethical prosecutors wisely do so. "But the liberty of our citizens cannot rest at the whim of an individual who could have a grudge or, perhaps, just exercise bad judgment."[15]

As explained below, Madden used his influence in such a way that he groomed the jury into disregarding the law, and he preempted and anchored his authority on the jury. By inviting the jury to convict Petitioner based on any of the transactions, he maliciously defied this Court's explicit mandate. Petitioner's trial team (albeit ineffective with critical issues and during vital moments) abided by this Court's express instructions, presenting its defense based on facts (which were blatantly distorted as it will be discussed later) and the law, but were unsuspecting that the lead prosecutor was going to essentially encounter the same Court's instructions with an obscene gesture. This systematic misconduct only grew in egregiousness. If a case like this transpired under the watchful eye of the public, what happens in other unpublicized cases litigated by this prosecutor?

*2. Improper & Prejudicial Statements Made by Lead Prosecutor:*

The prosecutor's comparison of Petitioner applying for a loan to robbing a bank and labeling Petitioner as a robber are improper insinuations and assertions calculated to mislead the jury. They were also aimed to distort the truth and misstate evidence in the trial record. This is the lead prosecutor's calculated attempt to link Petitioner to an FDIC-insured entity and improperly create a vision for the jury that Petitioner walked into a bank, applied for loans with the intention of robbing different banks for each of the transactions in its scheme to defraud. It is impossible to ascertain the evil influence charged statements like these had on the jury when a robbery is most often associated with violence and people who are armed and dangerous.

*Applicable Case Law:* [Add]

---

[15] *See also United States v. Wells,* 519 U.S. 482 (year), n. 15.

14

The Supreme Court has repeatedly recognized the special role prosecutors play in the pursuit of justice.[16] Professional conduct rules recognize the exceptional status of prosecutors in the criminal justice system.[17] In fact, prosecutors are held to a higher standard than that which is imposed on other attorneys because of their unique function in representing the interests of the federal government and exercising its sovereign power. "As a nation, we do not expect prosecutors to be typical advocates. We expect them to hold truth, justice, and mercy more sacred than winning."[18] One of the standards of the National District Attorneys Association state, "The prosecutor is an independent administrator of justice. The primary responsibility of a prosecutor is to seek justice, which can only be achieved by the representation and presentation of truth."[19] This prosecutor abandoned the honorable, truth-seeking obligation of every prosecutor during these proceedings and based on this conduct alone, he unconstitutionally sought injustice with tyranny. When a prosecutor aboard the train of recklessness decides to run over a defendant's constitutional right to a fair trial, no court can determine with any certainty as to the validity of the jury's verdict. This prosecutor's misstatement of law relates to a subject-matter jurisdiction embedded in the crimes that he chased to charge Petitioner unambiguously contained in 18 U.S.C. § 20 and therefore was material in this case. This error alone screams for reversal of Petitioner's illegally begotten conviction. However, this grave misconduct only represents part of what the prosecutor did to raise havoc in this case.

---

[16] *See Banke v. Dretke*, 540 U.S. 668, 696 (2004) ("We have several times underscored the 'special role played by the American prosecutor in the search for truth in criminal trials.'" (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

[17] *See* American Bar Association Model Rules of Professional Conduct, rule 3.8 (2015).

[18] ABA Standards for Criminal Justice: Prosecutorial Investigations 1, American Bar Association (3d ed. 2014).

[19] National Prosecution Standards § 1-1.1 (National Dist. Attorneys Association (2009).

*Proof of Prejudicial Effect of Prosecutor's Misstatement of Law:* While deliberating, the jury sent a note to your Honor that read: "Can we rephrase final jury instructions on page 22, No. 2?" (Tr. Vol. 8, p. 1319, lines 13-16). The Court had to call the parties into the courthouse. After some time, the parties finally made it to this Court, but before an answer to the note was given to the jury, the Court received another note between 30 to 45-minutes (Tr. Vol. 8, p. 1326, lines 16-22) indicating, "We have reached a verdict." (*See also* Tr. Vol. 8, p. 1319, lines 17-18). Before the announcement of the guilty verdict, the Court gave a note to members of the jury in response to their question, stating, "Members of the jury: In response to your question 'Can you rephrase final jury instructions on page 22, No. 2,' the answer is no," and was signed by the judge. (Tr. p. 1330, lines 1-10). Exactly five minutes later, but at least over an hour since the question was originally posed to the Court, members of the jury submitted another note to the Court indicating, "Our verdict remains the same." (Tr. p. 1330, lines 16-20). The question of intent was also the dominant query during oral arguments before the Seventh Circuit Court of Appeals too demonstrates the importance of this issue and in turn, that Court's Opinion recited and falsely relied on this government's misstatement of facts. *See Ex. __.*

*Standard to Apply & Law Analysis:* Petitioner's trial attorney failed to object to the prosecutor's misstatement of law; however, the Federal Rule of Criminal Procedure 52 (b) authorizes this Court to correct "particularly egregious errors," *United States v. Frady*, 456 U.S. 152, 163 (1982), those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." *States v. Atkinson*, 297 U.S. 157, 160 (1936). Plain-error exception to the contemporaneous -objection rule is applicable in those circumstances in which a miscarriage of justice would otherwise result. *United States v. Frady*, 456 U.S. 152, 163, n. 14. Based on the

above, the plain error standard must be applied on the above two errors and the remainder of the errors discussed below.

3. *Distorting Facts in Evidence:*

In the lead prosecutor's rebuttal closing argument referring to Petitioner's trial attorney's closing argument, AUSA Madden said, "But what he's doing is just adding a fact that is not consistent with the reality here. Right? You could say, for example, if Chicago were right on the equator, we'd have a hot and tropical climate. Right? But here's the fact –here is the fact that's being added there: Chicago is not on the equator. It's just irrelevant. You can't add a fact to something and then say it's our reality. We deal with reality here. The reality is that there was no co-borrower listed here. You can't just pretend that there was a second co-borrower listed there and then add that income."[20]

This argument is another instance where AUSA Madden distorted the facts in this case and making this argument when in fact, there is uncontroverted written evidence in the loan documents that the lender's underwriter did in fact take Petitioner's "other sources of funds," Ex. ___ and in fact accepted as part of its underwriting approval a letter indicating, " household income." Ex. __.

Based on the express underwriting condition requesting this letter of other sources of income, Argent Mortgage Company (the 2004 lender) was following its own lending relaxed lending guidelines, which allowed the underwriter to accept Petitioner's household income. Fourteen years later, the government cannot impose its own underwriting standards on Argent in a blatant attempt to deceive the jury into thinking that Petitioner lied to the lender when its own documentary evidence explains fully the income indicated in the loan application. As a seasoned prosecutor who has prosecuted multiple mortgage cases, he knows fully that a loan application is

---

[20] Tr. Vol. 7-B, p. 1292, lines 6-16. (Feb. 14, 2018)

a process and does not just complete at the application of the loan application. *See also discussion of each of this transactions in Section ___.*

Notably, AUSA Madden's description of Petitioner's trial attorney's closing argument is exactly how he presented his case. Well aware of the grave potential that any jury inevitably places on his position of power and that it could affect the reasonable probability of his arguments, statements or representations could be used as improper evidence, he nonetheless suborned Taylor's perjured testimony and intentionally defined "Citi" as "Citibank."

**(b) A Series of Subornation of Perjured Testimony Pertaining to Key Issues in this Case with the government's key witness at trial.**

**1.** *Subornation of Perjury # 1:*

The government knowingly presented false testimony to the jury by suborning perjured testimony from Citibank's Judy Taylor, its key witness to unconstitutionally link Petitioner to the only FDIC institution at issue in its Indictment, Citibank, N.A. First, the government suborned perjury of Taylor to lie about Citibank, N.A. being a successor lender of Petitioner's 2004 purchase loan that was originally funded by Argent Mortgage Corporation, a non-FDIC entity. Instead, CitiFinancial Mortgage, another non-FDIC entity, succeeded the Argent loan.[21] The government suborned Taylor's perjured testimony to falsely establish that Petitioner had a prior relationship with Citibank, N.A. Suborning this perjured testimony was methodical and aimed at confusing the jury and this Court with the following relevant trial questioning ("Q"-By Lead Prosecutor Matthew Francis Madden and "A"-By Taylor):

> "Q. [AUSA Madden] And I'd like to specifically direct your attention to certain exhibits I'm just going to ask you if they're true and accurate copies of Citi records. And when I refer to "Citi," I'm referring to Citibank."
> A. Of course." (R. # Doc 258, Tr. Vol. 4-A (Feb. 8, 2018), p. 611, lines 20-24).
> "Q. And are they all true and accurate copies of Citi records?
> A. Yes, sir.

---

[21] *See* Gov. Ex. 46th Street Refinance 1 at Chase _005-000006, line 2.

Q. And with respect to a number of these records, some of these are legal documents, like a HUD-1 or a loan application or other contracts, like a mortgage or a note. But with respect to some of other records are not just those legal documents are Citi records, were those Citi records were made in the ordinary course of Citi's business?
A. Yes, sir." (R. Doc # 258, Tr. Vol. 4-A (Feb. 8, 2018), p. 613, lines 6-22).
"Q. So you testified earlier that Citi was the successor lender on this loan.
A. Yes, sir.
Q. Meaning they purchased the loan from another bank.
A. Correct." (R. Doc # 258, Tr. Vol. 4-A (Feb. 8, 2018), p. 625, lines 13-17).

The government knew Taylor's testimony was perjured given that its very own exhibit entitled, 46th ST REFI 1 (HUD-1/RESPA) indicates CitiFinancial Mortgage was paid off on October 17, 2005 when Petitioner refinanced her Argent loan.[22] *See Ex. __.* CitiFinancial Mortgage Corporation, a non-FDIC entity, is a primary subsidiary corporation of Citigroup, Inc., another non-FDIC entity.[23] The prosecutor's barefaced intention to deceive the jury and this Court is evident here since he knew that 1) Argent Mortgage Company was not a bank and 2) CitiFinancial Mortgage succeeded this loan and not Citibank, N.A. AUSA Madden knew this because his own documentary evidence, which was the HUD-1 for the refinance, explicitly indicates that CitiFinancial Mortgage was the lender to be paid off. Instead, he endeavored to deceive the jury into believing that Petitioner had prior dealings with Citibank, N.A. when she had not.

***Reliance on Falsehood***: The Seventh Circuit Court of Appeals explicitly relied on the falsehood that Citibank, NA, rather than CitiFinancial Mortgage, was the successor lender to the 2004 Argent purchase loan in its March 13, 2020 Opinion ("Opinion") when it stated, "She had prior experience working with Citibank in particular."[24] *See also Oral Arguments Trial Transcript, Ex. __.* The subornation of perjury by the government at trial regarding this issue has wrongly attributed false prior dealings between Petitioner and Citibank, N.A. where the record shows that Petitioner had

---

[22] *See* Government's 46th Street Refinance 1 at Chase_005-000006, line 2.

[23] *See attached and marked as* Ex. 3, certified copy of the relevant page of Ex. 21.01 of Citigroup, Inc's Principal Subsidiaries as of December 31, 2007 listing CitiFinancial Mortgage Corporation.

[24] *See* page 15 of the Opinion.

neither the knowledge of nor any prior relationship with Citibank, N.A. for any of her mortgages. The government has had multiple opportunities to correct this falsehood, but instead, remained muted. Perhaps because that was intentional, given that the government's brief stated, "In addition, representatives of the financial institutions who issued loans to defendant –*e.g.*, Citibank, who purchased the $204,000 loan from Argent Mortgage Company and who also funded Kwan's mortgages…"[25] Also, as discussed below, the lead prosecutor knew the corporate structure of Citigroup, Inc., Citibank, N.A. and CitiMortgage, Inc. in 2007 and the subsequent changes of the corporate structure.[26] In fact, as mentioned above, Citigroup, Inc. announced that it rebranded itself as "Citi" prior to the sale transaction in this case. *See attached* Ex. __. Thus, various government's mortgage documents at trial that indicated "Citi" were in reality referring to Citigroup, Inc., a non-FDIC entity. The prosecutor's intentional and deceptive reference to this brand name in the beginning of Taylor's testimony clearly indicates that he suborned Taylor's perjured testimony and further reveals his pattern of defrauding this Court and the jury. By defining "Citi" to mean "Citibank, N.A.," lead prosecutor Madden blatantly lied to the jury and violated Petitioner's constitutional right to a fair trial. This is not a minor issue in this case as evident in the Seventh Circuit Court's Opinion and this Court's prior rulings.

## 2. *Subornation of Perjury # 2:*

The government further violated Petitioner's constitutional rights to a fair trial with Taylor's perjured testimony that CitiMortgage, Inc. was a wholly-owned subsidiary of Citibank, N.A. for the purpose of satisfying *Serpico*.[27] [ ] The government knew or should have known that this contradicted Taylor's testimony in *United States v. Vani*,[28] 13 CR 0167:

---

[25] Government's Brief, p.8 ¶2.

[26] *See* Ex. __, Relevant page of the Final Pre-trial conference in this case.

[27] R. 258 (Feb. 8, 2018, Vol. 4-B) Tr. p. 652, lines 22-25, p. 653, lines 1-2.

[28] *See* Ex. ___, *Vani* Tr. of Judy Taylor trial testimony in *United States v. Vani*, 13 CR 0167.

"Q. Did you also work at CitiMortgage back in 2007, 2008?

A. Yes.

Q. What was your job title back then?

A. Back then, I was an operations manager."[29]

"Q. Focusing on CitiMortgage specifically, is it a wholly-owned subsidiary of Citigroup?

A. Yes. Citibank now. But then Citigroup, yeah.

Q. And does Citi – did Citigroup then and does Citi – I'm sorry, what did you say it was now –

A. Citibank."[30]

Citigroup, Inc., as discussed above, is a non-FDIC entity. This is consistent with paragraph (e) of the *Vani* indictment which recites: "Washington Mutual Bank ("WAMU") and CitiMortgage, a wholly-owned subsidiary of Citigroup [...].,"[31] further evidencing the government's knowledge of Taylor's perjured testimony. Similarly, paragraph 1 (c) of the indictment in another case, *United States v. Michele Dicosola*, 867 F.3d 793 (2017) (12 CR 446),[32] also states, "CitiMortgage, a subsidiary of Citigroup, was in the mortgage-lending business."[33] The lead prosecutor in this case obviously must have known this since he was also the lead prosecutor in *DiCosola*. The lead prosecutor confirmed his awareness of the corporate change when he relayed to this Court at the final instruction conference that, "I know Citibank's corporate structure has changed over the years..."[34] Petitioner's trial attorney never objected to any of the lead prosecutor's objectionable conduct. *See also* Ineffective Assistance of Counsel Section of this Petition.

3. *Subornation of Perjured Testimony # 3:*

---

[29] Ex. ___, Vani Tr. (Judy Taylor), R. Doc. # 225, Tr. p. 189, lines 3-6.

[30] *Id.* at p. 190, lines 1-6.

[31] *See attached and marked* as Ex. __, *United States v. Vani,* 13 CR 0167 indictment.

[32] *See attached and marked* as Ex. __, *United States v. Michele DiCosola*, 12 CR 446.

[33] *Id.* at ¶ 1 (c). *Dicosola* involved allegations of mortgage applications submitted prior to the May 20, 2009 amendment to 18 U.S.C § 20 as well and tax returns relating to 2006 and 2007. Thus, the time frame is the same as this case.

[34] R. Doc. # 260, p. 158, Tr. Vol. 6-A, p. 1165, lines 6-17.

The lead prosecutor in this case suborned Taylor's testimony by having her bear witness that CitiMortgage, Inc. is the "loan servicing arm of Citibank,"[35] thereby imposing on the jury the false impression that CitiMortgage, Inc. was not in the mortgage lending business and only services loans for Citibank, N.A. This may be true after the 2009 financial crisis, but it is definitely perjured for 2007 and AUSA Madden knew this fact full-well. Even the government's documentary evidence at trial in relation to Kwan's loans were all created by CitiMortgage, Inc., including the documents that indicated "Third-Party HELOC." *See Group Ex. __.*

The subornation of Taylor's perjured testimony persisted throughout the trial in this case. As previously mentioned, the indictment in *DiCosola* where Madden also served as the lead prosecutor,[36] states specifically, "CitiMortgage, a subsidiary of Citigroup, was in the mortgage lending business."[37] This contributes to the induced jury confusion of another key issue in this case aimed at prejudicing Petitioner at her trial, and thus, depriving her of any chance of getting a fair trial.

4. ***Subordination of Perjured Testimony # 4:***

The government continued to insist on the non-existent link between Petitioner and an FDIC entity by suborning Taylor's perjured testimony on the losses incurred from the 2007 loans. In reality, none of the Citigroup, Inc. subsidiaries involved in the securitization of the loans lost any money—a blatant contradiction to the government's argument both at trial and at sentencing.[38] In this case, Taylor testified that the losses on the 2007 non-FDIC CitiMortgage, Inc. loans were

---

[35] R. Doc. # 258, Tr. Vol. 4-B, pp. 653-654. (Feb. 8, 2018).

[36] *See attached and marked* as Ex. __, relevant pages of attorney listing for *DiCosola.*

[37] Ex. __, *Dicosola* indictment ¶ 1 (c).

[38] In addition to suborning Taylor's perjured testimony, the prosecutor also lied to the district court regarding losses sustained by Citibank, N.A. or any of its affiliates at sentencing, which Defendant-Appellant will detail in a separate Motion for Investigation.

incurred by Citibank, N.A even while the government knew it was false. However, under similar circumstances that occurred in 2007, in *Vani*, Taylor testified as follows:

"Q. Who stands to lose, both then and now, if the borrower defaults on a loan they get from CitiMortgage?

A. CitiMortgage."[39]

This also proves that Taylor lied in this case during the evidentiary hearing held on October 11, 2017. The government knew or should have detected the conspicuous discrepancy since *Vani* was prosecuted in the same office and since this is their key witness. It is also a violation of the government's obligation to disclose exculpatory and impeachment evidence as part of the constitutional guarantee that all defendants receive a fair trial. AUSA Madden knew full well the consequences of *Brady v. Maryland*[40] as shown by the fact that it took only six months for him to violate this obligation again. Mr. Madden even filed a supplement[41] after the trial in this case and reiterated his knowledge of his obligation. What makes this violation even more egregious is that Petitioner's attorney filed a motion specifically requesting *Brady, Giglio, Jencks* materials in May ___, 2017, a little over a month after this case began and then again on ____, __, __. *See* Ex. __.

## 5. *Suborned Perjured Testimony # 5:*

Taylor deceptively testified that Kwan's 2007 loans to purchase 625 W. 46th Street were funded by "a Citibank cash treasury account."[42] Taylor's carefully phrased words proved strategic and catalytic to aid the government in satisfying its subject-matter or federal jurisdiction, and an element of both bank and mail fraud statutes. The government's corrupt efforts were focused on satisfying the "affects a financial institution" element of the mail fraud and the targeted "financial

---

[39] Ex. _, Vani transcript (Taylor), 13 CR 0167, R. Doc. # 225, Tr. p. 191, lines 19-21.
[40] 373 U.S. 83, 87 (1963)
[41] *See attached* Ex. ___, Doc. # __, filed February __, 2018).
[42] R. Doc. # 258, p. 667, Tr. Vol. 4-B, p. 667, lines 11-22.

institution" of the bank fraud statutes. Although Petitioner was completely unaware of Citibank, N.A.'s involvement in Kwan's loans (discussed in more detail below), this Petition explains the government's systematic concealment of the true funder of Kwan's loans.[43] What Taylor and the government fraudulently omitted and failed to disclose was that: 1) the U.S. Consumer Banking Group which was involved in this transaction was a division of Citigroup, Inc. –a non-FDIC insured entity and not Citibank, N.A.[44] and 2) Citibank, N.A. was never anything more than a compensated paying agent and a mere custodian of the mortgage and note of Kwan's $73,000 loan without any beneficial interest or risk of loss in the non-recourse transaction. This is why multiple documents made reference to the $73,000-investor as the "HELOC Third Party."[45]   *See also* Ex. ___, *relevant pages of* [cite case].

In reality, the loans discussed here were pre-designated to be securitized and funded by the CitiMortgage Alternative Loan Trust, 2007 Series A-5 (SEC CIK # 0001397812) (referred to hereinafter as the "CMALT"),[46] a non-FDIC entity and with Citigroup's other asset-backed

---

[43] Despite Defendant-Appellant's multiple subpoenas issued prior to trial, securitization documentation requests were stonewalled.

[44] *See* Defense Ex. 208, p. 2 – Citigroup Segments and Products

[45] *See* the Govt. Exs. 46th St. Sale 18 and 46th St. Sale 25, Defense Ex. 75.

[46] Procedurally, the government represented to the district court as early as July 2017 that it had funding documents. Taylor also testified during the October 11, 2017 evidentiary hearing that Citibank had funding documents, yet it never produced them after multiple subpoenas, emails and letters to Citibank/CitiMortgage attorney. On January 31, 2018, during a court proceeding, Citibank/CitiMortgage attorney informed the district judge that the government had specifically asked them on January 29, 2018 to search for "statement from Citibank treasury account from April of 2007 which would evidence the debits made on April 16th 2007 to the CitiMortgage, Inc. account, a portion of which was then debited to the CMI Wholesale Lending account and used to fund the Kwan loan."[46] The attorney also explained that a senior manager for Citibank was "coordinating with individuals with various business lines, including global consumer banking and treasury." R. Doc. # 264 (Jan. 31, 2018), Tr. p. 7, lines 9-10). This was a surprise to this Court and Your Honor asked, "Was the new request by the government markedly different from what had been requested by numerous defense subpoenas and a broad subpoena by the government, which asked for all documents relating to X? I mean, they don't have to get granular, especially since neither of them are –neither the government nor defense is expert in, you know, the internal banking documents of Citi…" *Id.* at p. 8-9. Given the DOJ's investigation of Citigroup's securitization for 2006 and 2007 resulted in billions of dollars in settlement (*See* Ex. __), there is reason to believe the lead prosecutor knew or should have known at this point that Kwan's loans were funded by the CMALT. The

24

derivative securitization offering (*e.g.,* Double AA Collateralized Debt Obligation "CDO" or Synthetic CDO (AIG Insurance) or Citi Home Equity, a subsidiary of Citigroup). *See Group Ex.* __. This CMALT is designated as the issuing entity in its charter.[47]   The CMALT identifies "Citicorp Mortgage Securities, Inc." (CMSI) as the **depositor** and CitiMortgage, Inc. (CMI) as its sponsor, all non-FDIC entities.  The CMALT certificate holders ultimately bore the risk of loss while Citibank, N.A.'s primary relationship with the CMALT was designated as a compensated paying agent, custodian of certain mortgages and notes, etc. and the CMALT compensated it for these services.  As remunerated paying agent, Citibank was acting in its *individual* capacity (*e.g.,* arguably not in its National Association capacity that triggers FDIC insurance coverage) to fulfill CSMI and CMI payment instructions through Citigroup's United States Consumer Banking Group, a Citigroup's division.  *See also* relevant pages of Citigroup's 2006-2007 certified 10-Ks, 10-Qs excerpts from case law, etc.  This is why the government's purported funding document indicates "Citibank *FOR* USCBG"[48] for an account that was drawn or swept every lending day[49] as Taylor testified.  The government was well aware or should have been aware of the CMALT's existence given that in July 2014, the DOJ[50] settled with Citigroup, Inc. in relation to its 2006 and 2007 securitization of mortgages, which included the CMALT REMIC 2007-A5 trust that funded the loans at issue in this case.  This Court also relied on Taylor's perjured testimony during the October 11, 2017 evidentiary hearing in this case to determine that statutory element of "affecting a financial institution," statute of limitation and fulfillment of the government's subject matter

---

Government request was made less than a week before trial. Given this government's fraud scheme on the Court, it is likely it knew before the Indictment was issued; however, what is available to Petitioner is this in-court transcript evidencing its knowledge of how Kwan's loans were funded.
[47] *See attached and marked* as Ex. __.
[48] *See* Gov't's Ex. 46th St. Sale # 27
[49] R. Doc. # 113, Tr. 56-63 (Oct. 11, 2017 hearing).
[50] *See* Ex. __, Group Ex. __DOJ announcement, settlement agreement, statement of facts, & attachments.

jurisdiction or the requisite FDIC-insured elements of "financial institution" contained in 18 USC §§ 1341 and 1344. However, the extrinsic documents show that the reliance was misplaced as a direct result of the government's systematic misconduct.

6. *Taylor's Perjured Testimony:*

Taylor falsely testified that all HELOCs offered by CitiMortgage were all Citibank, N.A. products. This was also perjured. *See attached* CitiMortgage's announcement regarding HELOCs,[51] which also explains Taylor's inconsistent statement regarding loans originated in CitiMortgage, Inc. The announcement also demonstrates each of these entities' roles – CitiMortgage, Inc. fulfilling the offering of first mortgages and Citi Home Equity as the second or HELOCs provider. Judy Taylor never mentioned this entity during the evidentiary hearing nor the trial. The computer printouts produced by Citibank/CitiMortgage representative had minimal information for Kwan's $73,000 loan and more for the $292,000 loan. In those print-outs, a representative from Citi Home Equity responded as to foregoing participation in the foreclosure proceedings, presumably because it had already made its money before Kwan even closed on his loans. It explains why the underwriting documents for Kwan's HELOC indicated "Third-Party." The print-out also listed other borrowers' names as having being "pooled" in one account.

In a 500-page complaint filed in the United States District Court of Southern District of New York, Master File No. 07-CV-9901 (SHS) (consolidated class action complaint), the following are the relevant information that exposes yet another one of Taylor's perjured testimony that were blatantly questionable in the outset:

1. "Beginning in 2005, Citigroup, under the auspices of CitiMortgage, its residential mortgage production arm, aggressively expanded its subprime and Alt-A loan production. These loans originated by CitiMortgage were woefully deficient in terms of their underwriting and eventual performance. These loans suffered from severe infirmities that

---

[51] Ex. _, March 18, 2008 CitiMortgage, Inc. and Citi Home Equity Announcement Home Equity/Second Mortgage.

eventually led to significant defaults and losses that infiltrated Citigroup's RMBS and CDO securitizations, leaving Citigroup with many orphaned RMBS and CDO positions that were effectively of little or no market value." P. 328, ¶ 710.

2. "Prior to August of 2005, three different and distinct entities were involved with Citigroup's mortgage originations: CitiMortgage, CitiFinancial Mortgage, and Citi Home Equity. Each entity has its own executive team, sales team, origination and servicing platforms, and each reported to different executives within Citigroup." P. 330-331, ¶ 715.

3. "CitiMortgage, headquartered in O'Fallon, Missouri, was involved with Citigroup's premium loan origination, including traditional conventional, conforming loans and prime jumbo loans. CitiMortgage also housed Citigroup's warehouse lending unit, the former First Collateral Services, Inc., which was acquired by Citigroup in 2000, when it bought Associates First Capital Corp. ("Associates"), a Dallas-based finance company." P. 330 FN 41.

4. "CitiFinancial Mortgage, headquartered in Dallas, Texas, was involved with Citigroup's subprime business." P. 330, FN 42.

5. "Citi Home Equity was based in O'Fallon, Missouri, and was involved with Citigroup's second mortgages and home-equity lines. Citi Home Equity was launched in 1999 after the merger of Citicorp and Travelers Group, Inc. to take advantage of what was believed to be a huge potential for home-equity lending." P. 330, FN 43.

6. In September 2005, Steven Freiberg, who headed Citigroup's Global Consumer Group, announced that Citigroup's three formerly-separate mortgage businesses – CitiMortgage, CitiFinancial Mortgage, and Citi Home Equity – would be merged with the combined entity retaining the CitiMortgage name." p. 331, ¶ 716.

7. "Citigroup consolidated its mortgage operations beginning in 2005 in order to expand into the subprime market. Beginning in 2005 and throughout 2006, Citigroup furiously expanded its subprime mortgage originations. By 2006, Citigroup was the fourth largest overall mortgage originator, with $132.92 billion of originations in the first 9 months of 2006. *Mortgage Banking, "CitiMortgage On the Move,"* December 2006. According to a February 8, 2007 Bear Stearns report on subprime mortgage exposure among the big banks, mortgages to borrowers with subprime credit made up $40 billion of Citigroup's 2006 Q3 production alone, and represented 25% of Citigroup's total $160.9 billion mortgage portfolio. CitiMortgage's loan volume also continued to grow 17% from 2006 to 2007." p. 331, ¶717.

8. "Citigroup Also Expanded its Offering of Other High Risk Loans Such as High Loan-to-Value HELOC Loans that, Unbeknownst to the Public, Became Seriously Impaired by No Later Than Mid-2007." p. 332, ¶ b.

9. "Citigroup expanded into very risky loans such as high loan-to-value ("high-LTV") home equity line of credits ("HELOCs")… p. 332, ¶ 719.

10. "Citigroup's HELOC originations grew from $800 million in 1999 to about $48 billion in 2006. Most of the HELOCs that contributed to Citi Home Equity's growth were purchased from other originators." p. 333, ¶ 720.

11. "Complementing its rapid expansion of subprime loans and high-LTV HELOCs, Citigroup's origination of risky Alt-A, and first and second mortgage loans all experienced tremendous growth during 2006. By CitiMortgage head Bill Beckmann's own estimate, Alt-A loans grew from nothing to 20-25% of CitiMortgage's overall business in 2006. CitiMortgage's Alt-A loans were largely originated through the wholesale channel. While Alt-As represented only 4% of wholesale originations in 2005, by September 2006, Alt-As accounted for 32% of wholesale originations." p. 334, ¶ 724.

12. "In 2006, CitiMortgage also experienced huge growth in its second mortgages. As shown by the chart [*See attached Ex.* __], in 2005, CitiMortgage originated $36.6 billion in second mortgages, while in the first nine months of 2006, CitiMortgage had already originated $51.5 billion in second mortgages." p. 334, ¶ 724.

13. "In the third quarter of 2007, Citigroup began to rein in its lax lending practices. Through an internal bulletin dated August 8, 2007, CitiMortgage discontinued the following products: …SIVAs (stated income/verified asset)." p. 339, ¶ 738.

Compare these statements with Taylor's testimony at the trial in this case as it related to the HELOC:

Q. [Madden]   And with respect to that second mortgage, what kind of product was that?
A. [Taylor]   That was a home equity loan, a fixed-rate home equity loan, which meant that the $73,000 came in one distribution for the intent of the purchase, where a home equity line of credit, you could use a portion of it for the purchase and then have some left over you could draw on at a future time or you could use the full amount, pay it down, and then draw on it again. This particular second is a fixed, so there was no ability to draw on it later ---
Q. Okay.
A. --- the original.
Q. With respect to that second loan that we're talking about, the $73,000 home equity loan, was that a Citibank product that was offered by Citibank or was it a CitiMortgage product?
A. All second mortgages are originated by Citibank on behalf of CitiMortgage.
Q. Okay. And so all second mortgages, such as the one here –and that was true in 2007?
A. And it is today, yes, sir.
Q. Still true that they were Citibank products?
A. Yes, sir.
Tr. Vol. 4B, p. 456, line 15 – p. 457, lines 1-23.

At the evidentiary hearing, this is how Taylor testified in regards to the HELOC:

Q. [Meza]   And do you know if that's a CitiMortgage wholesale lending combo loan?

A. [Taylor] So second mortgages, the FRHELs, the HELOCs, those are all bank products, not CitiMortgage products.

Tr. 65, lines 11-14

....

Q. Okay. And but this says a "CitiMortgage Combo Home Equity Line of Credit," doesn't it?

A. Yes.

Q. Okay.

A. But it doesn't – but correctly it would say CitiMortgage first mortgage, combo loan with HELOC – with Citibank HELOC second.

Tr. 66, lines 20-25, p. 67, line 1

....

"Q. So it's – this is telling you that CitiMortgage offers subordinate financing in the form of a home equity line of credit, doesn't it?

A. No. It says it's a Citi combo, referring to CitiMortgage first and a home equity second, which is a bank product. We don't say in here that it's a bank product, but they – the broker doesn't care if it's a bank product or a mortgage product.

Q. And, in fact, you were interviewed by the government yesterday and today. Is that correct?

A. Yes.

Q. And did they ask you to review these exhibits to see if there was anywhere on there that said Citibank?

A. I provided these documents, the ones that we're looking at now, to my legal counsel at Citi. I'm guessing – assuming they provided them to the government.

Q. And I've reviewed documents that indicate that the second mortgage is a Citibank product because it is a Citibank product."

Tr. p. 67, lines 7-25.

Taylor could not keep up her lies at that evidentiary hearing.

Q. That account belongs to CMI wholesale lending. Is that correct?

A. Yes, mm – hmm.

Q. And do you know what this wire represents or what the purpose of this wire was for?

A. It was an incoming wire for Citi – CitiMortgage wholesale lending.

Q. So you don't know that it funded both the primary and the second loan with regard to this transaction that we're dealing with at 625 West 46th Street. Is that correct?

A. All home equity loans and first mortgages are funded by the – for the wholesale channel are funded by CitiMortgage.

Q. So they're all funded 100 percent by CitiMortgage.

A. Yes, mm-hmm.

Tr. 73, lines 3-16.

To be sure, the following are relevant information in Citigroup, Inc.'s Memorandum of Law in support of their Motion to Dismiss the Amended Consolidated Class Action Complaint:

1. "Solely for purposes of this motion, we accept as true the non-conclusory factual allegations of the complaint. .." Case 1:07-cv-0991-SHS, Doc. 77 p. 3, FN 1.

2. In that motion, Alternative-A ("Alt-A") was defined as "residential mortgage-backed securities," which was Kwan's loans. *Id.* at p. 7. The motion further explains that "Alt-A mortgages are a class of loans that are generally considered to be of higher quality than subprime mortgages, but are not traditional "conforming" or prime loans. (¶945). Alt-A mortgages therefore were viewed by the market as less risky than subprime mortgages. (¶946). Likewise, ALT-A RMBS—securities backed by Alt-A mortgages—were regarded as safer investments than subprime RMBS. (¶¶944-45). Starting in 2006, Citigroup underwrote and traded Alt-A RMBS. (¶955). Due to financial crisis that unfolded in the late 2007, downgrades of Alt-A RMBS began to occur in late 2007 and early 2008. On November 27, 2007 Moody's downgraded certain Alt-A RMBS originated in 2005 and 2006, and on January 17, 2008, it downgraded certain Alt-A RMBS originated in 2007. (¶¶950-51)."p. 11, ¶ 6.

3. "Citigroup's real estate lending business involves the origination and funding of residential and commercial mortgage loans, and is conducted primarily through its subsidiary, CitiMortgage. (¶¶717 n.40, 718)". It adds a footnote, "Prior to September 2005, the origination business also was conducted by Citigroup subsidiaries CitiFinancial Mortgage and Citi Home Equity. (¶ 717)." p. 8-9 and FN 7 on p.9.

4. "In addition to lending directly to borrowers through its retail channel, CitiMortgage also funded loans through its "correspondent" channel, whereby Citigroup purchased loans underwritten by other mortgage originators. (¶¶ 717-718, 730). Citigroup either held these mortgages in its first and second mortgage portfolios, sold them to third parties or securitized them into RMBS that were then held in its warehouse or sold to third parties." p. 9

5. "…Citigroup loosened lending standards in the summer of 2007 with respect to HELOCs, second mortgage loans, and Jumbo loans. (¶¶735-38)."p. 50."

Given that Taylor's testimony was inconsistent with her testimony at the *Vani* trial, it is not surprising that she lied again on the issue of HELOC.

**(c) Suppression of Exculpatory Evidence in Violation of *Brady, Jenck, and Giglio.***

**Background:** Citigroup, Inc.'s 2006 and 2007 certified 10-K is instructive here. The following are relevant excerpts from those documents:

*1.* ***CMALT 2007 REMIC 2007-A5.***

The government's insidious misconduct also involved the concealment of the CMALT.[52]  As aforementioned, Citibank, N.A. was a paying agent and a custodian of the notes and mortgage solely for the purpose of performing its servicing obligations on behalf of the CMALT. *See also attached and marked* Ex. ___, Power of Attorney.

2. *Quit Claims Deed Executed by Bartko to Kwan.*

At trial, the government offered into evidence Quit Claims deeds[53] over Petitioner's trial attorney's objection,[54] conveying title from Kwan to Bartko. Review of the deeds show they were prepared by Kwan and Bartko's attorney, and do not evidence Petitioner's involvement, knowledge, preparation or filing of these deeds.  The government obtained them from the Cook County Recorder of Deeds and offered them as evidence of its fabricated "straw-buyer" allegation. In granting the government's oral motion to admit these deeds at trial, the district court explained that the deeds tend to prove part of the government's Indictment allegations.  First, the government knew or should have known that Kwan was not a straw-buyer[55] specifically, because Kwan and Bartko had a joint account called K & B. Ex. ___.  When the FBI interviewed Kwan, he also told them the following: _____.  He even helped Bartko care for the properties they bought together. Since the government did not call Kwan or Bartko as witnesses, it had to heavily rely on the Kwan to Bartko Quit Claim deeds to prove its straw-buyer theory.  As with all the government's testimonial and documentary evidence in this case, the deeds were admitted without any witness testifying to these documents.  This also presented the lead prosecutor with an opportunity to "testify." His "testimony" in the guise of arguments had no support on the trial record because he failed to call relevant witnesses to provide reliable testimonial evidence as regards the deeds.

---

[52] *See attached and marked* as Ex. _, certified CMALT and its Exhibits.

[53] *See* Gov. Ex. CCRD1 and CCRD 2.

[54] R. Doc. # 255, Tr. Vol. 1-A, 48-50, (Feb. 5, 2018).

[55] *See* Group Ex. __.

Moreover, as with all evidence in this case, Petitioner's Confrontation Clause was violated in addition to methodically shifting the burden of proof to prove her innocence.

This, however, was not the government's worst transgression concerning the deeds. The government failed to disclose to this Court and the jury that there are subsequent Quit Claim Deeds conveying titles from Bartko back to Kwan.[56] Given this Court's explanation when it overruled Petitioner's objection to the admission of the Kwan to Bartko deeds, the government had the constitutional and legal obligation to disclose the exculpatory said deeds to the Court. Most importantly, the government was aware that these exculpatory Bartko to Kwan deeds existed as they would have been listed with the Cook County Recorder of Deeds alongside the deeds that they admitted into evidence. The lead prosecutor not only failed in his duty to investigate or discover this information,[57] he decided to disregard his constitutional and ethical duties yet again. He went ahead to conceal this exculpatory evidence from the Court and the jury and in doing so violated *Kyles v. Whitley,*[58] *United States v. Bagley,*[59] and *Brady v. Maryland.*[60] This evidence is material given the Court's explanation when it overruled Petitioner trial attorney's objection to the Kwan to Bartko Quit Claim deed, and thus subject to disclosure when its nondisclosure undermines the confidence in the reliability of the Petitioner's conviction, as it did here.[61]

**(d) *Brady* and *Jencks* Violation**

---

[56] *See attached and marked* as group Ex. __, Bartko to Kwan Quit Claim Deeds.

[57] *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) (observing *Brady* "requires of the prosecution than the ABA Standards" – Model Rules of Prof'l Conduct r. 3.8(d) (AM. Bar Ass'n 1983))

[58] 514 U.S. 419, 437, 115 S. Ct. 1555 (1995) (holding prosecutors have an express "duty to learn of any favorable evidence known to others acting on the government's behalf in the case.").

[59] 473 U.S. 667, 105 S. Ct. 3375 (1985) (considering *Brady* implications of information known to law enforcement agents but not to prosecutor).

[60] 373 U.S. 83, 83 S. Ct. 1194 (1963) (suppression of exculpatory evidence by the prosecution "violates due process where evidence is material either to guilt or to punishment.").

[61] *See* Kyles, 514 U.S. at 437 (quoting *Bagley*, 473 U.S. at 678).

**Background:** The government depended on Petitioner's defense trial team's failure to fully understand the nature of Citigroup, Inc.'s "gallimaufry of financial instruments"[62] and the changes to Citigroup, Inc.'s corporate structure after the 2009 financial crisis. Its methodical delay of identifying funding was seemingly aided by Citibank, N.A. and CitiMortgage, Inc.'s representatives. The government's success in the suppression of exculpatory evidence seemingly hinges on how well Citibank, N.A.'s employees, witnesses and representatives could lie. Its key witness, Judy Taylor, passed with flying colors during the evidentiary hearing in this case, lying outright to this Court's straightforward questions. Taylor misled the jury with impunity, knowingly backing the federal government in its lying schemes. Extensively groomed and well-prepped by the government, she committed perjury with confounding ease. As alarming as that sounds, this prosecutor knew of these lies all along and were his brainchild. Petitioner makes this charge mindful of the gravity of the accusation. Hence, she will explain this charge step by step using documents, transcripts, certified public documents, among others.

As with the first error manifesting in the government's misstatement of the law, it was necessary for the government to prove that Petitioner schemed to defraud an FDIC-insured financial institution. Again, given that this prosecutor chased this fictitious fraud, he also had to falsely chase the non-existent involvement of Citibank, N.A. as a typical financial institution that loans money to people—taking the risk of loss on a borrower and funding that loan. This is exactly the lie the government propagated to the jury at trial and to this Court throughout the proceedings in this case. Bearing in mind that the federal statutes aim to protect the federal government's assets—and here, Congress gave subject-matter jurisdiction to the federal

---

[62] *In Re Citigroup, Inc. Securities Litigation*, 1:07-CV-09901-SHS, Doc. # 88, Filed on 11/09/10, p. 6-10

33

Department of Justice over transactions of lenders insured by the FDIC. Again, without an FDIC-insured institution, the government was not only overstepping its bounds, it was also falsifying its jurisdiction. This prosecutor did that with the apparent help of Citibank, N.A., CitiMortgage, Inc. and Citigroup, Inc.'s employees.

For example, when prosecutor Madden emailed Citibank, N.A.'s Senior Counsel for loan documents relating to Petitioner's 2004 purchase which CitiFinancial, Inc., a primary subsidiary of Citigroup, Inc. in 2006, 2007 and beyond, purchased it produced those loan documents in exactly ___ days. Thirteen years later, it produced those files. Surprisingly, when asked to produce the signature card for the bank account which funded Kwan's loans—much newer than the 2004 loan—Citibank, N.A. or CitiMortgage, Inc. representatives never produced them. Also, when asked to produce funding documents on ___, 2017, Citibank and CitiMortgage did not produce them until January ____, 2018, just __ days before the trial in this case. And when the government finally asked for funding documents at the last possible hour, Citibank/CitiMortgage/Citigroup miraculously produced them in ___ days, all the while, the Petitioner having requested the same documents on ____, then again__ and then again on ____. At this juncture, it is abundantly clear that Citi entities were under the control of the government.

The government's key witness also lied about the documents. The following details the obstruction of justice that foreseeably violated Petitioner's constitutional rights to a fair trial and resulted in a grave miscarriage of justice:[63]

1. On *September 3, 2015*, AUSA Madden issued a subpoena to CitiMortgage, Inc. requesting Kwan's loan documents and any losses calculated as a result of the foreclosure or short sale.

2. On *September 18, 2015* at 12:30 p.m., Tonya Cwach, Legal Support Specialist from Citigroup Management Corp. (Citi Consumer Subpoena Compliance Unit) emailed Katie

---

[63] *See* Ex. ___. (originally letter states respectfully, instead of respectively).

Gatewood [GCB-GCM] requesting information regarding Kwna's loans. Gatewood emailed Ms. Cwach with the following information: 2004259276, Orig Loan: $292,000, UPB: $290, 253.02, REO Sold on 10/2010 at $50,000, Loss to CMI: $240,253.02. This does not include any fees or interest on the loan. 0771359755 (2nd mortgage), Orig. Loan: $73,000, UPB: $73,000, REO Sold 10/2010 at $50,000, Loss to CMI: $73,000. Here are the losses. Let me know if you have any questions. Thanks, Katie"

3. On *September 25, 2015*, Ms. Cwach, sent a letter to AUSA Madden in response to the government's subpoena to CitiMortgage where she produced available records on Kwan's mortgage loans. Ms. Cwach's letter states in relevant parts: "According to our records, for loan number 2004259276, the unpaid balance was $290, 253.02 and for loan 0771359755, it was $73,000. The loans sold in October 2010 for $50,000 resulting in a loss to CitiMortgage of $240,253.02 and $73,000, [respectively]." Attached to that letter, Ms. Cwach included her certification under penalty of perjury that as part of her duties, she is familiar with CitiMortgage, Inc.'s records kept in the ordinary course of business and is familiar with the types of documents received, created, and relied upon by CitiMortgage, Inc.

4. On *March 28, 2017*, at 2:55 p.m., Gretchen Wallace, Senior Counsel for Citibank, N.A. emailed AUSA Madden stating the following: "I've received your subpoena for this matter. I just wanted to let you know that this was contract underwritten by United Guaranty for CitiMortgage, Inc. The loan is a combo of 1st and 2nd lien. I'm available tomorrow to discuss to make sure we would be the appropriate party and that we know what information you'll need between 8:30 and 11 and then 1-3. Thursday afternoon I'm open. Please let me know if you're available any of these times or we can look later in the week or next week. I just want to make sure we have an appropriate witness for you. Thanks."[64]

5. On *March 28, 2017* at 4:12 p.m., AUSA Madden replied to Ms. Wallace's and said, "Thanks so much for reaching out. How about tomorrow at 10:30 CST? Thanks, Matt." Madden cc'd Donald Kaiser with the FBI and Robert Bart from the FHFAOIG.

6. On *March 29, 2017* at 9:17 am, AUSA Madden emailed Ms. Wallace and said, "Gretchen: Just confirming that we are set to talk at 10:30 am CST today. Thanks very much. Matt."

7. On *March 29, 2017* at 9:39 a.m., Ms. Wallace replied, "Yes, it will be just me. I don't have a witness identified yet."

8. On *March 29, 2017* at 10:51 a.m., AUSA Madden emailed Ms. Wallace and said, "Gretchen: Per our conversation, please see attached documents. Please have someone at Citibank/CitiMortgage search Citi's records to confirm whether Citi has any of these documents (particularly the third document, which references to the property at 625 W. 46th St. in Chicago). Thanks, Matt."

---

[64] *See* Ex. ___.

9. On *March 30, 2017* at 3:05 p.m., Ms. Wallace emailed AUSA Madden and said, "At the time the Kwan loans closed, CitiMortgage, Inc. was owned by Citibank Domestic Investment Corp which was owned by Citibank, N.A."[65]

10. On *March 31, 2017* at 2:29 p.m., Ms. Wallace emailed AUSA Madden and said, "Judy searched through the file documents. That side agreement was not included in our documents."[66]

11. On *May 16, 2017*, Petitioner's attorneys filed a Combined Motion and Memorandum for Immediate Disclosure of Favorable Evidence based on *United States v. Bagley*,[67] *United States v. Agurs*,[68] *Giglio v. United States*, 405 U.S. 150 (1972),[69] and *Brady v. Maryland.*[70]

12. On *June 16, 2017*, Petitioner's attorneys issued a subpoena to Citibank, N.A. requesting copies of Kwan's $73,000 loan including funding and any ledger or balance sheet reflecting the loss of $73,000 taken by either CitiMortgage or Citibank, N.A. On the same date, Petitioner's attorneys also subpoenaed documents from CitiMortgage, Inc. for Kwans' loans relating to funding and record keeping of Kwan's loans, including the $73,000 loan, the loss, accounting of that loss, etc.

13. On *June 20, 2017*, Petitioner's attorneys issued another subpoena to CitiMortgage, Inc. requesting for CitiMortgage, Inc.'s routing number and requesting funding documents for Kwan's loans, including third-parties that might have funded his $73,000 loan. On the same date, the same subpoena was issued to Citibank, N.A.

14. On August 4, 2017, Petitioner's attorneys again subpoenaed CitiMortgage, Inc. requesting any service agreements issued by Citibank, N.A. or CitiMortgage, Inc. in connection with Kwan's loans. In that subpoena, Petitioner's attorneys requested copies of the IRS 1098 issued by CitiMortgage, Inc. or Citibank, N.A.'s related to Kwan's loans. On the same day, Petitioner's attorneys issued the same subpoena to Citibank, N.A.

15. On *August 31, 2017*, Judy Taylor executed a Declaration in response to Petitioner's subpoenas. *See* Ex. __. In her Declaration, she represents that has personal knowledge and was authorized to the Declaration on behalf of CitiMortgage, Inc. ("CMI") and Citibank. Relevant in her Declarations, she declares in paragraph 10 the following: "With

---

[65] There's obviously a conversation between AUSA Madden in between these emails, but the government did not provide any FBI 302s to the defense on a critical issue.

[66] The side agreement that Ms. Wallace was referring to was the Acknowledgment where Petitioner acknowledged Bartko's involvement in the sale transactions that were notarized by the closer for the sales. *See* Ex. __.

[67] 473 U.S. 667 (1985).

[68] 427 U.S. 97 (1976).

[69] 405 U.S. 150 (1972).

[70] 373 U.S. 83 (1963).

respect to Request No. 9 of the Subpoenas, the first mortgage loan was sold into a residential mortgage-backed security. The loans were liquidated with the June 25, 2010 investor distribution payment and were paid to December 1, 2007 at the time of the liquidation." *See* Ex. __. Taylor's Declaration does not respond to whether or not the $73,000 was also sold into a RMBS and declares in paragraph 12 that "CMI, on behalf of itself and Citibank, has performed an extensive search for documents responsive to the Subpoenas, and produced herewith all responsive documents it has been able to locate. CMI, on behalf of itself and Citibank, does not expect to locate any additional documents that are responsive to the Subpoenas. Taylor also declared that Citigroup's announcement made on April 5, 2007 that it was informing brokers that they were limiting no-money down second mortgages and raise the minimum credit scores needed to obtain them was not applicable to Kwan because he had a high credit score.

16. Petitioner's attorney only received the IRS form 1098 for Kwan's first loan ($290,000). On the bottom of the document, it indicates that it is an internet reprint. No such internet reprint was received for Kwan's HELOC in the amount of $73,000.

17. Petitioner's attorneys requested the IRS forms from the IRS directly and they provided the IRS forms for both Kwan's loans which indicate that the lender for both was CitiMortgage, Inc.

18. On *December 8, 2017*, Citibank and CitiMortgage attorney indicating that her client is still searching for accounting records and document retention policy regarding Kwan's loans. She also sent Judy Taylor's work history.

19. On *January 29, 2018*, Katharine F. Lessaris, whose firm represented Citibank, N.A. and CitiMortgage, Inc. wrote a letter to Petitioner's attorney finally sending him the funding of the loans document that were first requested on _____.

20. Relevant provisions of Citigroup's 2006-2007 10-K are contained in Ex. __.

Recognizing the importance of the funding issue, the Court held an evidentiary hearing on the afternoon of October 11, 2017. Petitioner's trial attorney informed the Court that he just received MOAs from the government for interviews it held on October 6th and 10th with the witnesses appearing at the evidentiary hearing. However, this is just another situation where the government ambushed Petitioner's trial team. *See also Group* Ex. ___.

At the hearing, the attorney for CitiMortgage, Inc. and Citibank, N.A. was present during the entire proceedings as well as the AUSAs prosecuting this case. Also at that hearing, your Honor directly questioned the government's witnesses whenever Petitioner's attorney struggled to ask

concise questions. The first government witness was Ms. Cwach who was responsible for Citigroup's Management Subpoena Compliance. This is the same Citigroup representative who wrote to AUSA Madden on September 25, 2015 (before anyone was aware that the DOJ needed an FDIC entity to be acting as a financial institution in order for its Indictment to stick.) and stated in relevant parts: "According to our records, for loan number 2004259276, the unpaid balance was $290, 253.02 and for loan 0771359755, it was $73,000. The loans sold in October 2010 for $50,000 resulting in a loss to CitiMortgage of $240,253.02 and $73,000, [respectively]." The following is the relevant Q & As:

Q. (Meza)    Do you know if CitiMortgage has that information in its databases?
A.           This information, yes.
Q. (Meza)    But you didn't check with regard to the second loan, the $73,000 loan. Is that correct?
THE COURT: Check what?
THE WITNESS: If the information is in the file, then I would have seen it. But I don't check to see if CitiMortgage has sent it to the IRS or not.
Mr. MEZA:    Okay. You know, at this time I want to ask if the government can stipulate that no 1098 with regard to the $73,000 loan ending in 755 was not produced by Ms. Cwach, no hard copy.
MR. MURRAY: We don't believe so.
MR. MEZA: We don't have a copy of it, your Honor. I mean. I can –
THE COURT: What is it you're trying to –
MR. MEZA:    We just want to have – see if the government will stipulate that in the production of Ms. Cwach, no 1098 hard copy in relation to the $73,000 loan was ever produced.
....
THE COURT: All right. Well, why not? It would seem there would be a hard copy of it for the other loan, just as there would be for this one.
MR. MEZA: That's my next question, your Honor.
THE COURT: All right. Go ahead.
BY MR. MEZA:
Q.    Ms. Cwach, do you know why CitiMortgage in its records didn't have a 1098 for the primary loan ending 276 – or did have it, but didn't have it with regard to the second loan? Do you know why that was the case?
A.    No.
Q.    Okay. But Ms. Cwach, do you know, that CitiMortgage did electronically send information to the Internal Revenue Service with regard to the second loan, didn't you?
A. Not that I'm aware of.
…
THE COURT: What is Citilink?

BY MR. MEZA:

Q. Can you explain what Citilink is.

A. It's just our internal database of – that holds the loan information. There's no documents stored in CitiLink.

Q. But the information in CitiLink includes information, records about mortgage – mortgages. Is that correct?

A. Yes.

...

BY THE COURT:

Q. Ma'am, maybe it would be best to describe what you do when you get a grand jury subpoena. What are the –where do you search when you get a grand jury subpoena? What do you turn over, and what do you not turn over? And if you don't turn something over, do you have any direction as to what it is? And if it's written direction, tell me, and if it's someone you review it with orally, tell me.

A. Generally we –

Q. And I take it you get hundreds of these.

A. Yeah. We generally review the subpoena, see exactly what they're looking for, and we provide what they're looking for.

There is other documents out there. If they don't produce them.

Q. And how do you find these documents? What databases or database do you search for them?

A. Mostly the file imaging system we use is FileNet is what it's called. And anything that would have been in the hard file or anything that's image-related is scanned into the FileNet system. And that's where generally all the information comes from.

There are servicing notes held in Citilink, but, again, we usually object to those because those – there could be thousands of pages. And so we don't do anything that's undue and burdensome.[71]

...

Q. Well, unlike payments by the borrower, is there a separate area you can search for the funding of a loan?

A. It would all be in the FileNet documents.

Q. Okay. What is that –

A. Anything we have.

Q. Which is what you searched here?

A. Yes, and I provided.

THE COURT: Okay. Alright. Proceed.[72]

Next, the Court's dictum provide the government and counsel for CitiMortgage, Inc. and Citibank, N.A. notice as to the importance of the disclosure of the CMALT 2007-A5 trust documents and

---

[71] Tr. Evidentiary Hearing, p. 32, lines 10-25, p. 33, lines 1-10 (Oct. 11, 2017).

[72] Tr. Evidentiary Hearing, p. 35, lines 7-15 (Oct. 11, 2017).

its exculpatory evidential value. In addition to being a non-FDIC insured entity, the CMALT

2007-A5 trust documents expressly indicate that Citibank, N.A. was only acting as the paying

agent on behalf of the trust and was not the funder bearing he risk of loss for Kwan's HELOC.

The Court stated:

> Q    All right. And I think Mr. Meza's question earlier dealt with is there anything in
> the file related to an account number that indicates where the money comes from, in other
> words, the funding of the loan?[73]

At the same evidentiary hearing, your Honor also questioned the government's witness, Judy

Taylor, regarding the funding of the $73,000 loan in the following Q & As:

> "THE COURT: The $73,000. Are they Citibank funds.
> THE WITNESS: Yes, they're Citibank funds.
> The COURT: Where do they come from? Draw the line from where they start to where
> they end up in this closing document.
> THE WITNESS: I – so we cover – I thought we kind of covered that already, that the
> funds –
> THE COURT: I think we did. I just want it specific as to this $73,000. I know you've
> covered the general funding.
> THE WITNESS: Right.
> THE COURT: But I'd like to hear testimony as it relates to the $73,000.
> THE WITNESS: Well, when – when the funds are wired to the settlement agent from the
> wholesale lending account, it's inclusive of the first and second mortgage funds.
> So when – when the documents are signed and sent back, all the money goes to the
> settlement agent.
> Are you – could I – could I go on a little bit more about the process that happens after that?
> That might help –
> THE COURT: Sure.
> WITNESS: --- a little bit.
> THE COURT: Go ahead.
> THE WITNESS: So home equity loans, all of those bank products are serviced on a
> different system than the first mortgages. That system you cannot fund from. So all bank products
> that are home equity, they all fund from the CitiMortgage LaserPro mortgage system.[74]
> And then on the back end, after those loans are closed, Citibank reimbursed CitiMortgage
> for the transaction.
> But it doesn't matter where, what channel, what anything those loans originated. They're
> all Citibank products, and they're all funded on CitiMortgage's system, if that makes sense, sir.

---

[73] Evidentiary Hearing Transcript dated October 11, 2017, p. 34 – lines 23-25, p. 35 – line 1.
[74] The witness continues to evade answering this Court's direct question regarding funding.
Evidentiary Hearing Tr. p. 79.

THE WITNESS: Which ultimately gets its money from Citibank.

THE WITNESS: Yes, sir.

THE COURT: Okay.

Is there outside money that funds any of the loans involved in this –these subpoenas, or is it called Citi money?

THE WITNESS: It's all Citi money, your Honor."[75]

Taylor lied to the Court, to Petitioner's defense team and the jury. [ ] Petitioner's attorneys presumably proceeded based on Taylor's testimony at the evidentiary hearing.

Taylor, who lied at the hearing, was the government's key witness at trial. Each time she testified, she was lying, especially on material issues in the case. This series of lies also shows that the government and Citibank/CitiMortgage representative were methodical in selecting Taylor as a witness. Taylor's testimony about seemingly complicated transactions such as GSEs was enough to have intimidated Petitioner's trial attorney at trial. But documents that shed light on why Taylor waffled at key questions illuminated the third-party funder that your Honor referred to at the end of the October 11, 2007 evidentiary hearing.

The fact that the government and Citibank's representatives fought tooth and nail to hide the true identity of the funder of Kwan's loans demonstrates that Citibank was indeed a mere paying agent and a "note holder" of Citigroup's securitization trusts and vehicles. It never took any risks of loss, and for confirmation purposes, it did not take the loss. *See Group Ex. __.* Given the non-recourse nature of Kwan's loans, once they were sold to "Third-Party" investors, CitiMortgage or Citibank would not have been entitled to deduct losses that were properly incurred by the CMALT REMIC 2007-A5 and Citigroup, Inc.'s wholly-owned subsidiary Citi Home Equity that was securitizing HELOCs. *See discussion on Taylor's perjured testimony on page __.*

---

[75] Evidentiary Hearing Transcript dated October 11, 2017, p. 79, lines 1-18.

CitiMortgage's taking the loss after selling the loans before the sale even occurred on April 16, 2007 and having been paid is an improper windfall reduction of its income is for the IRS to address and irrelevant in this case. However, this idea that somehow Citibank, N.A. was taking all losses for CitiMortgage, Inc. is false and propagating the lie that Citibank, N.A. stands for Citigroup, Inc. is even more unacceptable. Citibank, N.A. in 2007 is only one of twelve banks that Citigroup, Inc. parented along with hundreds or even thousands world wide of primary subsidiaries listed on its Ex. 21.1 table attached to its 2007 10-K. The 10-K itself explains how the losses are taken. Citibank, N.A. had its own income statement. Citigroup, Inc. also provided its own income statement consolidated with its primary subsidiaries.

This is precisely the reason why AUSA Madden objected to Petitioner's attorney's offering into evidence Citigroup, Inc.'s SEC certified 2007 10-K. This Court sustained the objected and reasoned that there were litigation enumerated in these 10-Ks. [Tr. ___]. This is true, but that should have been the only section not admitted which is a very small section of the report. This 10-K report would have been extremely helpful to the jury and would have helped them unpack Taylor's lies. Instead, Petitioner's trial attorney was clueless as to the significance of these reports, unable to explain the significance of those reports. *See also Section on Ineffective assistance of counsel.* However, there was one person who knew well of what that 10-K contains—AUSA Madden. Consistent with his pattern of suppressing exculpatory evidence, his objection was not a surprise. Notably, he did not object to Petitioner's trial counsel's admission of New Century's 2005 10-K, which listed more litigation than Citigroup's 2007 10-K..

It's worth restating Taylor's testimony in *Vani* as Petitioner provides this Court with relevant and key facts that unravels the lies nurtured by the government and its key witness, Taylor,

all with the unshakeable approval of Citibank and CitiMortgage representative. Again, in *Vani*,

Taylor testified:

> "Q. Focusing on CitiMortgage specifically, is it a wholly-owned subsidiary of Citigroup?
> A. Yes. Citibank now. But then Citigroup, yeah.
> Q. And does Citi – did Citigroup then and does Citi – I'm sorry, what did you say it was now –
> A. Citibank."[76]

> …..

> "Q. Who stands to lose, both then and now, if the borrower defaults on a loan they get from CitiMortgage?
> A. CitiMortgage."[77]

At trial, Taylor gave perjured testimony to the jury with this relevant Q & A:

[78]Q. [AUSA Madden]: Are you familiar with what that corporate relationship was around the time of this, in 2007?

A. [Taylor]: Yes. CitiMortgage was a wholly-owned subsidiary of Citibank through – there was another level of bank in between there.

Q.     Was it Citibank Domestic Investment Corp. –

A.     Yes, sir.

Q.     --in the middle?

And so – so CitiMortgage, Inc. was owned by Citibank Domestic Investment Corp., which was in turn owned by Citibank, N.A. –

A.     Correct.

Q.     --the ultimate parent

A.     Yes, sir.

Q.     --of both companies?

A.     Mm-hmm.

Q.     And starting with Citibank, N.A. –you work for Citibank, correct?

A.     Yes.

Q.     And –

A.     Citibank NA is Citibank North America.

The N.A. in Citibank stands for National Association. How can the government expect to present

a truthful presentation of its case involving complex global corporate structure when its key

---

[76] *Id.* at p. 190, lines 1-6.

[77] Ex. _, Vani transcript (Taylor), 13 CR 0167, R. Doc. # 225, Tr. p. 191, lines 19-21.

[78] Tr. Vol. 4-B (Feb. 8, 2018), p. 652, lines 22-25 – p. 653, lines 1-17.

witness does not even know what N.A. stand for in its employer's name. And more disturbing is why would the government select her as its key witness. Kwan's loans as Taylor testified were originated in the Wholesale Channel, not the Correspondent Channel where Taylor worked—all Citibank's operations, Just insinuates, when in reality it is Citigroup, Inc. The fact that she perjured herself given her previous testimony in *Vani* answers the question as to why the government selected her.

Based on Citigroup, Inc's certified 10-K reports, Ex. 21.1, which lists its primary subsidiaries and the subsidiaries of its primary subsidiaries, all three entities, CitiMortgage, Inc., Citibank, N.A. and Citibank Domestic Investment Corp., were all primary subsidiaries of Citigroup, Inc. 2006, 2007, 2008, 2009. Only in year 2010 did CitiMortgage, Inc. become a subsidiary of Citibank Domestic Investment Corp. and that same year, Citibank Domestic Investment Corp. became a subsidiary of Citibank, N.A. *See Group Ex. ___.* Based on Citigroup, Inc. 10-K for year 2010, Citigroup, Inc. still maintained _____% ownership of its entire subsidiary regardless of its parenting structure. *See Ex. __.* AUSA Madden was aware of these arrangements just as he said to this Court, yet he left out the fact that this parenting occurred three years after the transactions in this case.

Furthermore, the reality remains that CitiMortgage, Inc. was not the entity that incurred the loss, given the non-recourse asset-securitization. Citigroup, Inc.'s 2006-2007 10-K reports specifically state that its RMBS are all non-recourse. *See attached* Ex. __. These mortgages in particular are sold before they were even closed. Why? Because they provide funding vehicles for Citigroup, Inc. Each mortgage immediately becomes an asset because of its Mortgage Servicing Rights, aka MSR, which translates into an income stream for the entities that acquire these MSRs. Again, the fact that CitiMortgage, Inc. took the losses for both Kwan's loans is an

improper windfall, but this would not be an isolated GAAP accounting mishap described in

_____. [citation]. Taylor gave non-consequential bits and pieces of the puzzle to trick the jury

into believing that all the funds came from Citibank, N.A.

Citibank, N.A. was an FDIC-insured entity subject to more regulations than other non-

banking subsidiary of Citigroup, Inc. It was limited in its activities and was required to obtain

permission from the OCC and the FDIC to engage in any corporate or beneficial ownership of any

entity. These are set forth accordingly in Citigroup, Inc.'s 10-K. As indicated in the SEC website,

"Laws and regulations prohibit companies from making materially false or misleading statements.

Likewise, companies are prohibited from omitting material information that is needed to make the

disclosure not misleading. In addition, a company's CFO and CEO must certify to the accuracy

of the 10-K and 10-Q."[79] The government would have us believe that Citibank, N.A. bears all the

losses because it was all Citibank, N.A.'s money—an outright, repulsive lie. The government

again knew or should have known that this was a lie as it investigated Citigroup, Inc. and its

subsidiaries, which resulted in a $7 billion dollar settlement in 2014 during Attorney General Eric

Holder tenure.

More on point, Citigroup, Inc.'s 2007 10-K specifically indicates its primary subsidiaries

in Ex. 21.1 and expressly excludes Citibank, N.A. in its consolidated income tax filing. *See*

*attached Ex.* ___. The claim that Citibank, N.A. absorbed CitiMortgage, Inc.'s loss is debunked

by Citigroup, Inc.'s 200710-K. It also confirms that Judy Taylor knew this as it is evidenced in her

testimony in *Vani.* But the truth is that the government suppressed the CMALT REMIC 2007-A5,

including any and all funding of Citigroup, Inc. securities because its funder was not an FDIC-

---

[79]  *See*  https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins/how-read.

insured entity. This Court must assume that the government was conscious of this since its Indictment imputed knowledge about Petitioner that she somehow knew any and all mortgages were succeeded by other lenders—e.g., RMBS. Therefore, it only follows that if Petitioner knew (which no supporting evidence on the record), then the government also knew and consequently, it was incumbent on them to investigate the real funder of Kwan's loans. AUSA Madden refused to accept this reality. Instead, he recklessly abandoned his constitutional duties as a prosecutor of the People and mindfully followed the path of deceit, subornation of lies, corporate bullying, and distortion of truth.

*Funding.* This was one of the most material issues in this case as it determines the financial institution as required by the bank and mail fraud statutes, 18 U.S.C. §§ 1344, 1341. The government suppressed this exculpatory evidence given what they knew or should have known. To comprehend the length, breadth and depth of its misconduct, a comparison of testimonies and representations to this Court is necessary.

At the evidentiary, Taylor's testified as follows:

[80]Q.    And if a borrower qualified for a particular product from CitiMortgage wholesale lending, who – what entity would fund that particular loan under that product?
A.    For the first mortgages, it's CitiMortgage.
Q.    And then when you say "first mortgages," I'm assuming there's also an opportunity for borrowers to obtain second mortgages. Is that correct?
A.    In the wholesale channel, they could obtain a second mortgage combined with the first. The brokers weren't allowed to just send us , I believe –we didn't originate just second mortgages in the wholesale channel.
Q.    So in order to get a second mortgage under the wholesale channel, there had to be combined with a first mortgage. Is that correct?
A.    To my knowledge, yes.
[81]Q.    And is that what is referred to as a CitiMortgage combo loan?
A.    Yes.

---

[80] Tr. p. 60, lines 11-25 Evidentiary Hearing (Oct. 11, 2017).
[81] *Id.* at p. 61, lines 1-22.

Q.    And are CitiMortgage combo loans –both loans funded – if they came from a program that was a CitiMortgage wholesale lending program, would that be funded by CitiMortgage wholesale lending?

A.    All of the loans originated by the wholesale channel were funded by the wholesale channel.

Q.    Okay. So if the wholesale channel offered a borrower a primary loan and a combo loan, a second loan, that would be funded by the wholesale channel. Is that correct?

A.    It's drawn from the wholesale lending account. It's drawn from CitiMortgage wholesale lending account.

Q.    And when you say "drawn," that means it's funded by that account. Is that correct?

A.    Well, the –the CitiMortgage wholesale lending account is basically a holding account. So that's where the –the ultimate –that's where the money funds from. But it's not ultimately where the money comes from, if that makes sense?

Q.    Where does the money come from?

A.    The money comes from Citibank.

Consistent with its pattern of not presenting a witness that bore in-depth personal knowledge, the government elected an employee who never worked in the wholesale channel to be its key witness. Instead, Judy Taylor was an operations manager from the Correspondent Channel.[82] Kwan's loans were initiated by the wholesale or broker channel. When she was asked whether she knew the products that the wholesale lending programs offered in 2007, she simply responded, "I do not know. There were a lot of products on the market at that time."[83] Pursuant to Citigroup, Inc.'s 10-K, it had three mortgage divisions: Retail, Wholesale or Broker, and Correspondent. Taylor testified consistently as Citigroup explained in its 10-K that each of these divisions were independent. The Retail is basically the offices or the banks accessible to everyday customers who wish to visit Citibank locations. CitiMortgage, Inc. independently runs the Wholesale and the Correspondent Channels. They had their products and are able to offer first and second mortgages as Taylor explained. However, she left out the fact that Citibank, N.A. and CitiMortgage, Inc. never provided Petitioner's trial team with any response to their subpoenas, despite being

---

[82] Tr. p. 55, lines 18-25, p.56, lines 1-19,
[83] Evidentiary Hearing Tr. 59, lines 25, p. 60, lines 1-3 (Oct. 11, 2017).

compelled multiple times to reveal the identity of the depositor for the account that funded Kwan's loans and all other Consumer Business transactions that CitiCorp Mortgage Securities, Inc. does or Citigroup's Global Consumer Business Group discussed below. But first, let us examine the remainder of her testimony at that evidentiary hearing:

[84]THE COURT: Is there a legal entity called CitiMortgage Wholesale Lending? Is it a division? A separate corporation? Does it have any legal significance?

THE WITNESS: No, sir. CitiMortgage is basically, you know, an entity within itself. But then within that, there are, you know, the wholesale correspondent channels.

THE COURT: All right. But vis-à-vis Citibank, what is the relationship with CitiMortgage? Is it a division? Is it just a – does it have any separate legal significance, if you know?

THE WITNESS: It's a subsidiary of.

Taylor knew full well that this case was related to loans issued in 2007 and therefore, lied to this Court.

Again, in *Vani* here is Taylor's testimony:

> "Q. Focusing on CitiMortgage specifically, is it a wholly-owned subsidiary of Citigroup?
> B. Yes. Citibank now. But then Citigroup, yeah.
> R. And does Citi – did Citigroup then and does Citi – I'm sorry, what did you say it was now –
> B. Citibank."[85]

Back to her evidentiary hearing testimony regarding funding:

THE COURT: All right. And when you said it's a holding account, it basically holds money that funds mortgages, funds loans?

THE WITNESS: Right. So basically the wholesale lending account, every morning – well, we don't have that channel anymore, so back then, you would anticipate the amount of funds you needed for closing that day. That money was then requested from the Citibank cash account and transferred over to the wholesale lending account.

That was zeroed out at the end of the day. So if loans didn't close, the money went back. If they did close, they were –the money was distributed to a settlement or titlement – or a title company or attorney's office, whoever the settlement agent was.

THE COURT: All right. And all of those monies were electronically transferred from a cash account for Citibank to a separate account for CitiMortgage wholesale lending.

THE WITNESS: That's correct.

---

[84] Evidentiary Hearing, Tr. p. 62, lines 7-17 (Oct. 11, 2017).
[85] *Vani* at p. 190, lines 1-6.

THE COURT: And then those would be drawn on at closings and return whatever wasn't used that day.

THE WITNESS: Exactly.

THE WITNESS: Well, we don't – we no longer have a wholesale lending channel. But for the entire time that it was operational, that, to my knowledge, was the process, yes, sir.

THE COURT: All right. And including back in two thousand and – what years are we talking about here?

MR. MEZA: 2007.

THE COURT: All right. 2007, at that time, it worked that way.

THE WITNESS: Yes, sir.[86]

[ ] In the next 15 pages of the evidentiary transcript, Taylor danced around the issues without attempting to dignify the truth. Her testimony at the evidentiary hearing is worth repeating. First, she testified that the wholesale channels offer both first and second mortgages, but never explained why the second indicates Third-Party HELOC and the Court asks:

For the second time during this evidentiary hearing, Taylor basically testified that all first and second loans from the wholesale channels are funded by that channel. Specifically, the Q & A goes:

Q. That account belongs to CMI wholesale lending. Is that correct?
A. Yes, mm-hmm.
Q. And do you know what this wire represents or what purpose of this wire was for?
A. It was an incoming wire from Citi – CitiMortgage wholesale lending.
Q. So you don't know that it funded both the primary and the second loan with regard to this transaction that we're dealing with at 625 West 46th Street. Is that correct?
A. All home equity loans and first mortgages are funded by the -- for the wholesasle channel are funded by CitiMortgage.
Q. So they're all funded 100 percent by CitiMortgage.
A. Yes, mm-hmm.[87]

The Court then asks the straightforward question:

[88]THE COURT: The $73,000 Are they Citibank funds?
THE WITNESS: Yes, they're Citibank funds.
THE COURT: Where do they come from? Draw the line from where they start to where they end up in this closing document.

---

[86] Evidentiary Hearing Tr. p. 62, lines 18-25, p. 63, lines 1-24
[87] Evidentiary Hearing, Tr. p. 73, lines 3-16.
[88] Tr. p. 78, lines 4-25, p. 79, lines 1-20.

THE WITNESS: I – so we cover – I thought we kind of covered that already, that the funds—

THE COURT: But I'd like to hear testimony as it relates to the $73,000.

THE WITNESS: Well, when – when the funds are wired to the settlement agent from the wholesale lending account, it's inclusive of the first and second mortgage funds.

So when – the documents are signed and sent back, all the money goes to the settlement agent.

Are you – could I –could I go on a little bit more about the process that happens after that? That might help –

THE COURT: Sure.

THE WITNESS: -- a little bit.

THE COURT: Go ahead.


THE WITNESS: So home equity loans, all of those bank products are serviced on a different system than the first mortgages. That system you cannot fund from. So all bank products that are home equity, they all fund from the CitiMortgage LaserPro mortgage system.

And then on the back end, after those loans are closed, Citibank reimbursed CitiMortgage for the transaction.

But it doesn't matter where, what channel, what anything those loans originated. They're all Citibank products, and they're all funded on CitiMortgage's system. If that makes sense, sir.

THE COURT: Which ultimately gets its money from Citibank.

THE WITNESS: Yes, sir.

THE COURT: Okay.

Is there outside money that funds any of the loans involved in this – these subpoenas, or is it all Citi money?

THE WITNESS: It's all Citi money, your Honor.

THE COURT: Isn't that what we're talking about? Isn't that what this is all about?[89]

*Notation: Taylor further testified that Citibank would take the loss, despite the IRS 1098 relating to the $73,000. Then Taylor again lied to the Court:*

[90]THE COURT: Okay. And who suffered the loss? Were these loans factored or bundled and sold off to anyone else? Or did they remain at Citi and then were serviced by Citi and then the foreclosure occurred when Citi owned the loan?

THE WITNESS: That is the case, to my knowledge.

THE COURT: All right. Because you're recognizing – at least this email states there's a loss to CMI.

THE WITNESS: Yes, sir …

THE COURT: But it's a loss to CitiMortgage, which then ultimately is a loss to Citi.

THE WITNESS: For the first mortgage, yes. And but the second mortgage generally is a direct loss to Citibank because they're the – the noteholder.

THE COURT: All right.

---

[89]Tr. p. 79,

[90]Tr. p. 88, lines 11-18, p. 89, lines 3-8.

When Taylor is asked directly as to whether or not Kwan's loans were sold into a mortgage-backed security, she responds, "I don't know the answer to that."[91] She is asked again and she responds, "I don't have personal knowledge of that," even after she had submitted a Declaration to Petitioner asserting the contrary. *See* Ex.___.

When pressed further, Taylor avoids the question even though her declaration was displayed on the overhead screen:

> Q.   It's on the screen also. Sorry.
> A.   I'm sorry. Was your original question if the loan was sold to –
> Q.   Yeah, I just asked you –
> A.   -- the secondary market?
> Q.   No, it was whether it was sold into a residential mortgage-backed security.
> A.   I don't think that was your original question.
> Q.   Okay. So this says it was sold to – in a residential backed – mortgaged-backed security.
>
> Can you – can you ask the question again? I'm sorry. The original question.
> Q.   That was it. The only other question, I guess, is Citibank would have some record of the loss, of the $73,000 loss. Is that correct?
> A. I don't – I'm –
> MR. MADDEN: It's been asked and answered also, your Honor.
> THE COURT: Overruled.
> Go ahead if you can answer the question.
> THE WITNESS: Well, I don't work in the – in the default area, so – and I haven't researched any evidence or documentation requests for that. So ---

Towards the end of the evidentiary hearing, Taylor was asked again if she checked whether or not Citibank ever took the loss on the $73,000 loan, or whether it was CitiMortgage. She responds, "I – I've been asked this question previously. And it's my understanding that Citibank takes the loss for CitiMortgage losses and Citibank losses because --…ultimately Citibank relies on the capital within CitiMortgage's servicing portfolio, you know, as part of their stress test."[92] But when asked

---

[91] Tr. p. 117, lines 7-11.
[92] Tr. p. 104, lines 14-22.

whether documentation exist showing that Citibank did take the loss, she responds, "I don't know."[93]

Taylor dribbles around the Citibank cash account but never discloses that it is for the Global Consumer Lending and Business Group of Citigroup, Inc. based on the Citigroup, Inc.'s 10-K discussed below on page ___. The Court noted that "This witness has now testified four times that the money that was lost ultimately came from Citibank. And I don't think there's any question Citibank is a financial institution as defined under Title 18 or wherever the definition of "financial institution" is.[94] At that evidentiary hearing, the Court concluded based on Taylor's perjured testimony that "...Citibank is a financial institution. CitiMortgage is apparently a wholly owned subsidiary of Citibank. But what the witness described is the fact that the money that funded these loans ultimately came from Citibank."[95]

The Court goes on to say, "I had thought the point of this hearing was to show that possibly some third party funded it or that CitiMortgage was a separate entity that didn't get their money from Citibank and that CitiMortgage may not qualify under Title 18 as a financial institution. I'm not seeing that.[96] ... But this hearing, I thought, in the first place was to see that Citi – Citibank had produced all documents they had. And secondly, I thought we'd roll into it, the statute of limitations issue, if there was some basis to argue – an unequivocal basis that the monies were funded from something that is not a financial institution. We don't have that[97]... But I don't see a silver bullet where this is not a financial institution that ultimately funded these loans. That's

---

[93] *Id.* at lines 23-25.
[94] Tr. p. 95, lines 16-20.
[95] Tr. p. 95, p. 25, p. 96, lines 1-3.
[96] Tr. p. 96, lines 4-9.
[97] Tr. p. 96, lines 16-20.

something the government and the attorney for Citi represented months ago when we --- this issue was first raised."[98]

At trial, Taylor's testimony was further enlarged with no one knowing that no one has figured out what the Citibank for USCBG really does and that nobody has noticed or understood that the CMALT REMIC 2007-A5 indication in the piles of documents buried therein is an indication of an investor. Also, nobody noticed or connected the dots that the power of attorney from Citibank indicated that "If owned by investors, the Loans may be in the undersigned's name solely for the purpose of allowing the undersigned to perform its servicing obligations on behalf of such investors. On the same Power of Attorney that has already been in place whereby the undersigned (meaning Citibank, N.A.) transfers to CMI (defined as CITICORP MORTGAGE, INC. of certain rights and responsibilities to service certain Loans. "These Loans are comprised of Mortgages, Deeds of Trust, Debts to Secure Debt, Co-ops and other forms of Security Instruments (collectively the "Security Instruments") and the Notes secured thereby, whether held in the undersigned's portfolio or sold to private, public or agency investors. *See* Ex. __. Now it makes sense why the Security Instruments were in Citibank, N.A.'s name and why the underwriting documents indicated "Third-Party HELOC." *See Group* Ex. __. Taylor, at trial, referred to GSEs even though she never mentioned it during the evidentiary hearing. When particularly asked by Petitioner's trial attorney, "Can you explain if it was Citibank's money, why is CitiMortgage is the noteholder. They're the lender."[99] Taylor responded, "CitiMortgage is the noteholder. They're the lender. CitiMortgage has the relationship with the GSCs for selling mortgages. So Citibank doesn't have that relationship. CitiMortgage is a wholly-owned

---

[98] Tr. p. 98, lines 3-6.

[99] P. 134 lines 11-12. [find actual citations on official Tr.]

subsidiary. It's its own entity."[100] As usual, this is inconsistent with her testimony in *Vani.* [ ] The government never turned over any *Jenck or Giglio* materials after Taylor testified. The fact that Petitioner's trial attorney failed to comprehend Citigroup, Inc.'s (not Citibank, N.A. as Taylor and AUSA Madden would have us believe) complex security and financial offerings does not grant the government carte blanche to present perjured testimony. Before unveiling the funding lies, an initial discussion of the government's suppression of exculpatory evidence would be helpful. In Section __ below, it will explain all the discrepancies in the documents and in turn, explain why the government wanted to keep the CMALT in the dark along with the truth about the Citibank for USCBG treasury account.

### (e)    Suppression of Exculpatory Evidence in Violation of *Brady, Giglio*

**Background:**  Concealing the CMALT gave room for the government to lie about the funding, the risk of loss, and the ownership of the note to satisfy the elements of "affecting" a financial institution that was insured by the FDIC.  The CMALT is evidence that Citibank, N.A. was only acting as a paying agent and had zero risk of Citigroup's non-recourse financing instruments as expressly stipulated in the trust documents and its 10-K reports.  Moreover, it would explain the reason CitiMortgage, Inc. took the loss for the $73,000 HELOC even when Citibank, N.A. was identified as the lender on Kwan's HUD statement that he signed alone.   This evidence is exculpatory because it establishes the fact that the government could not have proven all of the elements of bank and mail fraud that was effective before May 2009 and that it violated the applicable statute of limitation. Therefore, the government fraudulently obtained a conviction against Petitioner. The government's flagrant *Maryland v. Brady* violation prejudiced O'Brien in

---

[100] *Id.*

defending this criminal case and ultimately violated her constitutional due process right to a fair trial.

## 1. Concealment of Exculpatory Evidence # 1:

The government concealed exculpatory evidence of a third-party funder, CMALT REMIC 2007-A5, [101] the trust documents evidencing that Citibank, N.A. only had a paying agent role in Kwan loans in order to satisfy the element of affecting an FDIC insured entity pursuant to the bank and mail fraud statutes. The government's systematic concealment violated Petitioner's Due Process right to a fair trial. Most importantly, proper disclosure of this evidence would have changed the outcome of this case, thereby significantly prejudicing O'Brien.

What Taylor and the government deceptively omitted and failed to disclose to the jury and this Court during the evidentiary hearing and multiple court proceedings on the funding issue is that: 1) the U.S. Consumer Banking Group was a division of Citigroup, Inc. and not Citibank, N.A.[102] and 2) Citibank, N.A. was never anything more than a compensated paying agent without any beneficial interest or risk of loss in the transaction. Again, this is the reason why multiple documents made reference to the $73,000 investor as the "HELOC Third Party."[103] Furthermore, Citigroup's 2006 and 2007 10-K states, "..[quote]

In reality, the loans discussed here were pre-designated to be securitized and funded by the CitiMortgage Alternative Loan Trust, 2007 Series A-5 (SEC CIK # 0001397812) (referred to hereinafter as the "CMALT"),[104] a non-FDIC entity. This CMALT is designated as the issuing

---

[101] See attached and marked as Ex. __, certified CMALT and its Exhibits.

[102] *See* Defense Ex. 208, p. 2 – Citigroup Segments and Products

[103] *See* the Govt. Exs. 46th St. Sale 18 and 46th St. Sale 25, Defense Ex. 75.

[104] Procedurally, the Government represented to the district court as early as July 2017 that it had funding documents. Taylor also testified during the October 11, 2017 evidentiary hearing that Citibank had funding documents, yet it never produced them after multiple subpoenas, emails and letters to Citibank/CitiMortgage attorney. On January 31 2018, during a court proceeding, Citibank/CitiMortgage attorney informed the district judge that the government had specifically asked them on January 29, 2018

entity in its charter.[105]  The CMALT's identifies "Citicorp Mortgage Securities, Inc." (CMSI) as

the **depositor** and CitiMortgage, Inc. (CMI) as its sponsor, all non-FDIC entities.  The CMALT

certificate holders ultimately bore the risk of loss while Citibank, N.A.'s primary relationship with

the CMALT was designated as a compensated paying agent, custodian of certain mortgages and

notes, etc. and the CMALT compensated it for these services.  As remunerated paying agent,

Citibank was acting in its *individual* capacity to fulfill CSMI and CMI payment instructions

through Citigroup's United States Consumer Banking Group, a Citigroup's division. This is why

the government's purported funding document indicates "Citibank *FOR* USCBG"[106] for an

account that was drawn or swept every lending day.[107]  The government again was well aware of

the CMALT's existence given that in July 2014, the DOJ[108] settled with Citigroup, Inc. in relation

to its 2006 and 2007 securitization of mortgages, which included the CMALT that funded the loans

at issue in this case.  This Court also relied on Taylor's perjured testimony during the October 11,

2017 evidentiary hearing in this case to determine that statutory element of "affecting a financial

---

to search for "statement from Citibank treasury account from April of 2007 which would evidence the debits made on April 16th 2007 to the CitiMortgage, Inc. account, a portion of which was then debited to the CMI Wholesale Lending account and used to fund the Kwan loan."[104] The attorney also explained that a senior manager for Citibank was "coordinating with individuals with various business lines, including global consumer banking and treasury." R. Doc. # 264 (Jan. 31, 2018), Tr. p. 7, lines 9-10). This was a surprise to the court and the judge asked, "Was the new request by the government markedly different from what had been requested by numerous defense subpoenas and a broad subpoena by the government, which asked for all documents relating to X? I mean, they don't have to get granular, especially since neither of them are –neither the government nor defense is expert in, you know, the internal banking documents of Citi…" *Id.* at p. 8-9. Given the DOJ's investigation of Citigroup's securitization for 2006 and 2007 resulted in billions of dollars in settlement (*See* Ex. _), there is reason to believe the lead prosecutor knew or should have known at this point that Kwan's loans were funded by the CMALT. The government request was made less than a week before trial. Given this government's fraud scheme on the Court, it is likely it knew before the Indictment was issued; however, what is available to Defendant-Appellant is this in-court transcript evidencing its knowledge of how Kwan's loans were funded.

[105] *See attached and marked* as Ex. _.

[106] *See* Gov't's Ex. 46th St. Sale # 27

[107] R. Doc. # 113, Tr. 56-63 (Oct. 11, 2017 hearing).

[108] *See* Ex. __, Group Ex. DOJ announcement, settlement agreement, statement of facts, & attachments.

institution" was fulfilled. However, the extrinsic documents show that the reliance was misplaced as a direct result of the government's systematic misconduct.

AUSA Madden knew or should have known of this reality, yet chose to suppress it. As aforementioned, Citibank, N.A. was a paying agent and a custodian of the notes and mortgage, solely for the purpose of performing its servicing obligations on behalf of the CMALT, the serving obligations, which it already transferred to CitiMortgage. *See also attached and marked* Ex. __, Power of Attorney. These asset-backed securities arrangements are complex, but this seasoned and experienced prosecutor, along with Taylor who waffled whenever funding and RMBS questions were asked of her, knew what they were doing when they first lied about the corporate structure.

## 2. *Concealment of Exculpatory Evidence # 2:*

At trial, the government offered into evidence Quit Claims deeds[109] over Petitioner's trial attorney's objection,[110] conveying title from Kwan to Bartko. Review of the deeds show they were prepared by Kwan and Bartko's attorney, and do not evidence Petitioner's involvement, knowledge, preparation or filing of these deeds. The government obtained them from the Cook County Recorder of Deeds and offered them as evidence of its fabricated "straw-buyer" allegation. In granting the government's oral motion to admit these deeds at trial, the district court explained that the deeds tend to prove part of the government's Indictment allegations. First, the government knew Kwan was not a straw-buyer.[111] Since the government did not call Kwan or Bartko as witnesses, it had to heavily rely on the Kwan to Bartko Quit Claim deeds to prove its straw-buyer theory. As with all the government's testimonial and documentary evidence in this case, the deeds

---

[109] *See* Gov. Ex. CCRD1 and CCRD 2.
[110] R. Doc. # 255, Tr. Vol. 1-A, 48-50, (Feb. 5, 2018).
[111] *See* Group Ex. __.

were admitted without any witness testifying to these documents. This also presented the lead prosecutor with an opportunity to "testify." His "testimony" in the guise of arguments had no support on the trial record because he failed to call relevant witness to provide reliable testimonial evidence as regards the deeds. Moreover, as with all evidence in this case, Petitioner's Confrontation Clause was violated again, but this was their plan all along.

This, however, was not the government's worst transgression concerning the deeds. The government failed to disclose to this Court and the jury that there are subsequent Quit Claim Deeds conveying titles from Bartko back to Kwan.[112] Given this Court's explanation when it overruled Petitioner's objection to the admission of the Kwan to Bartko deeds, the Government had the constitutional and legal obligation to disclose the exculpatory said deeds. Most importantly, the Government was aware that these exculpatory Bartko to Kwan deeds existed as they would have been listed with the Cook County Recorder of Deeds alongside the deeds that they admitted into evidence. The lead prosecutor not only failed in his duty to investigate or discover the information,[113] he decided to disregard his constitutional and ethical duties yet again. He went ahead to conceal this exculpatory evidence from the Court and the jury and in doing so violated *Kyles v. Whitley,*[114] *United States v. Bagley,*[115] and *Brady v. Maryland.*[116] This evidence is material given the Court's explanation when it overruled Petitioner's objection to the Kwan to Bartko Quit

---

[112] *See attached and marked* as group Ex. __, Bartko to Kwan Quit Claim Deeds.

[113] *Kyles v. Whitley,* 514 U.S. 419, 436-37 (1995) (observing *Brady* "requires of the prosecution than the ABA Standards" – Model Rules of Prof'l Conduct r. 3.8(d) (AM. Bar Ass'n 1983))

[114] 514 U.S. 419, 437, 115 S. Ct. 1555 (1995) (holding prosecutors have an express "duty to learn of any favorable evidence known to others acting on the government's behalf in the case.").

[115] 473 U.S. 667, 105 S. Ct. 3375 (1985) (considering *Brady* implications of information known to law enforcement agents but not to prosecutor).

[116] 373 U.S. 83, 83 S. Ct. 1194 (1963) (suppression of exculpatory evidence by the prosecution "violates due process where evidence is material either to guilt or to punishment.").

Claim deed, and thus subject to disclosure when its nondisclosure undermines the confidence in the reliability of the Petitioner's conviction, as it did here.[117]

The incongruity embedded within the myriad of inconsistencies in the documents and testimonies in this case is glaring as well as shocking. This absurdity between "word and deed" establishes a strong inference of scienter. *Id.* at 47; *See also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,* 531 F.3d 190, 195-196 (2d Cir. 2008). "Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." (quoted directly from *Makor Issues & Rights, Ltd. V. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

Taylor's demonstrated perjury and lie after lie or concealment regarding the corporate structure of Citibank and CitiMortgage, then the CMALT or asset-backed securities, her going along with AUSA Madden that Petitioner's purchase loan was purchased by Citibank, N.A., when it clearly was purchased by CitiFinancial Mortgage, Inc, a non-FDIC or non-financial institution, her perjured testimony that CitiMortgage, Inc. was only a mortgage servicing company for Citibank, N.A. when it testified the opposite during the evidentiary hearing in this case and in *Vani*, her perjured testimony that Citibank, N.A. funds all of CitiMortgage, Inc.'s mortgage loans, which would violate bank or OCC and FDIC regulations, her perjured testimony about funding, mischaracterizing the USCBG account when the transactions were for Citigroup's global investments that include student lending globally, etc., her perjured testimony of Citibank taking the loss for Kwan's loans—authoring all those lies, she was conscious and so was AUSA Madden.

---

[117] *See* Kyles, 514 U.S. at 437 (quoting *Bagley*, 473 U.S. at 678).

In fact, since the Seventh Circuit Court of Appeals determined that Madden committed *Maryland v. Brady* violation and was cautioned to avoid making improper propensity arguments in its ____, 2017 Opinion, he simply ignored this caution and continued in his pattern of prosecutorial misconduct even into this case. Madden recidivated, and this time, he demonstrated bolder, flagrant and stunning exploits of indifference to honesty and fairness. Only a little over six months after he was warned against his rampant prosecutorial sins, he went ahead to suborn perjury, lying to this Court and the jury while directly displaying his lack of respect for the justice system where he had been bestowed with increasing power.

### (f) Questionable Prosecution Practices Outside the Department of Justice's Northern District of Illinois Standards

1. *Calling no witness with personal knowledge depriving Petitioner of her constitutional right to confront her accusers.*

2. *Substituting reliable testimony to explain events, transactions or actions with prosecutor's testimony in the guise of argument.*

3. *Backdooring evidence and improperly making arguments unsupported by the record and are not reasonable nor reliable inferences. For example, the checks, the Acknowledgment, Bartko and Kwan's dealings with Petitioner.*

4. *The following are verified lies in Bartko's Plea agreement:*

   a.

   b.

   c.

   d.

*e.*

5. *Making Prejudicial comments of guilt in his closing argument and using charged and prejudicial words such as calling Petitioner a robber and that the mortgage transactions. were a robbery enterprise.*

6. *Speaking with potential witnesses without anyone with him –e.g., Gretchen Wallace. Madden obviously was cognizant of his responsibility to have a witness when dealing with Ms. Wallace because he cc'd the agents who were helping him, yet right before Wallace emailed AUSA Madden about Citibank Domestic Corporation, Inc. being a parent of CitiMortgage, Inc. in 2007, an "off-line" conversation occurred right before that unsolicited email. See Ex. In that email, Wallace emails Madden stating CitiMortgage, Inc. was wholly-owned by Citibank Domestic Investment Inc., which in turn was wholly owned by Citibank, N.A. As mentioned above, this was not the case in 2007.*

### B. Petitioner's was Deprived of her Sixth Amendment Right to an Effective Assistance of Counsel During the Trial in this Case.

1. Petitioner's trial attorney's lack of understanding of Kwan's loans and Citigroup, Inc.'s corporate securitization practices were demonstrated by his failure to properly defend the subject-matter jurisdiction, financial institution element and statute of limitation issues in this case. Specifically, Petitioner's trial attorney was unable to refute the government's lies, deceit and misconduct regarding the actual funding and Citibank, N.A.'s role as a nominal paying agent and a mere custodian of the notes and mortgages in the CMALT. The HELOC too was designated for a Third Party HELOC, which was basically Citi Home Equity, Citigroup, Inc.'s subsidiary..

2. Petitioner's trial attorney failed to argue key exculpatory evidence in the record and any and all reasonable inferences that can be drawn from such evidence that a reasonable competent attorney would have presented to the jury.

   a. Acknowledgment – Petitioner's attorney stipulated to the admission of this document, but he failed to emphasize the importance of this document and relate it to the other documents such as the closing instructions, the document that expressly indicate that the closer represents the lender at the closing. The fact that Taylor who lied each time she had the opportunity and who testified that she could not find the Acknowledgment in the files when asked to look for it in the over ten-year file is irrelevant. It was signed during closing, whether it was in their files or not has no bearing as to whether or not Petitioner concealed Bartko—the answer is obviously not. This could have been an opportunity to bring up CitiMortgage's questionable mortgage practices. Although the Court granted the government's motion *in limine* of not blaming the "victim," the

government obviously opened the door to that when Taylor testified that she could not find the Acknowledgement.

b. Those underwriting documents demonstrate that Petitioner gave her tax returns to the mortgage brokers. The fact that they ended up being offered a stated program does not mean that they were not given Petitioner's tax returns. It was part of the application that the broker requested before the loan processor could begin the process.

c. There were documents that affirmatively prove that Petitioner could not have known of Citibank, N.A.'s involvement in Kwan's loans, but yet, Petitioner's attorney failed to explain these documents to the jury. His opening and closing statements were incoherent. The attorney swapping was disturbing, especially to request $50,000 [ ] in cash just days before trial was to begin knowing Petitioner had wanted Angelini to lead the trial. Each time Petitioner was consulted during trial, Petitioner would do the opposite. To be fair, Petitioner's trial attorney worked hard on the pre-trial motions. He did well with the first few witnesses, but during critical times, Petitioner's attorney missed the marks.

3. Petitioner's trial lawyer failed to make necessary objections to the government's prejudicial arguments and misstatement of facts unsupported by the record and misstatement of law that resulted in a miscarriage of justice.

   a. Charged terms such as "dumping the property" implied financial distress and was unsupported by the record. There were no foreclosure notices, late payments and failed to present extrinsic evidence that would have rebutted the government's inference of financial distress and debunks the government's theory that Petitioner was applying for these loans just to scheme money from the lenders – *e.g.*, a letter sent to CitiFinancial for losing Petitioner's checks multiple times, even after Petitioner sent one to them by Western Union and then again sent another check by Fedex.

   b. Petitioner's trial attorney failed to object to the prosecutor characterizing the checks as "kick backs" when no evidence exist to support that inference.

   c. Petitioner's attorney failed to object to the prosecutors' mischaracterization of Bonnie Pomrenze's (closing agent) relationship to the lender and failed to highlight for the jury specific evidence in the record that would have rebutted the government's false inference that it was presenting to the jury.

   d. Petitioner's trial attorney also failed to present to the jury CitiMortgage, Inc.'s previous misconduct with handling its loans when the government opened the door that Judy Taylor did not find the Acknowledgement in its files.

   e. Petitioner's attorney failed to object to the prosecutor's testifying in the guise of closing argument unsupported by the record, which resulted in the violation of Petitioner's Confrontation Clause –Bartko, Kwan, etc. and contrary to their investigations.

Case: 1:22-cv-00083 Document #: 1 Filed: 01/05/22 Page 63 of 75 PageID #:63

f. Petitioner's trial attorney failed to review the government's exhibits before they went to the jury. If he did, he would have found that the first page of the first loan was attached to Kwan's HELOC settlement statement. This misconduct tantamounted to jury tampering and forgery.

4. On the appellate level, Petitioner's attorney failed to fully grasp the evidence on the record which would have allowed him to respond effectively at the oral arguments in this case. In his brief and at the oral arguments, Petitioner's attorney failed to refute the government's misstatements that were not supported by the record regarding seller's attorney being able to see the borrower's loan documents. First, that is not even the reality of closings and there was uncontroverted testimonial evidence from the government's own witnesses, Taylor and Patricia Wood, when they testified that sellers do not see the buyers' loans. Any other insinuation is a blatant lie.

### C. Factual Realities of Petitioner's Transactions That The Government Instead Fabricated & Argued at Trial Without Any Proof In The Record

**Background:** The government did not call one witness with personal knowledge regarding the transactions in this case for the exception of Michelle Myer, who Petitioner never had any contact. The government back-doored evidence and the prosecutor improperly made arguments unsupported by the trial record and essentially testified to facts not in evidence or articulated inferences to the jury that were contrary to the government's investigations and the realities of the transactions. With that in mind, Petitioner provides this Court with facts known to her:

1. *Loan process.*

2. *Underwriting*

3. 2005 transaction – the call to the accountant –source of income.

4. 2006 transaction – tax returns and income notations in file.

5. 2007 transaction –

6. *Kwan*

7. *Bartko*

8. *Appraiser*

9. *The Checks*

### D. Summary & Final Arguments:

Government misconduct pervaded the prosecution of this case from the very beginning, making it impossible for Petitioner to have obtained a fair trial. It is indeed unusual for the government to excavate mortgage loans that were 9 years and 360 days old (5 days shy of the 10-year statute of limitation) that were not even hers, but instead were one of her buyers' loans. In addition to this bizarre fact, the government also bootstrapped and revived Petitioner's fully paid 13-year-old, 12-year-old, and 11-year-old loans. Here, the alleged FDIC-insured victim's files indicate "no fraud to be found" in its Citilink files. *See* Ex. _. Thus, it exposes yet another unusual fact that points toward the lead prosecutor who essentially coaxed representatives of the FDIC-insured entity to find a way to make themselves "victims" of falsified crimes. There was a myriad of reasons why the government bootstrapped those expired, paid and non-FDIC loans. First, it understood that the indictment against Petitioner, a sitting Circuit Court County judge at that time, would receive media attention and therefore, found a way to amplify the "fraud" in this case and pre-conditioned the jury pool by falsely indicating that a $1.4 million [confirm amount – check indictment] dollar fraud was involved. This is a supposed fact that the government knew the press would highlight repeatedly to sell news. Predictably, the government later slashed that exorbitant amount by more than half. More so, the government realized that its evidence for the 2007 sale transaction was weak to begin with, given the FBI 302 investigative reports of the appraiser—the loan officer, Kwan himself, its main "accuser," Bartko, who mysteriously changed her narratives multiple times after the government put her back against the wall using her other crimes. Bartko pliantly agreed to comport with the government's false narrative. The same government failed to even call her at trial.

In addition to its fabricated straw buyer scheme, the revival of expired loan transactions were used as indictment "padding" also for an improper propensity argument, even though the government could not gather complete files for any of the loans. Although it was evident that cogent information was misplaced in the files to support income information properly disclosed by Petitioner, the government was able to propagate lies and false conclusions.

This is the reason why statutes of limitations are put in place. However, this was only the beginning of the government's methodical misconduct. This Petition focused on issues *beyond* what was presented during pre-trial, post-trial and appeal, but not without bearing in mind that those issues would also have been or should have been decided differently had the government not

suppressed exculpatory evidence. For transactions that occurred over ten years prior to trial, how can the government prove a transaction is part of a fraudulent scheme if it has not procured a complete set of documents included in those transactions. Additionally, how can the government prove fraud if it doesn't present any witnesses (with one exception in Michelle Myers that Petitioner never interacted with throughout her refinance transactions) who had any involvement with these transactions when they took place. More importantly, how does the Petitioner prove what information and documents she provided to the mortgage broker during its loan processors' loan shopping phase, in the underwriting process when those documents were not in her control and witnesses with relevant information are being avoided by the government and they in turn avoid Petitioner. Petitioner dealt with the loan processor of her mortgage broker company, not with the lender representatives when she is applying for her own loans. [incomplete records law].

The transactions in this case were dated August 30, 2004 to April 16, 2007. Petitioner was indicted on April 11, 2017. The prosecution of this case was led by a team of seasoned and experienced attorneys who have extensively prosecuted mortgage fraud cases, most especially the lead prosecutor, Matthew Francis Madden. He and his team knew or should have known that Citibank, N.A. was not acting as a "financial institution" as the statute and case law required: (1) the multiple documents, *including* the underwriting, mortgage, note, and title insurance documents, they exhumed; (2) Citigroup, Inc.'s representatives' responses to the government's subpoenas; (3) the last minute indication of Citibank, N.A. for a "Third-Party HELOC;" (4) the DOJ investigation of Citigroup, Inc. and its subsidiaries' real estate mortgaged backed securities and trusts activities and other corporate funding activities (e.g., GSCs, CDOs, SIV, etc.); (5) the mortgage's industry's securitization realities in pre-2009, transacted by mortgage corporations and not FDIC-insured financial institutions outside the purview of the bank and mail fraud statutes and outside of the ten-year statute of limitation.

To dissolutely push forward its prosecution, the government recklessly relied on Kwan's $73,000 HELOC with Citibank, N.A.'s nominal administrative involvement to argue that it had subject matter jurisdiction and that it was within the ten-year statute of limitation is likened to the government's argument that Chicago is located in the equator. Giving its stamp of approval to "straw lenders," the uncontroverted evidence remains the same that as Taylor and Patricia Wood testified, Petitioner would not have seen Kwan's loan documents and Petitioner absolutely did not. Contrary to the government's false representations, there was no evidence in the record for the

jury to have reasonably inferred that Petitioner knew of Kwan's HELOC because 1) Taylor and Woods testified that Petitioner could not have seen Kwan's loan documents, 2) Kwan had to own the property first before he could obtain his HELOC, 3) Petitioner never signed and seen Kwan's $73,000 settlement statement, 4) As the seller of 625 W. 46th Street, one of Petitioner's tasks is to ensure that the lenders given to the title company to insure was accurate and undoubtedly, that was CitiMortgage, Inc. for both loans and on the day of the closing, that is exactly the entity insured for the two loans and 5) Petitioner never had any mortgages from Citibank, N.A. and she has never dealt with that institution in a mortgage-lender relationship. *See also Petitioner's Affidavit.*

Despite uncontroverted evidence in the record that Petitioner could not have seen Kwan's loan documents and especially not the HUD-1 for the $73,000 HELOC, the government submitted to the jury the HUDs for the loans so that they would look like Petitioner also signed and saw Kwan's $73,000 HELOC HUD-1. Specifically, the lead prosecutor gave the jury Kwan's HUD-1 for the $73,000 loan which was three pages, but then he deceptively added to the back of it the first page of the HUD-1 for the $292,000 loan. This was intentionally done to give the jury the illusion that Petitioner saw Kwan's $73,000 HUD-1 when she absolutely and without a doubt did not. *See* Ex. ___. Prior to that corrupt add-on, Citigroup, Inc.'s representative's written (email and letters) representations to the lead prosecutor should have alerted him of Citibank, N.A.'s administrative role. However, after a telephone conference with the lead prosecutor, where no FBI 302 report was ever disclosed regarding those conversations, the representative mysteriously send in an unsolicited statement, at least in writing, to comport with the prosecutor's meritless argument.

Given the government's methodical suppression of Citibank, N.A.'s actual involvement and the CMALT REMIC 2007-A5 trust that funded the loans, there can only be one viable conclusion: AUSA Madden knew it was out of statute before it even moved to seek an indictment against Petitioner from a grand jury. Thus, as soon as Madden understood that a circuit court judge could be implicated, his prosecutorial vision and focus were not to seek the truth or justice, but were impaired for conviction at the high cost of disrupting the life of a mother of three daughters. This Petition demonstrated this indifference towards the truth, but also the ways he sought to circumvent the truth. When a corrupt prosecutor is bent on proving fictitious frauds, he will go to any lengths to achieve his dubious goal. This explains the many inconsistent representations that emerged after Madden had back-door conversations with Citigroup, Inc.'s employees and representatives. Other discrepancies include key documents of losses favoring Petitioner for

Kwan's $73,000 loan could not be located in Citigroup's files only to be later obtained from the Internal Revenue Service that it was not Citibank that took the loss, contrary to Taylor's testimony in this case, but consistent with her testimony in the *Vani* case.

Petitioner provided this Court with documentary evidence of the government's systematic scheme to suppress exculpatory evidence and distort the facts of this case, leading to the violation of Petitioner's constitutional rights. AUSA Madden outright lied to this Court and the jury several times and also allowed the government's key witness to follow suit in this act of falsehood, especially when asked specific questions during court proceedings. He further misled the jury and ambushed Petitioner's trial team. Having led the prosecution in *United States v. Michelle DiCosola*, the lead prosecutor had first-hand knowledge regarding Citigroup's existing corporate structure in April 2007, yet he claimed the opposite to the members of the jury, and this Court.

Only one conclusion and description befits the lead prosecutor's presentation of his key witness, Judy Taylor—subornation of perjury which demonstrated his corrupt motive to win a conviction at all costs that he constantly ignored the law. An excellent recidivist when it comes to prosecutorial misconduct, lead prosecutor Mathew Francis Madden refused to discontinue his misconducts even though he had been called out for his concealment of exculpatory evidence and making improper propensity arguments just six months prior to the trial in this case.

When doing the right thing was no longer an option for prosecutor Madden, he engineered an indecent case by employing legal violence with impunity under the public eye. His deplorable trademark was engraved on his previous pattern of misconducts, demonstrating his trail of concealment of exculpatory evidence, making improper propensity arguments (*See United States v. Walter*), and presenting witness that lied for him (*See Dicosola 7ᵗʰ Circuit briefs*). These are just a few examples of cases Petitioner was able to gather. This Petition catalogued Madden's pandemic of prosecutorial sins and the paralysis of the Petitioner's attorneys who failed to effectively defend Petitioner throughout the criminal proceedings in this case.

Like a snake lying in wait to swallow innocent creatures, Assistant United States Attorney Matthew Francis Madden seamlessly preyed on the incompetence of Petitioner's trial counsel without conscience. He prosecuted this case by misstating the law to the jury, suppressing exculpatory evidence, suborning perjured testimony, and presenting uncorroborated arguments with non-existent evidence on the record. As if his questionable exploits were not enough, prosecutor Madden doubled down by making arguments contrary to the government's

investigation. The outcome of the same investigation should have prompted him to voluntarily and honorably dismiss this case. However, his unscrupulous thirst for the glory derived from prosecuting a sitting judge knew no bounds. Having abandoned his prosecutorial responsibilities and oath to the Constitution and the People, his self-serving motives resulted in the destruction of Petitioner's religious affiliation with the Carmelites, a reversal in her hard-earned career, life, liberty and more importantly, the sanctity of her family.

He condescendingly requested for an enhanced sentence against Petitioner based on "breach of trust", heartlessly arguing that Petitioner committed "fraud" while working for a state agency even though he knew well enough that the mortgage transactions had zero relationship with Petitioner's position with the Illinois Department of Revenue. Desensitized by his own ambition, the lead prosecutor committed the ultimate breach of trust over and again against the People of the Northern District of Illinois by engaging in "stomach-churning" misconduct comparable or worse than the misconduct discovered in Senator Steven's case.

Instead of carrying out his legal obligations and recommending not to prosecute, he egged the government onto pursue a baseless fraud case, engineered its jurisdiction, disregarded or avoided exculpatory evidence, held out until a few days before trial to address the funding issue to which this Court had to severally compel Citigroup, Inc.'s representatives to procure answers, and then lied time and time again to this Court, the jury, and to the defendant's trial attorneys all the way to the very end. The government's appeal maintained those lies especially when it matter the most. *See transcript of oral arguments.*

When the government could not bully Petitioner to plea to fabricated crimes or reconcile its evidentiary issues, its lead prosecutor found a way to manipulate the information previously provided to him directly by Citigroup, Inc.'s representatives and executives. When the DOJ wanted facts to be adjusted to suit its needs, they were changed during evidentiary hearing and at trial. When sensitive documents needed to disappear in the government's favor, they were nowhere to be found. Based on the revelations of multiple documents, the government knew or should have known at the beginning of its investigation that it had questionable federal jurisdiction and that the transactions it was investigating were outside the statute of limitation and were not under its jurisdiction.

Petitioner believes that this Court will not blindly tolerate injustice. And after reviewing the numerous egregious violations committed by such a group of experienced prosecutors, your

Honor will see right through all the unfounded excuses and premeditated lies this prosecutor is expected to employ to respond to this Petition.

The government's accelerant happened to be a defense attorney who was underprepared to go to trial. He failed to put together a coherent theory of defense and gather evidence that would have invalidated and exposed the government's malicious scheme to win at all costs and illegally obtain a conviction. Although Petitioner's trial attorney worked hard on pre-trial motions, the basis of those motions narrowed his vision, therefore crippling his chance of understanding key documents in the case and objecting to the government's misstatement of law, and making critical arguments that a competent attorney would have presented to the jury. Even the government could not help but highlight the lack of defense during its rebuttal argument. Petitioner's trial attorney was consumed by mounting pressure from his law firm to manifest the promised plea should his all-out motions be denied.

The government further pounced on the weak understanding of Petitioner's trial attorney about the gallimaufry of financial instruments involved in this case, emboldening Madden to lie, cheat and deceive this Court. Petitioner's appeal attorney also lacked understanding of the financial transactions. Like Petitioner's trial attorney, he failed to make meaningful arguments in his brief and respond to a simple question posed by the Chief Judge of the Seventh Circuit Court of Appeals during oral arguments— a vital stage to the element of intent for the crimes of bank and mail fraud. In its brief and during oral argument, the government continued to bask in its misconduct, crystallizing its indifference for the rule of law, truth, and justice. As detailed above, the government obtained a conviction fermented in the distillery of untruths and deceptions, and only intersected by a defense intoxicated with cluelessness.

Senator Ted Stevens was convicted in 2008, and the case was properly dismissed on April 7, 2009 at the request of then US Attorney General Eric Holder. More than a decade has passed and another set of experienced attorneys in the Midwest have presented a case founded on lies, deception and subornation o fabrications. Is this the criminal justice system we wish for our children and their children to inherit? Would you think justice was served or that it existed at all if it was your sons and daughters or any of your loved ones in Petitioner's case?

[ ]

# V.  CONCLUSION

The government's excavation of over a decade old loan applications, despite the United State's Supreme Court's consistent mandate that "criminal statutes are to be liberally construed ***in favor of repose***, so that prompt investigation of criminal activity is encouraged,"[118] was only the start of its deceptive scheme. Given the Seventh Circuit's holding in *United States v. Yashar*[119] "…that for offenses that are not continuing offenses under *Toussie,* the offense and the limitations period begins to run once all elements of the offense are established, regardless whether the defendant continues to engage in criminal conduct.  This interpretation is [consistent] with the purpose and language of the statute of limitations,"[120] this Court would have properly dismissed this case had the government prosecuted this case constitutionally and not otherwise. The government's manipulation of the statute of limitations denied Petitioner's protection from defending against charges where exculpatory documents were lost or destroyed[121] with the passage of time.  The government's success relied on incomplete records, concealment of exculpatory evidence, misrepresentations to the jury and the Courts, making arguments that are not supported or are inconsistent with the record, providing deceptive testimony, and in some crucial phases

---

[118] *U.S. v. Anderson*, 188 F.3d 886,887 (7ᵗʰ Cir. 1999) *quoting*, *United States v. Scharton*, 285 U.S. 518, 522 (1932) (*Emphasis added*).

[119] 166 F.3d 873, 879 (7ᵗʰ Cir. 1999).

[120] *Id.* at 880.  In *United States v. Anderson*, 188 F.3d 886 (7ᵗʰ Cir. 1999), the Seventh Circuit held that, "Just as mail fraud is punishable once the material is placed in the mail, *see United States v. Berger,* 178 F.3d 844, 1999 WL 288493 at  *2 (7ᵗʰ Cir. 1999), the crime of bank fraud is complete when the defendant places the bank at risk of financial loss, and not necessarily when the loss occurs."

[121] All mortgage brokers that Petitioner dealt with were long out of business when the Government began its investigations.  The mortgage company that brokered Kwan's loans to purchase 625 W. 46ᵗʰ Street, which included the Citibank, Inc. loan, apparently was also out of business. Thus, Petitioner was left to defend herself with incomplete records. Moreover, the out of statute transactions, involving non-FDIC lenders, were un-charged; the district court allowed the out-of-statute transactions to go forward nonetheless, Despite his promise to the district court that he would not make any propensity arguments relating to the out-of-statute transactions, he did so in his closing argument, and invited the jury to convict based on those out-of-statute transactions.  Tr. __, Vol. __, lines __.

during the trial, outright lies, and making improper propensity arguments, while Petitioner was deprived of the reasonable probability that disclosure of complete records, exculpatory evidence, and effective or competent representation would have changed the result of the proceedings.

Significantly, the bank fraud statute was modeled after the mail and wire fraud statutes, both of which use "executions" in connection with the use of the mails or an interstate wire communication in furtherance of the scheme to defraud.[122] With the bank fraud statute, however, the federal jurisdiction is provided by the federal backing of the financial institution through the FDIC as a basis for federal intervention into otherwise local frauds.[123] In other words, in 2007, the Department of Justice had no federal jurisdiction over the sale transactions in its indictment. The government deceived this Court and jury into believing that it had federal subject-matter jurisdiction over the out-of-statute transactions even though none existed.

To present a false narrative and misleading "facts" to the jury, the government presented partial evidence (*e.g.*, presenting a bank representative to identify checks as being presented at Chase without providing any evidence as to their purpose or any facts and circumstances surrounding them, and improperly argued a false narrative that was unsupported by the trial record). Furthermore, despite their availability, the government strategically did not call a single witness that personally interacted with Petitioner in connection with the transactions underlying the conviction, or who possessed personal knowledge regarding the transactions alleged in its Indictment. In fact, this Court was alarmed by this pattern during pre-trial when the government

---

[122] *See* 18 U.S.C. §§ 1341 and 1343 (criminalizing participation in a scheme by those who, "for the purpose of executing such scheme," use the Postal Service or overnight carrier or engage in an interstate wire communication). *Id.*

[123] *See, e.g., United States v. Walters*, 997 F.2d 1219, 1223-24 (7th Cir. 1993) (reversing mail fraud conviction of sports agent).

announced that it was not calling its key witness, Bartko on the Thursday before trial began the following Monday.[124]

When the government could not legally close these evidentiary gaps, it resorted to a comprehensive and corrupt prosecutorial scheme to obtain a conviction at all costs. Given the sheer volume of its misconduct, the only conclusion is that this government perpetrated fraud against the Court to obtain its conviction, resulting in an error of constitutional and jurisdictional magnitude.

This Court is the last check upon prosecutorial accountability. Ignoring this prosecutor's flagrant disregard of his ethical duties will only hurt other citizens, the DOJ and the integrity of our judicial system. Specifically, as it stands, there are many articles that say that the courts protect prosecutors or conceal their identities when they are said to have crossed the ethical prosecutorial lines. Petitioner believes in the courage, wisdom and fairness of this Court. Given the egregious prosecutorial misgivings in this case, this Court has the opportunity to lead the district courts in holding prosecutors accountable for their misconduct. Only then can our children and our children's children have a deserved chance at true and solid justice. Just as Martin Luther King said, injustice for one is injustice for all. The damage this prosecutor has inflicted on the people of his district is up to this point boundlessly unknown.

Given that prosecutors enjoy *almost* unlimited discretion, including who and what to charge, based on nothing more than the vague standard of whether the prosecution serves "a substantial federal interest,"[125] the courts must have zero tolerance for any misconduct if our nation is serious about reforming our criminal justice system. The government's comprehensive pattern

---

[124] Tr. Final Pre-Trial Conference (Part 1A), p. 62, lines 14-16 (Feb. 1, 2018).
[125] Justice Manual, § 9-27.220 (formerly, United States Attorneys Manual).

of lies here defied the limits of discretion and every citizen in this country has the right to know the extent to which this prosecutor's corrupt prosecutorial activities damage people's lives.

The government's act of trampling upon the Constitution to obtain Petitioner's conviction through an egregious misconduct must not be met with a blind eye. Every citizen of this country regardless of race, gender, religion or profession deserves to enjoy his or her right to a fair trial and due process of law.

WHEREFORE, Petitioner respectfully request that this Court overturns her conviction and dismiss this case with prejudice. At a minimum, Petitioner requests that this Court schedules a hearing on this Petition.

Respectfully submitted,

JESSICA A. O'BRIEN, *Pro Se*
17cr239obrien@gmail.com
312-965-9604