**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JESSICA ARONG O'BRIEN, | |
| Petitioner, | No. 22 C 00083 |
| v. | Judge Thomas M. Durkin |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**MEMORANDUM OPINION AND ORDER**

*Pro se* petitioner Jessica Arong O'Brien ("O'Brien") was charged and convicted in 2018 of a scheme to commit bank and wire fraud. The Court sentenced O'Brien to two concurrent one-year sentences, followed by two concurrent two-year terms of supervised release. *United States v. O'Brien*, No. 17 CR 239 (N.D. Ill. Dec. 21, 2018), ECF 325.[1] The Seventh Circuit affirmed her conviction on appeal. *United States v. O'Brien*, 953 F.3d 449 (7th Cir. 2020). O'Brien then filed a timely petition for relief under 28 U.S.C. § 2255, raising numerous issues regarding the underlying proceedings. R. 10. For the following reasons, the Court denies O'Brien's Petition in its entirety.

**BACKGROUND**

**I.    Indictment**

---

[1] Citations to O'Brien's criminal case record will be referred to throughout this Opinion by "C.R. [docket number]." Citations to the docket in this § 2255 Petition will be referred to as "R. [docket number]."

On April 11, 2017, O'Brien, a former Cook County judge who had an extensive background in real estate as a loan originator, mortgage consultant, real estate broker, and owner of a real estate company, and an accomplice, Maria Bartko, were charged with mail and bank fraud. C.R. 1. The indictment charged that, from approximately 2004 to 2007, O'Brien and Bartko participated in a scheme related to two investment properties that O'Brien owned in Chicago at 625 West 46th Street ("the 46th Street property"), and at 823 West 54th Street ("the 54th Street property"). Specifically, in 2004, O'Brien purchased the 46th Street property by falsifying her income and liabilities in order to obtain a mortgage. *Id.* at 5. In 2005, she refinanced both properties through Bartko by submitting applications with false statements as to her income. *Id.* at 5–6. In 2006, O'Brien fraudulently obtained a commercial line of credit, which she used to pay expenses on both properties. *Id.* at 6–7. And finally, in 2007, O'Brien agreed to sell the properties to Bartko through a straw buyer, Christopher Kwan, who was fraudulently qualified to purchase the properties. *Id.* at 7–9. O'Brien wrote checks to Bartko for her role in acquiring the properties. *Id.* Count One of the indictment alleged that O'Brien committed mail fraud under 18 U.S.C. § 1341 when, on April 16, 2007, she and Bartko caused the mailing of a check to pay off O'Brien's mortgage on the 46th Street property. Count Two of the indictment alleges that O'Brien committed bank fraud under 18 U.S.C. § 1344 on the same day when she caused Citibank, N.A. ("Citybank"), a financial institution, to fund a home equity line of credit in the amount of $73,000 (the "HELOC") for Kwan's purchase of

the 46th Street property. On January 26, 2018, Bartko entered a guilty plea by which she admitted to Count One of the indictment. C.R. 205. She did not testify at trial.

## II.     Pre-Trial Motions

### A. The Duplicity Motion

On May 16, 2017, O'Brien filed a motion to dismiss the indictment based on duplicity, alleging that each of the 2004, 2005, 2006, and 2007 transactions constituted separate offenses, and that the indictment improperly joined two or more offenses into a single count. C.R. 45, 46. The motion argued that, by charging earlier, separate conduct as a "scheme," the government was inappropriately attempting to evade the ten-year statute of limitations. C.R. 46 at 18–19. This Court denied the motion, holding that the government acted within its discretion to charge a single scheme, that the transactions "are fairly characterized as one scheme," and that any potential prejudice would be cured by "a jury instruction and special verdict form making clear that the jury 'must unanimously agree' that each element of the mail and bank fraud statutes have been met based on the 2007 executions." C.R. 116 at 18, 24.

### B. The Motions to Compel

On September 18, 2017, O'Brien filed a motion to compel Citibank and CitiMortgage, Inc. ("CitiMortgage") to produce documents responsive to her multiple subpoenas seeking the identity of "the entity that funded the $73,000 loan, namely the owner of Account 38682027." C.R. 100 at 3. Citibank and CitiMortgage responded that neither entity found any responsive documents and provided a declaration that

3

the account was "assigned to the broker channel (a/k/a wholesale lending)," but did not specify which entity it was referring to. *Id.* at 4. O'Brien sought to compel Citibank and CitiMortgage to conduct a search for any documents that would reveal the identity of the entity that owned the account. *Id.* at 6. O'Brien contended that this was important because she believed that CitiMortgage, not Citibank (as alleged in the indictment), funded the HELOC. *Id.* at 1. CitiMortgage was not insured by the FDIC in 2007, and thus it did not meet the definition of a "financial institution" under the bank and mail fraud statutes at the time. *Id.* If CitiMortgage alone funded the HELOC, she argued, the government would not be able to prove she defrauded a financial institution, as required to prove bank fraud, and a five-year statute of limitations would apply to her mail fraud charge and cause it to be time-barred. *Id.*

This Court set a hearing on the motion and ordered Citibank employees Tonya Cwach and Judy Taylor to appear. C.R. 108, 109, 113. Taylor, a Citibank vice president, testified during the hearing that the $73,000 for the HELOC were "Citibank funds," that the HELOC "was a Citibank product," and that the funds were "requested from the Citibank cash account and transferred over to the wholesale lending account." C.R. 113 at 62–63, 77–79, 105. The Court denied the motion to compel, finding that the Citi entities had properly responded to the subpoenas as they understood them. *Id.* at 122–27. O'Brien's attorney was counseled to work with Citi's counsel to craft a subpoena directed at the specific documents O'Brien was seeking. *Id.*

O'Brien then issued more subpoenas directed to Citibank and CitiMortgage, resulting in Citibank filing a motion to quash, O'Brien filing additional motions to compel, and a government report on O'Brien's inappropriate use of subpoenas. C.R. 120, 122, 124, 129, 132. The Court reviewed documents that Citibank withheld from O'Brien *in camera* and determined that they were privileged and did not answer her question regarding ownership of the funds. C.R. 142 at 4. Citi's counsel informed the Court that the documents O'Brien sought regarding the wire transfer information for the HELOC funds were no longer available per Citibank's document retention policy. *Id.* at 5.

### C. The Statute of Limitations Motion

On December 19, 2017, O'Brien moved to dismiss the indictment on the basis that a five-year statute of limitations, rather than the ten-year statute applicable to fraud that "affects a financial institution," barred the charges against her. C.R. 139. She again argued that the documents produced so far showed that CitiMortgage, not Citibank, funded the HELOC, and CitiMortgage was not an FDIC-insured institution at the time. *Id.* This Court denied that motion because it found that there was "significant evidence" that Citibank funded the loan, including Taylor's testimony at the evidentiary hearing on O'Brien's motion to compel and multiple documents which identified Citibank as the lender. C.R. 201 at 7–8. The Court further found that even if CitiMortgage funded the loan, the jury could find that O'Brien's scheme affected a financial institution because it exposed Citibank, CitiMortgage's parent company, to increased risk. *Id.* at 11–15.

### D. The Perjured Grand Jury Testimony Motion

O'Brien also moved to dismiss the indictment on the grounds that the government allegedly knowingly presented Bartko's perjured testimony to the grand jury, and that the indictment was based on this testimony. C.R. 131. Specifically, she alleged that Bartko lied about O'Brien concealing Bartko's identity as a purchaser from the lenders. *Id.* at 5. As proof that Bartko committed perjury, O'Brien produced acknowledgements signed and notarized by Bonnie Pemreze, the closing agent for the 2007 purchases, which read, "Acknowledgment & Agreements Between Christopher Kwan/Maria Bartko ('Buyers') and Jessica O'Brien ('Seller')" (the "Acknowledgments"). C.R. 131-2, 131-3. Citibank, however, stated that the Acknowledgments were not given to it and could not be found anywhere in its system. O'Brien also argued that Bartko lied about the condition of the properties when she told the grand jury that they were in "excellent condition" and not in need of repairs. O'Brien argued that the Acknowledgements stated the properties were being sold "as is" and noted some minor repairs to be done. *Id.* O'Brien therefore contended that the checks she wrote to Bartko were not illegitimate payments for purchasing the properties, but rather legitimate payments used to make those repairs. C.R. 131.

The Court denied the motion and held that O'Brien had merely shown that there was some exculpatory evidence, and that the government was under no obligation to present such evidence to the grand jury. C.R. 159. It further emphasized that it could not find that Bartko had lied to the grand jury without improperly weighing competing evidence and taking on the role of factfinder. *Id.*

### E. Pre-Trial Proceedings

On January 30, 2018, less than a week before trial, Citibank produced documents responsive to a government request for "a statement from the Citibank treasury . . . which would evidence the debits made on April 16, 2007 to the CitiMortgage, Inc. account, a portion of which was then debited to the CMI Wholesale Lending account to fund the Kwan loan." C.R. 264 at 7; C.R. 203. The government initially moved to continue the trial on the basis that there might be more documents. At a status hearing on the issue, Citibank counsel Katherine Lessaris informed the Court that Citi had previously assumed the documents had been destroyed per the document retention policy, but it had just discovered these documents after working with various employees to find them. C.R. 264 at 7–8. The Court noted that the government's request did not seem to be "markedly different than what had been requested by numerous defense subpoenas." *Id.* at 8–9. Lessaris responded that the documents were entirely consistent with Taylor's prior testimony and did not add any new information. *Id.* at 9–10. The government then withdrew its motion to continue the trial. *Id.* at 22.

The pretrial conference was held on February 1, 2018. C.R. 253. During it, this Court reminded the government that it needed to prove that the scheme "affected a financial institution . . . otherwise, it's a five-year statute of limitation on Count I." *Id.* at 131.

### III. Trial

7

O'Brien's trial began on February 5, 2018. R. 261. The government presented evidence that, in her 2004 loan application to purchase the 46th Street property, O'Brien reported a $6,800 monthly income, which inaccurately included her husband's income when he was not listed as a co-buyer, and failed to disclose liability for her personal residence, her unpaid leave from her job, and her actual wages. C.R. 364-1; C.R. 364-3; C.R. 364-17; C.R. 364-19; C.R. 256 at 215–28. It also presented evidence that, in 2005, O'Brien inflated her income from her realty company from $21,000 a *year* to $20,000 a *month* to qualify for more than $100,000 in cash-out refinances on her 46th Street and 54th Street properties' mortgages. C.R. 364-3; C.R. 364-8; C.R. 364-18. The government further presented evidence that O'Brien misrepresented her realty company's revenue, profits, and liabilities to obtain a commercial line of credit and loan to pay mortgages and expenses on the 46th Street and 54th Street properties in 2006. C.R. 364-12; C.R. 364-13; C.R. 364-18; C.R. 364-20.

The focus of the trial was the government's evidence that, in 2007, O'Brien purported to sell the 46th and 54th Street properties to Kwan, a shell buyer, when Bartko was the true recipient of the properties, and that O'Brien paid Bartko kickback checks. Evidence the government presented included the notarized Acknowledgments signed by O'Brien, Kwan and Bartko, evidencing O'Brien's knowledge that Bartko was the true buyer. C.R. 364-21; C.R. 364-22; C.R. 364-23. In addition, the government presented two checks for over $35,000, executed by O'Brien to Bartko, dated the day before closing, with the 46th Street and 54th Street

properties' addresses handwritten at the top. C.R. 364-6; C.R. 364-10. There was also a $4,000 check dated the day of the 46th Street closing from O'Brien to Kwan, which Kwan endorsed to Bartko. C.R. 364-11. There was further evidence that Kwan qualified for a traditional mortgage and the HELOC on the 46th Street property but failed to disclose Bartko's status as a buyer and O'Brien's payments to her on his HUD-1 forms. C.R. 364-4; C.R. 354-5; C.R. 364-9. Finally, the government showed that Kwan executed a quitclaim deed transferring the property to Bartko for $10 consideration about a month after his purchase of the properties. C.R. 364-24; C.R. 364-25.

To prove that O'Brien's scheme affected a financial institution, as required to convict O'Brien under the bank fraud statute and to establish the ten-year statute of limitations, the government again called Citibank vice president Judy Taylor as a witness. She testified that Citibank funded the $73,000 HELOC. Specifically, the government introduced through Taylor several exhibits illustrating the flow of the money from Citibank to CitiMortgage, funding both Kwan's $292,000 mortgage loan and his $73,000 HELOC on the 46th Street property as part of the 2007 sales. C.R. 257 at 667–79. Taylor traced the funds from a Citibank Treasury account (namely, "Citibank N.A. for USCGB Treasury"), to a CitiMortgage account, to another CitiMortgage account (a CitiMortgage Wholesale account), to the title company. *Id.* at 658–60, 667–74. The same process took place for both the mortgage and the HELOC. *Id.* at 660. Taylor also testified that, in 2007, CitiMortgage was wholly

owned by Citibank, an FDIC-insured institution, and that Citibank sustained CitiMortgage's losses. *Id.* at 652–53, 741–42.

As described in the sections below, during closing arguments, the prosecutor made statements that O'Brien now argues were improper and prejudicial, but her attorney did not object at the time. At the close of the government's case, O'Brien moved for a judgment of acquittal. C.R. 260 at 42-43; R. 225. At the close of evidence and following the jury charge, she moved for a directed verdict. R. 261 at 1049–50. The Court reserved ruling until after the jury returned a verdict. *Id.* at 1173. The jury returned guilty verdicts on both counts, after which O'Brien renewed her motion for judgment of acquittal and sought leave to file a written motion, which the Court granted. R. 262 at 1334–35.

## IV.    Post-Trial Proceedings

O'Brien moved for a new trial. Her motions challenged: the sufficiency of the evidence to support the jury's finding of a scheme; whether the scheme alleged in the indictment differed materially and prejudicially from the scheme proven at trial; the sufficiency of the government's evidence on the scheme to defraud and financial institution elements; whether "affecting a financial institution" is unconstitutionally vague; and the sufficiency of the evidence on Count Two to show her intent and causation. C.R. 225, 277, 288. This Court denied all the motions. C.R. 292. On December 20, 2018, the Court sentenced O'Brien to concurrent terms of twelve months and one day imprisonment on each count of the indictment, followed by two concurrent two-year terms of supervised release. C.R. 324, 325.

10

### A. Appeal

O'Brien appealed her convictions, arguing that the charges against her were duplicative; that the statute of limitations should have barred three out of four of the alleged offenses; that the district court should not have admitted evidence offered to prove the time-barred offenses; and that there was insufficient evidence to support the verdict, including on the financial institution element and O'Brien's knowledge of a financial institution's involvement. *United States v. O'Brien*, 953 F.3d 449, 453 (7th Cir. 2020). Oral arguments focused heavily on the weight of the evidence supporting how O'Brien could have known that Citibank funded CitiMortgage loans. The Seventh Circuit affirmed her conviction, notably finding that the jury could have found she had knowledge of Citibank's funding of Kwan's loans from O'Brien's significant history in the real estate industry, her prior dealings with Citibank for the 46th Street property mortgage (though she had only dealt with CitiMortgage), and her significant involvement in the transaction as both seller and seller's counsel. *Id.* The United States Supreme Court denied her petition for a writ of certiorari. 141 S. Ct. 1128 (2021).

### B. Section 2255 Petition

On January 12, 2022, O'Brien timely filed her § 2255 Petition, arguing that the government engaged in prosecutorial misconduct by: misstating the law and facts to the jury; making prejudicial comments during closing argument; tampering with a

trial exhibit; suborning perjury; and suppressing exculpatory evidence. R. 10. She also argues that she was deprived of her right to effective trial and appellate counsel.[2]

## LEGAL STANDARD

Section 2255 allows "a prisoner under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States. . . [to] move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).[3] A criminal defendant is entitled to relief from his conviction and sentence if "the court finds . . . that there has been a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." *Id.* § 2255(b). A court may deny a Section 2255 petition without an

---

[2] In her Reply and Supplemental Reply Briefs, O'Brien raises a number of arguments for the first time. Those arguments include that the government violated *Brady* and *Giglio* by failing to provide O'Brien the transcript of Judy Taylor's testimony in a different case (*United States v. Vani*), that the government committed misconduct in failing to disclose Bartko's criminal background to the grand jury and in emailing with the Attorney Registration and Disciplinary Committee regarding O'Brien's law license, and that the Court's reliance on "inaccurate" information in the presentence report was a violation of Due Process. The Court will not consider these arguments. *Porco v. Trustees of Ind. Univ.*, 453 F.3d 390, 395 (7th Cir. 2006) (even when litigant is *pro se*, arguments made for the first time in reply brief are waived).

[3] Though O'Brien is no longer in prison, and her supervised release ended in June 2022 (R. 10 at 6), she is still considered "in custody" for purposes of this § 2255 petition because she was under supervised release as of the date she filed this petition. *Clarke v. United States*, 703 F.3d 1098, 1101 (7th Cir. 2013) ("supervised release is a form of custody."); *Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) ("That [a § 2255 petitioner] is no longer in custody or on supervised release . . . does not preclude our review. [The petitioner] was in custody when he filed the motion, and that is all that is required to be 'in custody' under the statute."); *United States v. DeKelaita*, 391 F. Supp. 3d 866, 870 (N.D. Ill. 2019) (the determination of whether a petitioner is in "custody" relates back to the date on which the § 2255 petition was filed).

evidentiary hearing if "the motion and the files and records of the case conclusively show" that the defendant is not entitled to relief. *Id.* Section 2255 relief is reserved for "extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States,* 733 F.3d 870, 878-79 (7th Cir. 2013).

A claim cannot be raised for the first time in a § 2255 petition if it could have been raised during trial or on direct appeal. *Sandoval v. United States*, 574 F.3d 847, 850 (7th Cir. 2009). A court cannot consider such defaulted claims on collateral attack unless the petitioner shows both cause and prejudice for the default. *Hale v. United States*, 710 F.3d 711, 713 (7th Cir.2013). Absent cause and prejudice, procedural default is only excused if the petitioner can show that she is "actually innocent." *Torzala*, 545 F.3d at 522.

## DISCUSSION

The Court will address the claims in O'Brien's wide-ranging and extensive Petition[4] systematically. First, in order to determine the standards by which it may consider the merits of O'Brien's claims, the Court considers the procedural posture of her claims in Section I. Upon a finding that O'Brien's myriad prosecutorial misconduct claims are procedurally defaulted, each claim is addressed individually for cause and prejudice on the procedural default and on the merits in Section II.

---

[4] The Petition, supplemental brief, response, reply, and supplemental reply, along with their exhibits, total nearly 1,600 pages.

Finally, the Court addresses the merits of O'Brien's ineffective assistance of counsel claims in Section III.

## I. Procedural Defects

Notwithstanding the fact that O'Brien is a former attorney and Cook County Judge, the Court construes O'Brien's Section 2255 motion liberally because she is *pro se. Smith v. Dart*, 803 F.3d 304, 311 (7th Cir. 2015). The Court, however, cannot overlook the fact that many of O'Brien's arguments—though couched in constitutional terms—raise the same arguments made in her pre- and post-trial motions and that were rejected by this Court and the Seventh Circuit on appeal. Other arguments are raised for the first time.

### A. Claims Raised and Rejected on Appeal

First, many of the arguments O'Brien raises are recapitulations of her arguments made on appeal regarding the government's proof of the financial institution element and the statute of limitations. For example, all seven of her claims that the prosecution suborned perjury are essentially arguments that government witness Taylor lied about the involvement of Citibank, an FDIC-insured financial institution, in funding and absorbing the loss of the loans at issue. In support of her arguments, O'Brien rehashes many of the same arguments that her attorneys made in pre-and post-trial motions and on appeal that the government had insufficient evidence that the scheme affected a financial institution. Her arguments in her Petition that the prosecution misrepresented Citigroup's corporate structure and the funding of the loans at issue are similarly reiterations of those prior arguments.

14

Because these claims have already been considered by this Court and the Seventh Circuit on appeal, they therefore may not be reconsidered on a Section 2255 motion absent changed circumstances of fact or law. *Varela v. United States*, 481 F.3d 932, 935 (7th Cir. 2007) (A Section 2255 motion "is neither a recapitulation of nor a substitute for a direct appeal." (quoting *Belford v. United States*, 975 F.2d 310, 313 (7th Cir. 1992), *overruled on other grounds*)); *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995). O'Brien presents documents that she claims show the government misrepresented facts in front of the jury. But none of these documents carry the weight she says they do, as discussed *infra*. In the end, O'Brien has not presented evidence of any changed circumstances that would give the Court reason to revisit its prior determinations here, and O'Brien's Petition should be denied on these claims. The Court nevertheless addresses the merits of her arguments and finds them lacking.

### B. Procedurally Defaulted Claims[5]

Additionally, although O'Brien argues here that the government engaged in prosecutorial misconduct—including because it allegedly: misstated law and fact to the jury; made prejudicial comments; tampered with evidence; suborned perjury; and

---

[5] The government does not argue procedural default except on the subornation of perjury claims. But a district court may consider *sua sponte* whether a claim is procedurally defaulted unless the government has affirmatively waived the issue. *See Varela*, 481 F.3d at 936 (affirming denial of Section 2255 motion on procedural default grounds even though default was not raised by the government).

committed *Brady* violations—all of these claims could have been brought on appeal.[6] Generally, a claim that could have been raised on direct appeal is defaulted when raised in a Section 2255 petition absent evidence of actual innocence or cause and prejudice. *Delatorre v. United States*, 847 F.3d 837, 843 (7th Cir. 2017) (citing *Hale v. United States*, 710 F.3d 711, 713-14 (7th Cir. 2013)). The actual innocence exception allows a petitioner to proceed under Section 2255 if she can demonstrate: (1) a legitimate constitutional claim; and (2) a credible and compelling claim of actual innocence. *Schlup v. Delo*, 513 U.S. 298 (1995). But even assuming an underlying constitutional claim, "tenable actual-innocence pleas are rare." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). The exception is available "only when a petition 'presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Id.* at 385, 401 (quoting *Schlup*, 513 U.S. at 316). A claim "must have the support of 'reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence.'" *Arnold v. Dittmann*, 901 F.3d 830, 836 (7th Cir. 2018) (quoting *Schlup*, 513 U.S. at 324). And that evidence must make it "more likely than not that no reasonable juror would have convicted [the petitioner]." *Id.*

Accordingly, to demonstrate actual innocence, O'Brien must produce "reliable evidence" that the government's charges are baseless and that her innocence is

---

[6] O'Brien's ineffective assistance of counsel claims are not procedurally defaulted, though raised for the first time on collateral review. *Massaro v. United States*, 538 U.S. 500, 508-09 (2003).

apparent. But as both this Court and the Seventh Circuit have already noted, the government presented adequate evidence of O'Brien's guilt. And O'Brien has not produced any reliable evidence to the contrary (including to dispute critical evidence, such as the checks she wrote to Bartko and Kwan). In fact, aside from bald factual assertions with no citations to evidentiary support,[7] her own opinions or knowledge,[8] documents which do not actually say what she argues they do,[9] and arguments that the Court should weigh the evidence differently than the jury did, O'Brien offers nothing at all. She cannot overcome procedural default on this basis.

O'Brien has also not demonstrated cause and prejudice. To excuse a procedural default, O'Brien must demonstrate: (1) good cause for failure to raise the defaulted claim before collateral review; and (2) actual prejudice because of the violations alleged. *Delatorre*, 847 F.3d at 843 (citing *Theodorou v. United States*, 887 F.2d 1336, 1340 (7th Cir. 1989)). Though she argues that her trial and appellate counsel were

---

[7] *See, e.g.*, R. 30 at 34-36 ("Bartko and Kwan were business partners for all purposes. . . . Kwan told [O'Brien's] counsel, that [O'Brien] had nothing to do with his business dealings with Bartko. . . Kwan actually assisted Bartko with some plumbing issues in one of the properties they purchased . . . it was Bartko who offered to purchase Petitioner-Defendant's properties. . . . none of the parties attempted to influence the appraisal of the property and the price was in line with the appraiser's comparables or 'comps.' . . .").

[8] *Id.* ("[O'Brien] initially wanted to keep 625 W. 46th St. . . . [O'Brien] is a fair person and had no intention of not keeping her promises . . . [O'Brien] had no knowledge or involvement with Kwan and Bartko's business arrangements—None! . . . Given how Taylor perjured herself, her testimony on this issue was unreliable. . . . [O'Brien] did not even know that Citibank was involved.")

[9] For example, O'Brien makes much of what she calls the "CMALT" document. But as described at length below, the evidence shows that the CMALT had nothing to do with the loans at issue and was merely a vehicle Citi used to sell already-existing mortgage securities on the open market, not to fund original mortgage loans as O'Brien argues.

ineffective, this does not provide the basis for a finding of cause because she does not argue, except for a few limited exceptions, that their ineffectiveness was the reason for the default. Rather, she generally takes issue with their argument performance and strategies. And in the limited circumstances in which she does argue that her counsel was deficient by failing to object to or raise certain arguments identified below, she does not demonstrate prejudice.

O'Brien also argues that she did not raise her defaulted arguments on direct appeal because she did not discover extrinsic evidence of some of the supposed prosecutorial misconduct until after she was released from prison. While this is a legitimate reason for O'Brien's failure to raise these issues on direct appeal, *see, e.g.*, *United States v. Evans*, 224 F.3d 670, 674 (7th Cir. 2000), she also does not establish prejudice in this regard. The Court addresses the lack of prejudice as to each claim below. Therefore, the Court rejects O'Brien's myriad prosecutorial misconduct claims as procedurally defaulted. Notwithstanding their default, the Court finds that O'Brien's claims can be rejected for the additional reason that they are meritless.

## II.     Prosecutorial Misconduct

O'Brien's Petition primarily alleges a purposeful scheme of prosecutorial misconduct. The Court analyzes any claim of prosecutorial misconduct under the test articulated by the Supreme Court in *Darden v. Wainwright*, 477 U.S. 168 (1986). *Whitehead v. Cowan*, 263 F.3d 708, 728 (7th Cir. 2001). Under this dual-prong test, the Court first examines the prosecutor's actions in isolation and determines "whether they were proper." *Hawthorne v. Cowan*, 224 F. Supp. 2d 1178, 1187 (N.D.

Ill. 2002) (citing *Whitehead*, 263 F.3d at 728). If the Court finds the actions were improper, "it examines them in the context of the whole record to determine whether the defendant was denied a fair trial. *Id.* This analysis includes six factors: (1) whether the prosecutor misstated the evidence; (2) whether the prosecutor's remarks implicate the constitutional rights of the accused; (3) whether the defense invited response; (4) the court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut. *Whitehead*, 263 F.3d at 729. The most important factor is the weight of the evidence against the defendant. Where the evidence of guilt is strong, the prosecutor's remarks are much less likely to have deprived the defendant of a fair trial. *Id.*

### A. Misstatement of Law to the Jury

First, O'Brien argues that the prosecutor misstated the law to the jury during closing arguments when he stated:

> In considering whether the government has proven that scheme to defraud, the government must prove that one or more of the false or fraudulent pretenses, representations, or promises charged in the portion of the indictment describing the scheme be proved beyond a reasonable doubt. And I underlined the last line here: The government, however, is not required to prove all of them. This is a case where we have charged—and you've heard about numerous lies, . . . and numerous times when the defendant concealed material information from lenders. We only need to prove one of those as part of the scheme.

C.R. 261 at 1201. O'Brien's attorney failed to object. O'Brien argues this statement was wrongful because the Court had instructed the government that it needed to specifically prove the 2007 "straw buyer" transaction, or the case would not go to the jury because of the statute of limitation issues. C.R. 255 at 23.

19

O'Brien is correct as to the Court's instructions. But she is wrong that the prosecutor did not follow those instructions. In the quoted passage from the trial transcript, the prosecutor was reading from the jury instructions. Those same jury instructions explicitly required that, in order to convict O'Brien under Count Two of the indictment, the jury had to find O'Brien executed the 2007 straw buyer scheme, and that the scheme involved a "materially false or fraudulent pretense, representation or promise." The prosecutor read that portion of the jury instructions to the jury as well. C.R. 261 at 1184–85; 1193–94 ("And now I want to walk through the second count. . . . There was a scheme to defraud a financial institution . . . by means of false or fraudulent pretenses, representation, or promises as charged in Count II. Second is that the defendant knowingly executed the scheme by on or about that same date, April 16th, 2007, causing Citibank, a financial institution, to fund a mortgage loan in the amount of approximately $73,000."). O'Brien does not argue that the instructions themselves were incorrect in any way.

O'Brien claims that "[the prosecutor] told the jury that he could prove any of the transactions, which was contrary to law and the judge's instructions before the trial began." R. 30. But that is not what the prosecutor said, and O'Brien's argument conflates the execution of the scheme to defraud element, which the government was required to prove occurred in 2007, with the requirement that it needed to prove only one misrepresentation in furtherance of the scheme. They are completely different elements of the crime.

Even if the prosecutor's closing argument somehow implied that the government did not need to prove the 2007 execution of the scheme, this was a harmless error because the jury instructions contained a clear requirement that O'Brien be convicted on the 2007 executions of the scheme in order to find her guilty on either count. *See* C.R. 229 at 21–22. The Court must "presume that a jury follows its instructions." *Sorich v. United States*, 709 F.3d 670, 677 (7th Cir. 2013).

O'Brien points to a note the Court received from the jury while it was deliberating which asked the Court to "rephrase the final jury instructions on page 22, no. 2," which was the instruction under bank fraud requiring the government to prove that O'Brien "knowingly executed the scheme" in 2007. C.R. 262 at 1319; C.R. 229 at 22. O'Brien argues that this proves that the prosecutor's comment confused the jury about the law. However, about half an hour after receiving the note, and before the parties could convene to discuss how to respond, the Court received another note from the jury stating that it had reached a verdict. C.R. 262 at 1319. To the jury's first note, the Court merely replied "no," it would not rephrase the jury instruction, and the jury replied, "Our verdict remains the same." *Id.* at 1330. Contrary to O'Brien's characterization, this is evidence that the jury not only read the final instruction requiring it to convict on the 2007 executions of the scheme in order for it to find O'Brien guilty on either count, but carefully considered it and followed it. Thus, her claim of prejudice from the prosecutor reading those same instructions to the jury lacks merit.

## B. Prejudicial "Bank Robber" Statement

O'Brien argues that the prosecutor also made prejudicial statements and "inflame[ed] the jury's passions" against her during his rebuttal argument when he said:

> If you're a bank robber and you go and rob a bank tomorrow . . . and you get $5,000—the next week you return the money to the bank—you feel bad about it . . . –you are still a bank robber. Fraud is no different. It's what you do on the front end. If you meet the elements, if you tell those material lies and engage in a scheme to get money, the fact that you repaid the money or that you intended to repay the money, that is not a defense to criminal fraud charges.

C.R. 261 at 1296. O'Brien's attorney did not object to this statement. According to O'Brien, this statement improperly equated her fraud with bank robbery and violent crime and violated the rules of professional conduct for attorneys. Despite being procedurally defaulted without a showing of cause, this statement did not cause the trial to be unfair. "As a general matter, improper comments during closing arguments rarely rise to the level of reversible error." *United States v. Bowman*, 353 F.3d 546, 550 (7th Cir. 2003) (cleaned up). Here, the comment was relatively innocuous. The Court instructed the jury that the closing arguments were not evidence. C.R. 261 at 1179.

Nonetheless, the prosecutor's statement was not improper. He did not openly evoke violent imagery or misstate the law, but rather, made an analogy to respond to the defense's argument that O'Brien had repaid one of the loans at issue and thus lacked the intent to defraud. *See Whitehead*, 263 F.3d at 729 (listing the factors which weigh against a finding of a fair trial deprivation, including that the prosecutor's comments were invited by the defense). This is quite unlike the *Richards* case cited

22

by O'Brien in which the Seventh Circuit found prejudice in the government's rebuttal argument because the prosecutor invited the jury to make a prohibited propensity inference. *United States v. Richards*, 719 F.3d 746, 766-67 (7th Cir. 2013). The prosecutor here did not invoke any of O'Brien's constitutional rights or invite the jury to make any prohibited inferences, but merely made an analogy to elucidate the element of intent. Therefore, the prosecutor's comment comparing an intent to pay back moneys fraudulently received to a bank robber returning money did not deprive O'Brien of a fair trial.

### C. Evidence Tampering

O'Brien next argues that the prosecution engaged in evidence tampering when it presented to the jury Kwan's HUD-1 form for the $73,000 HELOC, which does not list O'Brien's name, together with the first page of Kwan's HUD-1 for the $292,000 mortgage, which showed Kwan's name as the buyer and O'Brien's name as the seller. O'Brien argues the HELOC HUD-1, because it does not list her name, is exculpatory evidence that she was not involved in Kwan's HELOC loan, and that the prosecutor's addition of the first page of the mortgage HUD-1 was a deliberate attempt by the prosecutor to tie her to the HELOC loan and cause the jury to wrongfully convict her. Her attorney did not object, and O'Brien claims her attorney was ineffective for failing to double-check the exhibits the jury received. She further argues that her procedural default on this claim should be excused because she discovered it mere "days" prior to filing her § 2255 petition.

23

O'Brien's claim of evidence tampering, however, is unsupported by any evidence. The Court first notes that it does not appear that this actually happened during the trial. *See, e.g.*, C.R. 268 at 634–36; C.R. 261 at 1232–33. Instead, O'Brien's argument seems to stem from the copies of the exhibits the government used to supplement the record on appeal. C.R. 363, 364-5 (Gov. Exh. 46th St. Sale 2, which is Kwan's HELOC HUD-1 along with the first page of Kwan's mortgage HUD-1). The Court further notes that the HELOC HUD-1 was Bates-stamped 000034 through 000036 and the mortgage HUD-1 was Bates-stamped 000037 through 000039. Both exhibits were admitted into evidence.

Even if the prosecutor did show the jury pages 000034 through 000037, instead of 000034 through 000036, he merely would have included the first page of the next exhibit when he presented Kwan's HELOC HUD-1. This appears to be inadvertent. If the prosecution did it deliberately, it was likely in an effort to show that the first page of the mortgage HUD-1 referred to the HELOC. This is not tampering, but comparison of two duly admitted exhibits. There is no requirement that an attorney display all or certain pages of admitted exhibits in any specific order to the jury.

Even so, a document with O'Brien's name as seller shown together with a document without O'Brien's name does not necessarily convert an exculpatory exhibit into an inculpatory one—it highlights the contrast between the two documents. O'Brien can point to no facts that show that this improperly affected the jury's deliberations or caused her any prejudice. Indeed, the jury would have seen the mortgage HUD-1 regardless because it was also admitted into evidence, and the jury

received copies of all exhibits when it deliberated. O'Brien argues the prosecutor's action prejudiced her because it was the sole "evidence" tying her to Kwan's HELOC. But the government presented strong evidence that O'Brien was intimately involved in the sale—as the seller and seller's attorney, she was present for the closings and prepared some of the documents—and she signed Acknowledgments identifying Kwan and Bartko as buyers. This is evidence enough to demonstrate her knowledge of Kwan's HELOC. Therefore, O'Brien has shown no prejudice.

### D. Distortion of Facts in Evidence

O'Brien next argues that the prosecutor distorted facts in evidence during his closing and rebuttal arguments.

#### 1. 2004 Purchase Application

During his closing argument, O'Brien's attorney argued that O'Brien did not have the intent to defraud when she listed her husband's income in addition to her own on her first mortgage application. *See* C.R. 261 at 1261. In his rebuttal, the prosecutor responded to that argument:

> But what he's doing is just adding a fact that is not consistent with the reality here. Right? You could say, for example, if Chicago were right on the equator, we'd have a hot and tropical climate. Right? But here's the fact . . . Chicago is not on the equator. . . . You can't just add a fact to something and then say it's our reality. We deal with reality here. The reality is that there was no co-borrower listed here. You can't just pretend that there was a second co-borrower listed there and then add that income.

*Id.* at 1292. O'Brien's attorney did not object to this statement. O'Brien argues the prosecutor misstated the evidence because there was evidence that the underwriter requested proof of her total household income, and that the underwriter processed

the loan knowing that O'Brien had included her husband's income on her application. Specifically, she points to her loan application, which stated that the underwriter accepted proof of "all income amounts," and a letter from O'Brien to the underwriter indicating the amount of her "household income." R. 11-1 at 32–36.

Even though this argument is procedurally defaulted, the prosecutor did not misstate the evidence—he made a truthful statement. He specified that there was no co-borrower on O'Brien's loan application. This is supported by the loan documents referred to by O'Brien, which also do not list a co-borrower. O'Brien essentially argues that it was wrongful for the prosecutor to argue to the jury that it should not credit her version of the events or draw certain inferences in her favor. This is typical trial practice and within the proper bounds of trial advocacy. Where there is no fair trial deprivation, there can also be no prejudice.

### 2. Bonnie Pemreze

O'Brien's arguments regarding Bonnie Pemreze, the closing agent, are similarly meritless. O'Brien contends that the prosecutor misstated the evidence during his rebuttal argument when he stated that Pemreze "did not work for Citibank. She was the person who was there at the closing. And so she does not work for Citibank. She's not associated with Citibank. Her job was to handle the closing at the title company." C.R. 261 at 1303–04. The prosecutor apparently said this to respond to O'Brien's counsel's argument that O'Brien did not intend to defraud or conceal Bartko's involvement in the sale because she presented the Acknowledgements between O'Brien, Bartko, and Kwan to Pemreze at the closing.

The prosecutor also stated that Citibank's witness testified that it "never got this document," (referring to one of the Acknowledgements). *Id.* at 1304. O'Brien argues that because witness Patricia Wood testified during trial that Pemreze's role at the closing was to represent the interests of the lender, the prosecutor's statement that Pemreze was "not associated with" the lender was misleading. O'Brien also argues that the prosecution should have called Pemreze as a witness, and that her omission from the trial caused a misstatement of the evidence and deprived O'Brien of the right to cross-examine her. She also takes issue with her attorney failing to object to the prosecutor's statement.

First, the prosecution cannot misstate the evidence by *failing* to call a witness. The government is not obligated to call a witness and may present its case in whatever way and with whatever evidence it desires. *Old Chief v. United States*, 519 U.S. 172, 186-87 (1997) ("the prosecution is entitled to prove its case by evidence of its own choice"). Further, the government violates the Confrontation Clause by failing to call a witness only when it presents "testimonial hearsay" by that witness. *United States v. Vitrano*, 747 F.3d 922, 924 (7th Cir. 2014). O'Brien points to no specific statements presented by the government that constituted testimonial hearsay. Rather, if O'Brien wanted the opportunity to question Pemreze, she could have called her as a witness. But O'Brien does not argue her counsel was ineffective for failing to do so.[10]

---

[10] Throughout her petition, O'Brien also references the prosecution's decision not to call other witnesses with material knowledge, like Bartko and Kwan, who were also available to be called by O'Brien in her case. Any argument that the government's

As to whether the prosecutor misstated the evidence regarding Pemreze's role at closing, the prosecutor stated the truth—Pemreze did not work for Citibank. That Pemreze's role at the title company was to represent the lender's interests at the closing does not mean that she worked for or was "associated with" Citi. Nonetheless, this is an issue of semantics that can hardly be construed as prejudicial. Even if the prosecutor misstated the evidence, the jury had the full benefit of Woods's testimony, which explained Pemreze's role in representing the lender's interests. Second, the prosecutor's statement that Pemreze was not associated with Citi cuts both ways: the jury could have concluded from this statement that O'Brien did tender the Acknowledgments to Pemreze, indicating that she did not have the intent to conceal Bartko's identity, and that O'Brien was mistaken that Pemreze would give the Acknowledgments to the lender. Once again, O'Brien is merely attempting to relitigate her arguments at trial and ask the Court to draw inferences from the evidence in her favor that the jury did not. This is not proper for a § 2255 petition.

### E. Suborning or Presenting Perjury

Next, O'Brien alleges that the prosecution suborned or presented perjury from witness Judy Taylor numerous times throughout the trial in a wrongful and deliberate attempt to tie Citibank, an FDIC-insured institution, to the charges against her, when CitiMortgage, a non-FDIC insured institution, was the true entity at issue. The government did this, according to O'Brien, in order to falsely meet the

---

failure to call them as witnesses deprived O'Brien of her right to a fair trial is unavailing for the same reasons.

"defrauding a financial institution" element of the bank fraud statute and in order for the ten-year statute of limitations to apply to the charges rather than the five-year statute on Count I.

O'Brien's subornation of perjury claims are procedurally defaulted, but she claims she did not discover the "perjury" until she saw various documents upon her release from prison. She further claims the perjury was prejudicial because the government used Taylor's testimony to establish the "financial institution" elements of the crimes, the ten-year statute of limitations, and this Court's subject matter jurisdiction.[11] Even if the procedural default is excused, O'Brien's claims lack merit. Notably, there was strong evidence presented at trial that the fraud affected Citibank, a financial institution. And even if the fraud primarily affected CitiMortgage, the jury considered evidence that it was a Citibank subsidiary and Citibank faced a risk of loss. The Court has already addressed this argument multiple times—during the hearings on her motions to compel, during the pretrial conference, in its opinion denying O'Brien's motion to dismiss the indictment on statute of limitation issues, and in its opinion denying her motion for a judgment of acquittal.

---

[11] Though O'Brien argues that the statute of limitations deprives the Court of subject matter jurisdiction, "statutes of limitations and other filing deadlines 'ordinarily are not jurisdictional'" absent statutory language that the time bar is meant to be jurisdictional. *Musacchio v. United States*, 577 U.S. 237, 246 (2016) (quoting *Sebelius v. Auburn Reg. Med. Ctr.*, 145, 154–55 (2013)). The provision setting the statute of limitations on mail and bank fraud, 18 U.S.C. § 3293, contains no such jurisdictional language. Therefore, the Court had subject matter jurisdiction over O'Brien's case regardless of whether the statute of limitations barred the charges against her.

C.R. 201, 292. That O'Brien couches her argument now in terms of perjury does not raise anything new.

Even so, the Court will discuss why each of O'Brien's claims of perjury fail on the merits. Perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Inconsistent testimony alone does not suffice. *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001). "[A] prosecutor's knowing use of perjured testimony violates the Due Process Clause." *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001) (quoting *Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir. 1999)).

### 1. That Citibank, N.A. was a Successor Lender of the 2004 Purchase Loan

O'Brien first argues that the government suborned perjury when the prosecutor referred to Citibank as "Citi" and then extracted testimony from Taylor that "Citi" was the successor to O'Brien's 2004 loan, when the successor was really CitiMortgage. Specifically, O'Brien takes issue with this exchange:

> Q. [AUSA Madden] And I'd like to specifically direct your attention to certain exhibits. I'm just going to ask you if they're true and accurate copies of Citi records. And when I refer to "Citi," I'm referring to Citibank.
>
> A. [Judy Taylor] Of course.

C.R. 258 at 611. Fourteen pages into the trial transcript later, the prosecution asked Taylor:

> Q. So you testified earlier that Citi was the successor lender on this loan.
> A. Yes sir.
> Q. Meaning they purchased the loan from another bank.
> A. Correct.

*Id.* at 625. O'Brien argues that the government knew this testimony was perjured because it purposefully defined "Citi" to mean "Citibank" and extrinsic evidence showed that CitiMortgage was the successor on the loan, not Citibank. She further points to a press release regarding Citibank's rebranding as "Citi." But O'Brien has presented no evidence that Taylor willfully provided, or that Madden willfully suborned, false testimony. At worst, it seems they were inconsistent with their references to the various Citi entities.

Nonetheless, the error, even if there was one, was not prejudicial. Witnesses testified that CitiMortgage was wholly owned by Citibank. R. 260 at 1067–68.[12] Most importantly, the jury was not required to find fraud affecting a financial institution as to the initial purchase of the 46th Street property in 2004 in order to convict O'Brien. Though she argues that the government used this background to prove her knowledge that the funding for the 2007 loans would come from Citibank both to the jury and on appeal, there was sufficient evidence by which a jury could have found

---

[12] In her reply, O'Brien points to an affidavit by Richard M. Bowen III, an ex-CitiMortgage Vice President. This exhibit shows an organizational chart for high-level employees of the Consumer Lending Group at Citi in 2007, and that the CitiMortgage CEO reported to the CEO of the "Consumer Lending Group." R. 30 at 123. But as Mr. Bowen acknowledges on page 100, this organization chart is not exhaustive, and is only meant to demonstrate who reported to whom, not the ownership structure of the various Citi entities. The SEC 10-K further establishes that CitiMortgage was a subsidiary of Citibank. *See, e.g.*, R. 11-2 at 81 (listing CitiMortgage as a subsidiary of Citibank, which is listed as a subsidiary of Citigroup).

O'Brien had the requisite knowledge because of O'Brien's extensive experience in the real estate industry as a loan originator, mortgage consultant, licensed broker, and owner of a real estate company. *See O'Brien*, 953 F.3d at 459–60.[13]

### 2. That Taylor's Testimony in *United States v. Vani*, 13 CR 0167, Contradicts Her Testimony that CitiMortgage Was a Wholly-Owned Subsidiary of Citibank

O'Brien next argues that Taylor's testimony that CitiMortgage was a wholly-owned subsidiary of Citibank in April 2007 is contradicted by her testimony in another case, *United States v. Vani*, 13 CR 0167. Specifically, in *Vani*, Taylor testified that she worked for CitiMortgage in 2007 and 2008, and that, at the time, CitiMortgage was a wholly-owned subsidiary of Citigroup, Inc. ("Citigroup"), and that it later became a subsidiary of Citibank. O'Brien also cites to the indictment in *United States v. DiCosola*, 12 CR 0446, which states that CitiMortgage was a wholly-owned subsidiary of Citigroup. The importance of this discrepancy, O'Brien argues, is that if CitiMortgage were owned by Citigroup rather than Citibank, then it was a subsidiary of a different non-FDIC-insured entity, which further defeats the jurisdictional element of the bank fraud statute.

The Court does not find evidence of perjury or prejudice. First, Taylor's testimony in O'Brien's case was bolstered by Katherine Greenwood, business control

---

[13] The Seventh Circuit held that there was sufficient evidence of O'Brien's knowledge of a financial institution's involvement in part because "[s]he had prior experience working with Citibank in particular." *United States v. O'Brien*, 953 F.3d 449, 459 (7th Cir. 2020). Though her first loan was actually serviced by CitiMortgage, not Citibank, the Seventh Circuit's holding found sufficient evidence of her knowledge based on her experience in the mortgage industry as well. *Id.*

manager for Citibank, who also testified at trial that CitiMortgage was wholly owned by Citibank in 2007. R. 260 at 1067–68 ("[W]e're all under the umbrella of Citibank. That is why I may work for CitiMortgage . . . but I'm paid by Citibank. So we're wholly owned by Citibank as CitiMortgage."). Further, O'Brien's own trial exhibit 208, Citigroup's SEC 10-K for the year 2007, acknowledges that its portfolio of mortgages was comprised of its US Consumer Lending and US Retail Distribution Groups within Citibank, and other § 2255 reply brief exhibits detail that CitiMortgage was within the US Consumer Lending Group and a subsidiary of Citibank. *See* R. 30 at 100; Citigroup's 2007 Annual Report on Form 10-K, at 51.[14] Taylor's testimony in *Vani* was not contradictory because CitiMortgage was a wholly-owned subsidiary of Citibank, which was a wholly-owned subsidiary of Citigroup. R. 11-2 at 81 (SEC 10-K form, listing CitiMortgage as a subsidiary of Citibank, which is listed as a subsidiary of Citigroup). Even if it were contradictory, the evidence in this case cuts both ways, and it is not the Court's place to weigh competing evidence on a § 2255 petition.

### 3. That CitiMortgage Is the Loan Servicing Arm of Citibank

O'Brien also argues that the prosecutor suborned perjury by having Taylor agree that CitiMortgage is the "loan-servicing arm of Citibank." C.R. 258 at 656. She argues that this created the false impression that CitiMortgage was not in the mortgage lending business, but rather merely serviced loans for Citibank. For

---

[14] O'Brien attaches selective portions of this document to her Petition. The full report can be found at https://www.citibank.com/citi/investor/data/k07c.pdf.

starters, the prosecution was not testifying. If the question called for a different answer than the one given, that was for the witness to so testify. Even so, O'Brien fails to show that this testimony is misleading, let alone perjured or known by the prosecutor to be false. She does not argue, for example, that "loan servicing" and "lending" are mutually exclusive. Nonetheless, this testimony could not have been prejudicial because multiple witnesses testified during trial that CitiMortgage was in the mortgage lending business. *See, e.g.*, C.R. 256 at 43 (witness Michelle Meyer testifying that CitiMortgage was a lender).

### 4. That the Losses from the 2007 Loans Were Incurred by Citibank

O'Brien's argument that Taylor committed perjury in stating that the losses from the 2007 loans were borne by Citibank similarly lacks merit. O'Brien points to three pieces of evidence that allegedly show that Taylor was lying. First, she points to a letter from Tania Cwach, which states that "the loans sold in October 2010 for $50,000, resulting in a loss to CitiMortgage." R. 10-2 at 59. Second, she cites again to Taylor's testimony in *Vani*, 13 CR 167, in which she testified that CitiMortgage stands to lose if a borrower defaults on a CitiMortgage loan. 13 CR 167, ECF no. 225 at 191; 2015 WL 764025, at *2. However, neither of these first two pieces of evidence are inconsistent with Taylor's testimony, because Taylor admitted that the 2007 loans in O'Brien's case were funded by CitiMortgage, and that CitiMortgage is in turn funded by Citibank. Taylor further testified that a loss to CitiMortgage is a loss to Citibank. C.R. 258 at 677–78 ("then that's a loss to us, to Citibank."). The third piece of evidence—the IRS 1098 document which shows that Kwan paid mortgage interest

34

to CitiMortgage—is wholly irrelevant to Taylor's testimony. R. 10 at 43; R. 10-2 at 62. This document says nothing about how the loan was funded or which entity absorbed any losses. Therefore, O'Brien has not made the threshold showing that Taylor made a false statement to prove that she committed perjury or that the prosecution suborned perjury on this subject.[15]

### 5. That the Funding of the 2007 Loans Originated in a Citibank Cash Treasury Account

O'Brien next takes issue with Taylor's testimony that Kwan's loans to purchase the 46th Street property were funded by a "Citibank treasury account." C.R. 258 at 740. She first complains of Citi's failure to produce responsive documents to her subpoenas on this issue, of which the Court is already aware. What Citi's reluctance to produce documents does not show, however, is that Taylor's testimony was false. As the government explained, Citi's piecemeal production of relevant documents was as detrimental to its preparation for trial as it was to O'Brien's. The government even moved for a continuance because of Citi's last-minute document production.

Second, O'Brien argues that there is evidence that Citigroup's division involved in asset securitization of real estate mortgages and student loans, the U.S. Consumer Banking Group, funded Citigroup investments, and that the loans at issue here were

---

[15] O'Brien also argues that the restitution order in her case is invalid because Citibank experienced no loss. R. 10 at 44. Arguments relating to restitution orders are not proper to a § 2255 petition because § 2255 only challenges custody. *Virsnieks v. Smitth*, 521 F.3d 707, 717-21 (7th Cir. 2008); *Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997) (challenge to restitution award could not be brought in § 2255 petition because it "does not rise to the level of a constitutional violation."). Even so, this argument fails for the reasons discussed in this section.

funded by the CitiMortgage Alternative Loan Trust ("CMALT"), another non-FDIC entity. In support, she points to Citigroup's SEC 10-K for the year 2007 but does not argue which portion of it supports her arguments. O'Brien's attorney attempted to offer it at trial, but the Court ruled that the majority was irrelevant, and ultimately allowed three pages of it to be admitted (out of over 300). O'Brien's attorney discussed it in his closing:

> And it talks about the Citigroup segments. Citigroup, not Citibank. Citigroup. Then . . . there's a list of all of the Citigroup subsidiaries. . . . So who are the subsidiaries of Citigroup? Is CitiMortage a subsidiary of Citibank, as Judy Taylor said, as Katie Gatewood said? Or is CitiMortgage, Incorporated and Citibank, N.A., a subsidiary of Citigroup?

C.R. 261 at 1276.

She also argues that the evidence shows that Citibank "was never anything more than a compensated paying agent and a mere custodian of the mortgage and note of Kwan's $73,000 loan without any beneficial interest or risk of loss . . . ." R. 10 at 33. In support, she points to various sale documents which reference a "HELOC Third Party," and speculates that the third party must have been Citibank. *See, e.g.*, R. 10-2 at 52. She also cites the government's funding document, which states that Citibank was acting "for USCBG," the U.S. Consumer Banking Group. C.R. 258 at 740. O'Brien finally argues that the government was aware of the existence of the CMALT because the Department of Justice and Citigroup entered into a settlement agreement relating to statements Citigroup made to investors regarding the quality of mortgage-backed securities in 2007, and the CMALT is listed, along with pages of other trusts, in an appendix to the settlement agreement. R. 10-1 at 90. The

settlement agreement between the Department of Justice and Citigroup, however, says nothing about the funding of CitiMortgage products or loans.

Evidentiary issues with all these documents aside, none of them show that Taylor's testimony was perjured. For example, the sale documents undermine O'Brien's argument and evidence that Citibank funded the loan because they explicitly instruct that, if the loan failed to close, the underwriter should return the money to Citibank. R. 10-2 at 52. Second, that Citibank was acting for the U.S. Consumer Banking Group or was a "paying agent" (this is unclear from the documents) does not mean it did not stand to lose or be at risk from the transaction.

Further, O'Brien's unsupported inference that the CMALT funded the 2007 loans is contradicted by one of the exhibits to her reply brief, an affidavit by Richard M. Bowen, a former CitiMortgage Senior Vice President and Chief Underwriter, in which he explains that the CMALT was a securitization trust used to pool and *sell* mortgage loans that already existed, not to fund them in their outset, as O'Brien claims. *See* R. 30 at 104 ("[M]ortgage loans were sold through securitization conduits by Citimortgage. . . . A total of $7 billion of total securities were sold annually through two securitization trusts. . . . Citimortgage Alternative Loan Trust Series ('CMALT'). This series contained 'Alt-A' mortgages . . . ."); *CitiMortgage, Inc. v. Okahata*, 2015 IL App (2d) 140651-U, ¶ 12 (case cited by O'Brien that details how a mortgage was placed into the CMALT to be "sold on the open market."). The Court has seen no evidence that suggests that Kwan's HELOC was placed in the CMALT to be

securitized and sold after he obtained it.[16] And even if it was pooled with other loans in the CMALT, it would not have mattered because the risk occurred upon the issuance of the loan.

In short, none of these documents change the fact that Taylor's testimony, and the documents accompanying it, clearly and systematically traced the funds from Citibank's cash account to the title company for Kwan's loans, and evidenced that Citibank was CitiMortgage's parent company. *See* C.R. 258 at 667–77. The jury credited that evidence, despite O'Brien's attorney presenting this same argument regarding Citi's corporate structure at trial. In all, O'Brien's argument is an improper attempt to request that the Court weigh the evidence differently than the jury ultimately did. The Court refuses to do so and does not find any evidence that Taylor's testimony was false, let alone that it was willfully perjured or knowingly procured to wrongfully convict O'Brien.

### 6. That the HELOCs Offered by CitiMortgage Were Citibank Products

O'Brien's final claim of perjury relates to Taylor's testimony that HELOCs offered by CitiMortgage are Citibank products. The evidentiary support for the alleged falsity of Taylor's testimony is dubious at best. O'Brien cites to a 2008 press release that states that CitiMortgage would no longer be offering HELOCs. She argues that this document shows that Citi Home Equity, another Citigroup entity,

---

[16] Therefore, any argument that the government wrongfully withheld the CMALT document or that O'Brien's attorney was ineffective for failing to present the same document lacks merit.

funds HELOCs. But this document postdates the events in this case and does not contradict that Kwan's April 2007 HELOC was offered by CitiMortgage and ultimately funded by Citibank. She also cites to two pages regarding Kwan's loans, which show that Citi Home Equity did not participate in the foreclosure proceedings for the 46th Street Property. Instead of showing that Citi Home Equity was not involved in Kwan's loans, O'Brien speculates that this document instead shows Citi Home Equity had already "made its money" before the foreclosure. But this speculation is not at all clear from the documents, which do not name Citi Home Equity at all. R. 10-2 at 98-101.

She finally cites extensively from a class action complaint from litigation in the United States District Court for the Southern District of New York, which describes HELOCs as CitiMortgage and Citi Home Equity products. R. 10 at 48-51. She does not show that the allegations in that complaint are true or provide any information as to the disposition of that case. Nor do the general allegations contained in that complaint contradict Taylor's trial testimony as to Kwan's specific HELOC. She also does not provide any evidence that Taylor intended to lie or that the prosecution intended to suborn perjury. Therefore, this claim of suborning perjury meets the same fate as those before it.

### F. Suppressing Exculpatory Information in Violation of Brady

O'Brien next claims that the prosecution committed violations of *Brady v. Maryland*, 371 U.S. 812 (1962), by failing to turn over forms related to the CMALT and a quitclaim deed executed between Bartko and Kwan in August 2008. Once

39

again, this claim is procedurally defaulted, as O'Brien did not raise this issue in her posttrial motions or on appeal. She claims she did not discover these documents until after she was released, and that the government's failure to disclose them was prejudicial.

Nonetheless, to establish a *Brady* violation, O'Brien must prove that the evidence at issue was favorable to her because it was either exculpatory or impeaching, that the evidence was suppressed by the government, and that the denial of the evidence was prejudicial. *United States v. Kimoto*, 588 F.3d 464, 474 (7th Cir. 2009). Withholding of evidence is prejudicial in a constitutional sense where the evidence is material, or where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J.)). However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality.'" *United States v. Villasenor*, 664 F.3d 673, 683-84 (7th Cir. 2011) (quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)). *Brady* does not apply to information or evidence the defense already has. *Agurs*, 427 U.S. at 103.

### 1. CMALT Forms

O'Brien first argues that a "Pooling and Servicing Agreement" for the "CMALT 2007-A5" should have been given to her by the prosecution. The government's response brief incorrectly identifies this document as the 2007 Citigroup SEC 10-K

that O'Brien's attorney presented at trial. Rather, the portions of the purported Pooling and Servicing Agreement that O'Brien reference detail Citibank's and CitiMortgage's respective roles regarding the CitiMortgage Alternative Loan Trust 2007-A5. O'Brien argues this document is exculpatory because she alleges the CMALT funded the 2007 loans and because the agreement states that Citibank was a "paying agent" of the CMALT, that Citibank was not taking any risk of loss by servicing the CMALT, and that the sponsor of the CMALT was not Citibank.

O'Brien admits that this document was publicly available and there is no evidence the government suppressed it. *United States v. Shields*, 789 F.3d 733, 747 (7th Cir. 2015) (denying *Brady* claim because information was publicly available); *United States v. Mahalik*, 498 F.3d 475, 478-79 (7th Cir. 2007) ("*Brady* requires disclosure only of exculpatory material known to the government but not to the defendant,") (internal quotation omitted).

But there is a more fundamental problem: this document is not material. O'Brien speculates, without evidence, that the CMALT funded the 2007 loans. Rather, as previously explained, evidence provided by O'Brien shows that the CMALT was a securitization conduit used to sell *existing* mortgage loans that did not meet certain underwriting criteria; it was not involved in the initial funding of Citi mortgages. *See* R. 30 at 104 (Existing "mortgage loans were sold through securitization conduits by Citimortgage. . . . A total of $7 billion of total securities were sold annually through two securitization trusts [including] . . . Citimortgage Alternative Loan Trust Series ("CMALT"). This series contained 'Alt-A' mortgages . .

. .”). Citibank and CitiMortgage's roles and liabilities as to the CMALT are irrelevant to the initial funding of the 2007 loans at issue in this case, and there is no reasonable probability this document would have changed the outcome of the trial. Therefore, it was not material, and the government had no duty to disclose it to her.

### 2.    Quit Claim Deeds Executed by Bartko

At trial, to prove the theory that Kwan was a straw buyer of the 46th Street Property, the government offered a May 2007 quitclaim deed from Kwan to Bartko for $10 consideration. O'Brien argues that the government violated *Brady* by failing to disclose another quitclaim deed conveying title of the 46th Street Property from Bartko *back* to Kwan in August 2008, over a year later, and that this document disproves the government's straw buyer theory.

But this was not a *Brady* violation because O'Brien was informed through the discovery prior to trial that Bartko gave the title of the 46th Street Property back to Kwan. *See* R. 20-5 (notes regarding an interview with Bartko, which states that she gave the 46th Street Property back to Kwan a year after the straw buyer transaction because she could not keep up with maintenance and mortgage payments); *Agurs*, 427 U.S. at 103 (*Brady* does not apply to information or evidence the defense already has). O'Brien further admits that the quitclaim deed from Bartko back to Kwan is a public record. *Shields*, 789 F.3d at 747 (denying *Brady* claim regarding publicly available information). Even so, the 2008 quitclaim deed is not exculpatory—it occurred fifteen months after the straw buyer transaction, the interview notes state that Bartko only gave the property back to Kwan because she could not afford to

upkeep the property, and the strong weight of the evidence is that O'Brien participated in the initial straw buyer transaction in 2007.

### G. Misrepresenting Citigroup, Inc., its Corporate Structure, and Investment Vehicles/Funding Misrepresentations

O'Brien's final two claims of prosecutorial misconduct do not raise any new arguments. They restate at length her prior arguments regarding (a) the alleged subornation of perjury; (b) Citi's corporate structure; (c) Citi's reluctant and piecemeal production of documents in response to her subpoenas; (d) the government's alleged *Brady* violations; (e) the 2007 SEC 10-K; and (f) Taylor's alleged contradictory statements in *Vani*. She further alleges, without pointing to any specific examples, that the prosecutor engaged in an improper narrative in his questioning of all the witnesses, that O'Brien did not know or intend that the fraud affected a financial institution,[17] and that the Citi financial documents the government used at trial were confusing. Lack of evidence is not a constitutional claim, nor is the confusing nature of the Citi documents a basis for questioning her conviction. The Court has been clear in prior opinions in her case that there was sufficient evidence to support O'Brien's conviction as to the financial institution element and that there was significant evidence that Citibank funded the loans at issue and suffered a loss as a result of O'Brien's conduct.

---

[17] *O'Brien*, 953 F.3d at 458 ("[N]othing in [§ 1344(2)] additionally demands that a defendant have a specific intent to deceive a bank. And indeed, imposing that requirement would prevent § 1344(2) from applying to a host of cases falling within its clear terms.") (quoting *Loughrin v. United States*, 573 U.S. 351, 356–57 (2014)).

She also details allegedly improper, secret communications and telephone conversations between the government and Citi representatives regarding the government's subpoena requests. R. 10 at 47–50. But the communications appear to be innocent and do not evidence some sort of conspiracy by the government to suppress any documents. She further fails to argue how the government's communications with the Citi representatives violated her constitutional rights or affected the jury's verdict. And, indeed, the government is free to interview witnesses to prepare its case for trial without the defendant present. *United States v. Linder*, No. 12 CR 22, 2013 WL 812382, at *44 (N.D. Ill. Mar. 5, 2013) ("The prosecution and the defense have an equal right to interview witnesses in criminal proceedings.").

O'Brien also recites at length portions of the transcript of the pre-trial hearing on her motion to compel. She alleges much of Taylor's testimony in that hearing was false for the same reasons as discussed in the subornation of perjury sections. Her arguments fail for the reasons laid out in those sections.

Finally, O'Brien incorporates her pre-trial motion to dismiss the indictment on the basis of perjured grand jury testimony. C.R. 159. O'Brien does not detail why the Court's denial of that motion was wrong at that time, nor did she appeal it. She provides no explanation for the procedural default and fails to provide any new facts or arguments which would cause the Court to revisit its ruling.

## III. Ineffective Assistance of Counsel

Next, O'Brien argues that her trial and appellate counsel were ineffective. Constitutionally ineffective assistance of counsel occurs when "counsel's performance

44

was deficient." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To be considered deficient, counsel's performance must have fallen "below an objective standard of reasonableness." *Id.* at 688. Courts view such claims with a "strong presumption" that a petitioner's attorney rendered adequate representation, *United States v. Meyer*, 234 F.3d 319, 324-25 (7th Cir. 2000) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986)), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689. The petitioner must also show that "[counsel's] deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 688. In this context, "prejudice" means "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. This standard applies equally to trial and appellate counsel, though to show appellate counsel was constitutionally deficient, O'Brien must show that but for his inadequacy, "there is a reasonable probability that [her] case would have been remanded for a new trial or that the decision of the . . . trial court would have been otherwise modified on appeal." *Howard v. Gramley*, 225 F.3d 784, 790 (7th Cir. 2000).

According to O'Brien, her trial attorney was ineffective for (a) failing to understand and argue the subject matter jurisdiction, financial institution element, and statute of limitation issues as discussed at length in this opinion; (b) failing to present and argue certain allegedly exculpatory pieces of evidence; and (c) failing to object to the government's supposedly prejudicial arguments and misstatements of fact and law. She argues that her trial and appellate counsel were both ineffective for failing to make certain arguments, such as her alleged inability to view Kwan's loans.

She also contends that her appellate counsel wrongfully stated that she had prior dealings with Citibank, and that the Seventh Circuit based its decision upholding her conviction on that statement.

### A. Failing to Understand and Argue the Subject Matter Jurisdiction, Financial Institution Element, and Statute of Limitation Issues

O'Brien does not demonstrate that her trial counsel's performance fell below an objective standard of reasonableness. She in fact undermines her own argument by admitting that her "trial attorney worked very hard on the pre-trial motions, meticulously researching the issues of duplicity, *statute of limitations*, pre-indictment delay, perjured testimony before the grand jury, etc." R. 10 at 86 (emphasis added). Her attorney vigorously pursued numerous pretrial motions—to dismiss the indictment on three different grounds, C.R. 46, 139, 141, and to compel, C.R. 77, 100, 109, 124, 132, 152—many on the very same issues O'Brien raises regarding the financial institution element and the statute of limitations. Her attorney also argued in his closing argument at length that the government had not proven the financial institution element. C.R. 261 at 1275–79.

Regardless, O'Brien's attorney's allegedly deficient performance on this matter could not have prejudiced her because the evidence was sufficient to support her conviction. As already discussed in this opinion, the government adequately met its burden of proving the financial institution element and establishing the predicate for a ten-year statute of limitations.

### B. Failing to Present and Argue Exculpatory Evidence

O'Brien next argues that her counsel was deficient for failing to present certain allegedly exculpatory evidence and argue certain inferences from that evidence. Specifically, she alleges her counsel did not properly emphasize the importance of the "Acknowledgement" documents. O'Brien argues that these documents prove that she did not conceal Bartko's involvement to the lenders. She also contends that her counsel should have argued that various unspecified underwriting documents allegedly show that she gave the underwriter her tax returns. Finally, she states, "[t]here were documents that affirmatively prove that Petitioner could not have known of Citibank, N.A.'s involvement in Kwan's loans, yet, Petitioner's attorney failed to explain these documents to the jury." She also argues that his opening and closing statements were "incoherent," and complains about "attorney swapping" and the fact that she felt her attorneys ignored her.

First, the Court is mystified by O'Brien's claim that her attorney did not emphasize the Acknowledgments. Her trial counsel argued extensively in his closing argument about the Acknowledgments. *See* R. 261 at 1271–73 ("So Jessica, in order to conceal the fact that Maria Bartko was a buyer, brings a document to closing identifying Maria Bartko as a buyer and which she's listed also as an interested third party. Wait a minute. That's concealment? You know, that's the opposite of concealment. That's disclosure."). The Court cannot say that his argument fell below an objective standard of reasonableness.

The problem with O'Brien's arguments regarding the other allegedly exculpatory documents is that she does not provide a single citation to any of them,

nor, as far as the Court can tell, does she provide them as exhibits to her Petition. The Court therefore cannot tell whether the referenced documents exist or to the extent that they are exculpatory. O'Brien does not describe how, then, she was prejudiced by her attorney's failure to present any of the documents or how the jury would have come to any different conclusion if her attorney had only introduced them or emphasized them better. The Court can only conclude that his failure to present these documents was a matter of trial strategy. *Wright v. Cowan*, 149 F. Supp. 2d 523, 534 (C.D. Ill. 2001), *aff'd*, *Wright v. Walls*, 288 F.3d 937 (7th Cir. 2002) ("deference must be accorded to strategic decisions made by counsel after suitable investigation.").

As to her general complaints about the style of her attorney's opening and closing arguments, that her attorneys "swapped," or that they ignored her suggestions on strategy, she again provides no specifics for the Court to analyze. She does not describe how her attorney's arguments were "incoherent," nor does she allege that if a different attorney on her team had conducted the arguments, the outcome would have been different. *Argyropoulos v. City of Alton*, 539 F.3d 724, 739 (7th Cir. 2008) (undeveloped and unsupported arguments are waived even when those arguments raise constitutional issues). In sum, these complaints fall within the ambit of trial strategy, and they are not a basis for an ineffective assistance of counsel claim.

## C. Failing to Object to the Government's Misstatements

O'Brien's arguments regarding her counsel's failure to object to the government's alleged factual and legal misrepresentations and prejudicial

statements are also meritless, because, as previously addressed, the statements already identified in this Opinion were not actually misrepresentations, nor were they prejudicial. Her counsel could not have been deficient in failing to object to statements that were not improper. *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001) ("failing to object to admissible evidence cannot be a professionally 'unreasonable' action, nor can it prejudice the defendant against whom the evidence was admitted. Indeed, only in a rare case will a court find ineffective assistance of counsel based upon a trial attorney's failure to make an objection that would have been overruled . . . .") (cleaned up). But as the Court already described, even if the statements at issue were improper, her attorney's failure to object did not prejudice her, as the statements were all relatively minor given the weight of the evidence against her.

But she also states that her attorney was supposedly deficient for failing to object to a smattering of additional "misstatements" not addressed in her allegations of prosecutorial misconduct. She provides no analysis, however, to describe how her attorney's failure to object to these additional statements was prejudicial to her, and indeed, they were not misstatements, but rather, inferences from the evidence that contradicted her theory of the case. *See Argyropoulos*, 539 F.3d at 739 (undeveloped and legally unsupported arguments are waived).

These additional statements include the prosecutor's use of the term "dumping the property," which allegedly wrongfully implied that O'Brien was in danger of foreclosure. The Court does not think that the term "dumping the property"

necessarily implies that a property is in danger of foreclosure—its plain meaning is that a person is attempting to get rid of it because it is unwanted. *See Dump (verb)*, Merriam-Webster online (2023), found at https://www.merriam-webster.com/thesaurus/dump ("as in to unload, to get rid of as useless or unwanted"). She also challenges her attorney's failure to object to the prosecutor's characterization of the checks as "kickbacks," which she says is a legal term. This was not wrongful because it was the theory of the government's case. *United States v. Hancock*, 604 F.2d 999, 1002 (7th Cir. 1979) ("we believe that the term kickback has a commonly understood meaning," and "[t]he term is commonly used and understood to include 'a percentage payment . . . for granting assistance by one in a position to open up or control a source of income,') (quoting Webster's Third New International Dictionary (1966)). Other statements include the prosecutor's arguments that O'Brien's checks to Bartko were issued before closing (though she fails to acknowledge that two of the checks were dated the day before closing), and that it was O'Brien's idea to execute the quit claim deed from Kwan to Bartko (this was merely an inference that could have been drawn from the evidence). Finally, she challenges the prosecutor's suggestion that there was no work that needed to be done on the houses, which, she alleges, undermined her theory that the checks were in consideration of work that needed to be done to the properties. Again, this was merely a contrasting inference to be drawn from the evidence, not a misstatement. O'Brien's attorney's conduct was not deficient in failing to object to these identified statements, as they were not misstatements, and he was free to argue otherwise before the jury.

### D. Failing to Make Certain Arguments

O'Brien next argues that her attorneys were deficient for failing to make certain arguments; namely, that she could not have seen Kwan's loan documents even if she wanted to. She also argues her appellate counsel was ineffective for failing to make this same argument on appeal. He did, however, argue this point, and the Seventh Circuit aggressively questioned the government about it. R. 10-1 at 23-24 (transcript of O'Brien's appellate counsel's oral argument: "[T]here was something on one form that said Citibank and that had to do with Mr. Kwan's loan, but she never saw his loan documents because she's not entitled to,"); *id.* at 34 (Chief Judge Wood questioning the government attorney: "I don't know how a jury can conclude [O'Brien's knowledge of Citibank] without some evidence . . . that she looked at Kwan's form.").

O'Brien also argues her appellate counsel was ineffective because he misstated that she had prior dealings with Citibank as the successor on her initial mortgage loan for the 46th Street property, when the successor was really CitiMortgage, and that the Seventh Circuit upheld her conviction based on the misstatement. This may have been an incorrect statement by her counsel given the Seventh Circuit's focus on this issue, and the Seventh Circuit did indeed conclude that a rational jury could find "that O'Brien knew that the funds from the April 2007 loans originated from Citibank" in part because of "O'Brien's experience . . . with Citibank in particular." *O'Brien*, 953 F.3d 449, 459 (7th Cir. 2020). But the Seventh Circuit also cited the standard practice of Citibank funding CitiMortgage loans, O'Brien's extensive

background in the real estate industry, and O'Brien's intimate involvement in every step of the 2007 transaction as further evidence upon which the jury could have relied to find that she had knowledge that Citibank would be funding the loans. *See O'Brien*, 953 F.3d at 459–60 ("the jury could reasonably have connected O'Brien's background and experience with the other evidence regarding the relationship between Citibank and CitiMortgage, as well as the identification of Citibank as the lender on loan documents and O'Brien's participation in the fraudulent scheme (and in the 2007 transactions in particular), to conclude that O'Brien knew the funds originated from Citibank."). Therefore, even if her appellate attorney had correctly stated that she previously worked with CitiMortgage rather than Citibank, this Court does not believe it would have changed the outcome of her appeal.

## IV. Evidentiary Hearing Denied

In § 2255 cases, the Court must grant an evidentiary hearing if the petitioner "alleges facts that, if proven, would entitle [her] to relief." *Martin v. United States*, 789 F.3d 703, 706 (7th Cir. 2015) (citing *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006). Such a hearing is not required if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Neither is a hearing required if the petitioner makes allegations that are "vague, conclusory, or palpably incredible," rather than "detailed and specific." *Kafo*, 467 F.3d 1063, 1067 (7th Cir. 2006). Here, the Court denies O'Brien's § 2255 Petition because the motions, files, and records of the case "conclusively show that" she is not

entitled to relief and because her claims are general, vague, and conclusory. Therefore, her request for an evidentiary hearing is denied.

## V. Certificate of Appealability

Under the AEDPA, a certificate of appealability "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). This requires the petitioner to demonstrate that reasonable jurists could debate whether this Court should have resolved the petitioner's claims differently or that the issues were "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack*, 529 U.S. at 484) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). The Court declines to issue a certificate of appealability as O'Brien cannot make the requisite showing for her claims.

## CONCLUSION

O'Brien's Section 2255 Petition generally contains arguments attempting to convince the Court to draw inferences from the evidence in her favor; inferences the jury rejected. There is no basis for the Court to re-weigh the evidence here. For these reasons and because O'Brien did not suffer constitutional violations, O'Brien's Petition for relief under Section 2255, R. 10, is denied, and the Court declines to issue a certificate of appealability.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: March 20, 2023